UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: |
| | ) | |
| GS LABS LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| **Serve Registered Agent:** | ) | |
| Capitol Corporate Service, Inc. | ) | |
| 222 E. Dunklin St., Ste. 102 | ) | |
| Jefferson City, MO 65101 | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

COMES NOW Plaintiff, Blue Cross and Blue Shield of Kansas City ("Plaintiff" or "Blue KC"), by and through undersigned counsel, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, or in the alternative Mo. Rev. Stat. Section 527.010, *et seq.*, and for its Complaint for Declaratory Judgment and Injunctive Relief, states as follows:

1. Defendant GS Labs LLC ("Defendant" or "GS Labs") is intentionally engaging in an abusive scheme to exploit the COVID-19 pandemic by duping health insurers into paying thousands of COVID-19 diagnostic testing claims at grossly inflated rates.

2. Defendant's scheme is, at its core, quite simple. Pursuant to laws Congress enacted in response to the global pandemic, health insurers and plans must cover certain COVID-19 diagnostic testing. Prices for the required coverage could be established in one of two ways: the provider and insurer may negotiate a price or, if negotiations do not result in agreed-upon rates, the price would

1

then be the provider's publicly posted "cash price." CARES Act § 3202(a).[1] A "cash price" is the price a person that pays cash, or a cash equivalent, would pay for that test. *See* 45 C.F.R. § 182.20. Instead of posting reasonable and accurate cash prices and negotiating with Blue KC in good faith if any pricing dispute remained, Defendant GS Labs posted inaccurate and wildly excessive "cash prices". Defendant then refused to accept reasonable reimbursement rates and now demands that Blue KC pay rates many times higher than the rates other providers charge for the same services.

3. GS Labs's submission of rapid antigen claims illustrates the scheme. Rapid antigen tests are one of several types of COVID-19 tests GS Labs claims to have performed for Blue KC's members. GS Labs submitted over 10,000 claims for COVID-19 rapid antigen testing to Blue KC. These tests can be purchased at wholesale for under $20 per test and sometimes for as little as $11 per test. The Medicare program typically reimburses providers $41.38 to administer this type of test. Other providers charge as little as $35. However, GS Labs's posted cash price for the same test is $380 - *approximately ten times higher than reasonable rates and twenty times higher than the wholesale cost.* In negotiations with Blue KC, GS Labs insisted it was entitled to its posted cash price of $380 per test and offered only small discounts in exchange for prompt payment.

4. The Kansas Insurance Department commented in a letter describing GS Labs's practices, "**[i]f these astronomical costs charged by unscrupulous providers are borne by the health plans and insurers without recompense, consumers will ultimately pay more for their health care as health insurance costs will rise**." **Exhibit A, page 2.** (emphasis in original).

5. Moreover, GS Labs's purported cash prices are not only excessive and objectively unreasonable, but its purported cash prices are also intentionally deceptive. While GS Labs represented to insurers that its established and true cash prices were hundreds of dollars per test, GS

---

[1] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020).

Labs had, in fact, not established any cash price. GS Labs refused prospective patients that sought to pay cash. Then, when GS Labs updated its website to reflect that it accepted cash-paying customers, it represented that it would accept cash payments at rates only a fraction of the posted cash price.

6.    In total, GS Labs submitted over $9.2 million[2] in inflated and otherwise improper claims to Blue KC.  Blue KC refuses to submit to GS Labs's demands and files the instant action.

7.    A ripe and justiciable controversy exists between the parties, in part, because GS Labs has submitted millions of dollars of claims for reimbursement to Blue KC, GS Labs continues to demand payment of these claims, and the claims are not payable for reasons that include the following:

a.)    GS Labs knowingly and willfully concealed or misrepresented material facts or circumstances relating to the claims including, but not limited to, the true cash prices for the services in question;

b.)    GS Labs failed to comply with Section 3202 of the CARES Act which requires that GS Labs post accurate cash prices for diagnostic tests;

c.)    GS Labs violated its duty of good faith and fair dealing when it purported to set its "cash prices" for COVID-19 diagnostic tests at unreasonable rates;

d.)    The claims GS Labs submitted to Blue KC amount to unlawful price gouging and disaster profiteering; and

e.)    Other reasons described herein and as may be described in subsequent pleadings.

8.    Blue KC also brings this action to enjoin GS Labs from engaging in any efforts to collect the outstanding claims directly from Blue KC members. These collection activities would be prohibited by the CARES Act, would harm innocent Blue KC members, would cause irreparable harm

---

[2] Upon information and belief, after duplicative, inadvertently paid, and withdrawn claims are excluded, the total disputed claims exceed $5.8 million.

3

to Blue KC in the form of hundreds or thousands of appeals, complaints, and a loss of customer goodwill, and would discourage Blue KC members and others from obtaining necessary and appropriate COVID-19 diagnostic testing in the future.

## PARTIES

9.  Blue KC is a Missouri not-for-profit corporation with its principal place of business in Kansas City, Missouri.

10.  Blue KC is an independent licensee of the Blue Cross Blue Shield Association.

11.  Blue Cross Blue Shield Association is a national trade association of 35 independent, community-based and locally operated Blue Cross Blue Shield companies.

12.  Blue Cross Blue Shield Association affiliated companies provide health insurance to more than 110 million people in all 50 states, Washington, D.C., and Puerto Rico.

13.  Blue KC provides comprehensive health care coverage, including medical diagnostic services, to approximately one million members[3] in the Greater Kansas City region and Northwest Missouri.

14.  GS Labs is a foreign limited liability company formed under the laws of Nebraska on January 14, 2020.

15.  Documents GS Labs filed with the Missouri Secretary of State indicate that GS Labs was formed to "perform Covid testing."

16.  GS Labs operates or operated COVID-testing laboratories in Lee's Summit, Missouri; Lenexa, Kansas; Omaha, Nebraska; and approximately two dozen other locations across the country.

---

[3] Blue KC refers to all individuals covered under any of the health plans it administers as its "members."

4

17.     GS Labs first became registered to do business in Missouri on February 2, 2021 and in Kansas on December 12, 2020.  Upon information and belief, GS Labs operated in Missouri and Kansas before it was authorized to do so.

18.     GS Labs may be served with process at the office of its registered Missouri agent at Capitol Corporate Service, Inc., 222 E. Dunklin St., Ste 102 Jefferson City, MO 65101.

19.     GS Labs's principal office address is 222 S. 15th Street Suite 1404S, Omaha, Nebraska 68130.

20.     Upon information and belief, GS Labs's members are Christopher Erickson, Daniel White, and Gabriel Sullivan.

21.     Upon information and belief, each member of GS Labs is a resident and citizen of Nebraska.

## JURISDICTION AND VENUE

22.     The Court may exercise diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

23.      Complete diversity exists because (1) Plaintiff Blue KC is incorporated in Missouri, has its principal place of business in Missouri, and is a citizen of the state of Missouri and (2) Defendant GS Labs was formed under the laws of Nebraska, has its principal place of business in Nebraska, and, upon information and belief, each of its members are citizens of Nebraska.

24.     As is described below, the amount in controversy exceeds $75,000 and involves, among other issues, GS Labs's submission of over $9.2 million in claims for COVID-19 diagnostic testing and related services.

25.     The Court may also exercise federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

5

26.    If the Court exercises federal question jurisdiction over only a portion of the claims, this Court may exercise supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

27.    The parties have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

28.    Venue is proper because the Defendant engaged in the conduct at issue in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district. Many of the diagnostic services at issue in the Complaint occurred in this judicial district, Defendant submitted bills to Blue KC's offices in this judicial district, and much of Blue KC's work investigating and processing of the claims took place in this judicial district.

29.    This Court may exercise personal jurisdiction over Defendant because Defendant operated a testing clinic in Lee's Summit, Missouri, and the dispute described in this Complaint arises out of services provided, in large part, at that testing clinic.

30.    All necessary and proper parties are before the Court for the matters in controversy, and there is no other parallel litigation between the parties concerning their respective rights and obligations.

31.    Plaintiff has satisfied all conditions precedent, if any.

## THE POLICIES AND HEALTH PLANS AT ISSUE

32.    Blue KC operates as both a traditional insurer and as a claims administrator.

33.    Blue KC administers a variety of healthcare benefit plans and policies of insurance including: (1) self-funded plans, (2) plans insured under group policies issued by Blue KC in which the plans are established and maintained by private employers, (3) plans covering federal employees, (4) plans covering employees of state governmental entities, (5) church plans, (6) policies issued

6

directly to individuals, and (7) policies administered pursuant to the Medicare Advantage Program (Medicare Part C).

34.     Blue KC insures certain plans and members directly. For these plans and members, Blue KC processes claims and makes benefit payments, as warranted, from its own assets.

35.      Blue KC also provides administrative services to self-funded group health plans (either directly or with the assistance of other BCBS licensees).

36.     Many of the health plans sponsored by private employers and employee organizations (such as unions) are governed by ERISA, 29 U.S.C. § 100, *et seq.*

37.     Blue KC is a plan fiduciary of many of the ERISA-governed plans at issue.

38.     Blue KC can supply an exhibit identifying the plans, groups, and types of policies impacted by GS Labs's claims described in this Complaint and will seek the Court's leave to file such a document in an amended pleading after an appropriate protective order is entered.

## BLUE KC'S RELATIONSHIPS WITH HEALTH CARE PROVIDERS

39.     Blue KC has contractual relationships with certain health care providers known as "participating" providers. These providers render medical services to Blue KC members in return for a pre-negotiated fee.

40.     Blue KC members also may receive services from "non-participating" providers who do not have contracts establishing pre-negotiated fees with Blue KC. These are known as "out-of-network" services. Non-participating providers have not agreed to accept in-network rates as payment in full for their services.

41.     Typically, non-participating providers set their own prices for services rendered to their patients subject to state and federal laws and regulations.

7

42. Where a member receives care or treatment from a non-participating provider, the member may be exposed to a "balance bill", *i.e.*, the balance remaining after the allowed amount, if any, has been paid.

43. Unless a state or federal law provides otherwise, a non-participating provider may "balance bill" the member for portions of services not covered by Blue KC.

## THE COVID-19 PANDEMIC

44. In a January 21, 2020 press release, the Centers for Disease Control and Prevention ("CDC") noted, "there are growing indications that limited person-to-person spread [of COVID-19] is happening. It's unclear how easily this virus is spreading between people . . . CDC continues to believe the risk of [COVID-19] to the American public at large remains low at this time."[4]

45. Less than two months later, however, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic. The WHO expressed grave concern for both the spread and severity of the disease and alarming levels of government inaction.[5]

46. At that time, there were "no proven effective specific treatment strategies" and no approved diagnostic testing.[6]

47. Uncertainty about the fatality rate of COVID-19 caused fear and confusion as the pandemic unfolded. Initial reports from abroad estimated a fatality rate as high as 15%. As more data became available, this estimated fatality rate dropped to a range between 4.3% and 11%. The most recent data suggests the fatality rate in the United States is roughly 1.8%.[7]

---

[4] https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html
[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7569573
[6] *Id.*
[7] https://ourworldindata.org/mortality-risk-covid

8

48.     Kansas Governor Laura Kelly declared a state of emergency in response to the COVID-19 pandemic on March 12, 2020.[8]  In Kansas the state of emergency expired on June 15, 2021.

49.     In Missouri, Governor Michael Parson declared a state of emergency in response to COVID-19 on March 13, 2020.[9]  The state of emergency is currently set to expire on August 31, 2021.

50.     Prior to March 2020, the U.S. had only completed 459 tests of patients suspected to have COVID-19.[10]  Initially, the CDC controlled the only testing operations in the U.S., which *Science Magazine* described as "a fiasco."[11]

51.     Efficient and accurate testing for the virus was, and remains, a key measure to end the pandemic.

52.     In February of 2020, due to the rapid spread of COVID-19, the Secretary of the U.S. Department of Health & Human Services ("HHS") authorized the emergency use of *in vitro* diagnostic devices for the detection of COVID-19.[12]

53.     Since the outset of the pandemic, several types of COVID-19 tests were approved for emergency use and have become available to the public including the following:

---

[8] https://governor.kansas.gov/governor-issues-emergency-declaration-for-covid-19
[9] https://governor.mo.gov/press-releases/archive
[10] https://www.sciencemag.org/news/2020/02/united-states-badly-bungled-coronavirus-testing-things-may-soon-improve
[11] *Id.*
[12] https://www.fda.gov/medical-devices/emergency-use-authorizations-medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices

9

| Test Type | Description | Billing Code | MAC Allowable Rates[13] |
|---|---|---|---|
| COVID-19 Rapid Antigen Test | Rapid Antigen tests detect protein fragments specific to the Coronavirus and are used to diagnose active infection. | 87811 | $41.38 |
| COVID-19 Rapid Antibody Test | Antibody tests are "not [used] used to diagnose an active COVID-19 infection."[14] Instead, these tests detect two different types of antibodies (IGM and IgG) that may develop in patients after exposure to COVID-19. This test requires a blood sample. | 86328 | $45.23 |
| COVID-19 PCR Test[15] | Also called a molecular test, these tests detect genetic material of the virus using a lab technique called polymerase chain reaction (PCR). Many consider this test to be the most accurate diagnostic test. | 87635 | $51.33 |
| BIO-Fire PCR Test 2.1 | This test is like the PCR Test, but instead of detecting only one pathogen it detects 22 target respiratory pathogens including COVID-19. | 0202U | $416.78[16] |
| GenMark ePlex Respiratory Pathogen 2 Panel | This test is like the PCR Test, but instead of detecting only one pathogen it detects 21 target respiratory pathogens including COVID-19. | 0225U | $416.78 |

54.     Since February 2020, federal, state, and local governments have worked together with numerous health care providers and insurers to build a robust testing infrastructure.

---

[13] Medicare Administrative Contractors ("MACs") are responsible for developing the allowable rates for the Medicare program for newly created procedure codes until the Centers for Medicare & Medicaid Services ("CMS") establishes national rates. CMS has not yet established national payable amounts for these tests.

[14] https://www.fda.gov/consumers/consumer-updates/coronavirus-disease-2019-testing-basics

[15] PCR testing is appropriately billed using CPT code 87637 where the test attempts to detect both COVID-19, influenza, and respiratory syncytial virus. This expanded testing is sometimes referred to as a "small panel test." "Large panel PCR testing", such as the BioFire and ePlex tests, are administered by GS Labs and designed to detect 21 and 22 target respiratory pathogens.

[16] Not all MACs have established pricing for large panel tests GS Labs administered.

55.     To date, Blue KC has completed processing and payment of approximately 510,000 COVID-19 diagnostic testing claims from approximately 1,300 providers.

**COVID-19 DIAGNOSTIC TESTING UNDER THE FFCRA AND CARES ACT**

56.     In response to the deepening pandemic crisis, Congress enacted the Families First Coronavirus Response Act ("FFCRA")[17] on March 18, 2020.

57.     Among many other provisions, the FFCRA requires certain health plans and insurance providers to cover certain COVID-19 *in vitro* diagnostic testing at no cost to the insured patient. FFCRA § 6001(a).

58.     Only nine days after the FFCRA was enacted, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act of 2020 on March 27, 2020.

59.     The CARES Act describes how the pricing for FFCRA-required coverage for diagnostic testing is to be established. CARES Act § 3202.

60.     Pursuant to the CARES Act, when there is no negotiated pricing agreement between the insurer and provider, the insurer must reimburse the provider "an amount that equals the cash price for such service as listed by the provider on a public internet website." *Id. at* § 3202(a).

61.     The CARES Act also requires that providers establish and publicly post on their websites an accurate "cash price." *See* CARES Act § 3202(b)(1) (stating, "each provider . . . shall make public the cash price for such test on a public internet website of such provider.").

62.     "*Cash price* means the charge that applies to an individual who pays cash (or cash equivalent) for a COVID–19 diagnostic test." 45 C.F.R. § 182.20.

**GS LABS SUBMITS THOUSANDS OF SUSPECT CLAIMS TO BLUE KC**

63.     On March 2, 2021, GS Labs sent correspondence to Blue KC regarding the diagnostic testing claims it would soon be submitting to Blue KC. **Exhibit B**.

---

[17] Pub. L. No. 116-127.

64. In its March 2, 2021 correspondence, GS Labs informed Blue KC, "[y]ou should anticipate that the claims submitted to your company by GS Labs will set out the GS Labs Cash Price on the date of service identified in the claim . . . *[y]our company must pay GS Labs at its publicly posted cash price rates*." (emphasis added).

65. GS Labs's correspondence then claimed its established cash prices were the following:

| Test Name | Billing Code | Cash Price |
|---|---|---|
| COVID-19 RAPID ANTIGEN TEST | 87811 | $380.00 |
| COVID-19 RAPID ANTIBODY TEST | 86328 | $380.00 |
| COVID-19 PCR TEST | 87635 | $385.00 |
| COVID-19 BIO-FIRE PCR TEST | 0202U | $979.00 |
| COVID-19 EPLEX PCR TEST | 0225U | $979.00 |

66. GS Labs's statements regarding its cash prices were false since GS Labs had not established cash prices at the rates identified above (as is described in greater detail below).

67. GS Labs then submitted to Blue KC at least 11,149 claim forms ("the claims")[18] totaling over $9.2 million at the reimbursement rates referenced in the March 2, 2021 correspondence.

68. Upon information and belief, the purported dates of service for the claims range from approximately November 29, 2020 to June 28, 2021.

69. To date, GS Labs has submitted to Blue KC over:

a.) 10,167 claims for rapid antigen testing;

b.) 10,277 claims for specimen collection;

c.) 8,253 claims for rapid antibody testing; and

d.) Approximately 800 claims for various types of PCR testing.

70. Upon information and belief, all PCR testing claims submitted is large panel PCR testing irrespective of the coding used by GS Labs.

---

[18] Each claim form typically includes claims for multiple services.

12

71.　Reproduced below is a typical claim form GS Labs submitted to Blue KC (with patient

identifying information redacted):



BCBS OF KC

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 03/12

PICA

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLKLUNG (ID#) | ✓ OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE / SEX　M ☐ F ✓

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

6. PATIENT RELATIONSHIP TO INSURED　Self ☐ Spouse ☐ Child ☐ Other ✓

7. INSURED'S ADDRESS (No., Street)

8. RESERVED FOR NUCC USE

CITY　STATE

ZIP CODE　TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

28549000

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)　YES ☐ ✓ NO

a. INSURED'S DATE OF BIRTH MM DD YY　SEX M ☐ F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?　YES ☐ ✓ NO　PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?　YES ☐ ✓ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES ☐ ✓ NO　If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED Signature on File.　DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED Signature on File.

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY　QUAL.

15. OTHER DATE QUAL. MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY　FROM　TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN POWELL STEVEN W

17a.
17b. NPI 1477649168

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY　FROM　TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?　YES ☐ ✓ NO　$ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)　ICD Ind. 0

A. Z20822　B.　C.　D.
E.　F.　G.　H.
I.　J.　K.　L.

22. RESUBMISSION CODE　ORIGINAL REF. NO.
1

23. PRIOR AUTHORIZATION NUMBER
17D2203899

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02 23 21 | | 11 | N | 87811 | | A | 380 00 | 1 | | N | NPI |
| 02 23 21 | | 11 | N | 86328 | | A | 380 00 | 1 | | N | NPI |
| 02 23 21 | | 11 | N | G2023 | | A | 50 00 | 1 | | N | NPI |
| | | | | | | | | | | | NPI |
| | | | | | | | | | | | NPI |
| | | | | | | | | | | | NPI |

25. FEDERAL TAX I.D. NUMBER　844333441　SSN ☐ EIN ✓

26. PATIENT'S ACCOUNT NO.　508301

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)　✓ YES ☐ NO

28. TOTAL CHARGE $ 810 00

29. AMOUNT PAID $

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
Signature on File.
SIGNED　DATE

32. SERVICE FACILITY LOCATION INFORMATION
LENEXA
15729 COLLEGE BLVD
LENEXA KS 662191234
a. 1871106278　b.

33. BILLING PROVIDER INFO & PH # ( 816 ) 7087550
GS LABS
17650 WRIGHT ST, STE 5
OMAHA NE 681302800
a. 1871106278　b. ZZ291U00000X

NUCC Instruction Manual available at: www.nucc.org　PLEASE PRINT OR TYPE　APPROVED OMB-0938-1197 FORM 1500 (02-12)

13

72.     On the reverse side of each claim form, GS Labs certifies, "the services listed above [on each claim form] were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

73.     GS Labs's statements are false since the ordering physicians did not personally furnish the tests or personally direct his employees to furnish the tests.

74.     In fact, GS Labs does not exercise patient-specific judgment in ordering any of the testing at issue. Instead, GS Labs apparently relies on standing, blanket orders. *See* **Exhibits C, D, and E**. Upon information and belief, the physicians that signed the standing, blanket orders do not reside in the Kansas City metropolitan area and have little or no role in ensuring that their orders were followed.

75.     Provision of these tests without a licensed clinician's order, upon information and belief, amounts to laboratory staff's practice of medicine without an appropriate licence in violation of Mo. Rev. Stat. § 334.010 and/or K.S.A. 65-2803 as the ordering physician has no part in the actual (1) patient evaluation, (2) patient counseling, (3) interpretation of results, (3) patient diagnosis, or (4) patient treatment or referral.

76.     Moreover, GS Labs violated the terms of its own standing orders by providing testing even when not called for by its own standing orders. The standing orders state that the patient must be "concerned that he or she has been exposed to and/or infected with COVID-19" or present with symptoms consistent with COVID-19. Some, but not all, of the claims GS Labs submitted for reimbursement indicate the patient denied exposure and symptoms but was still tested.

77.     Furthermore, GS Labs does not create and maintain adequate documentation to substantiate that the tests in question were administered or administered in a manner that resulted in reliable results. In the alternative, GS Labs has failed to provide such documentation to Blue KC upon request. For example, records involving GS Labs's large panel PCR testing (the ePlex and Biofire

14

testing described above) do not record results of most of the pathogens for which the tests were designed to detect.

78. Further, many of the claims submitted by GS Labs include claims for services that appear to have been administered in bad faith and performed solely to generate fees. For instance:

    a.)    GS Labs routinely performs antigen and antibody tests together. There is no legitimate medical reason to routinely perform both rapid antigen and rapid antibody tests together;

    b.)    GS Labs submitted claims for large panel PCR testing using various procedure codes. These tests are designed to detect dozens of other pathogens including adenovirus, human metapneumovirus, human rhinovirus, influenzas, para influenzas, Bordetella parapertussis and chlamydia pneumoniae. Associated medical records identify no symptoms, suspected exposures, other test results, or justifications which would warrant using these expensive and extensive tests rather than simple antigen or targeted PCR tests; and

    c.)    In some instances, PCR, antigen, and antibody testing were performed at the same time, on the same member, without an apparent reason to do so.

## GS LABS'S CASH PRICES ARE OBJECTIVELY UNREASONABLE AND WERE ESTABLISHED IN BAD FAITH

79. GS Labs's purported cash prices are excessive, objectively unreasonable, and were set in bad faith.

80. GS Labs states the following are its established "cash prices" and posts the same on its website:

15

| Test Name | Description | Billing Code (CPT) (HCPCS) | Price/Cash Price |
|---|---|---|---|
| COVID-19 RAPID ANTIGEN TEST | The COVID-19 rapid antigen test detects protein fragments specific to the Coronavirus. This test requires a nasal swab. For the antigen test, GS Labs is using the CareStart test for Rapid Detection of SARS-CoV-2. Results may come back in as soon as 20 minutes. | 87811 | $380.00 |
| COVID-19 RAPID ANTIBODY TEST | This test detects two different types of antibodies (IgM and IgG) that may develop in most patients after exposure to SARS-CoV-2. The IgM/IgG test identifies whether a person has developed antibodies for SARS-CoV-2 and can do so as 48 hours after exposure. For the IgM/IgG test, GS Labs is using the Azure Biotech Inc. Assure IgM/IgG Rapid Test Device. At this time, it's unknown how much protection antibodies might provide against reinfection. | 86328 | $380.00 |
| COVID-19 PCR TEST | When supplies are available, we offer different COVID-19 Polymerase Chain Reaction (PCR) tests. A PCR test is the most accurate test available for detecting COVID-19. The PCR test detects RNA (or genetic material) that is specific to the SARS-CoV-2 virus and can detect the virus within days of infection, even those who have no symptoms. The only pathogen this particular test will check for is COVID-19. The sample is obtained via a nasopharyngeal swab. *THIS TEST IS CURRENTLY UNAVAILABLE DUE TO SUPPLIES.* | 87635 | $385.00 |
| Biofire – Respiratory Panel PCR | When supplies are available, we offer the Biofire respiratory pathogen panel PCR. A PCR test is the most accurate test available for detecting COVID-19. The BioFire identifies 22 of the most common viral and bacterial organisms associated with upper respiratory infection, including SARS-CoV-2, the virus that causes COVID-19. The sample is obtained via a nasopharyngeal swab. | 0202U | $979.00 |
| EPLEX- Respiratory Panel PCR | When supplies are available, we offer the Genmark ePlex respiratory pathogen panel PCR. A PCR test is the most accurate test available for detecting COVID-19. The Genmark ePlex identifies 21 of the most common viral and bacterial organisms associated with upper respiratory infection, including SARS-CoV-2, the virus that causes COVID-19. The sample is obtained via a nasopharyngeal swab. | 0225U | $979.00 |

81.     The two types of tests most frequently billed by GS Labs are the COVID-19 rapid antigen test and the COVID-19 rapid antibody test.

82.     GS Labs demands a $380 reimbursement per test administered and each of these tests are often priced at wholesale below $20 per test.[19]

83.     GS Labs also typically bills an additional $50 charge for specimen collection using the "G2023" procedure code along with the purported cash prices identified above.

---

[19] *See e.g.* https://www.covidtests.shop/product/healgen-antibody-rapid-test/; https://www.covidtests.shop/product/covid-19-antigen-rapid-test-kit/

84.     Upon information and belief, GS Labs also directly charged some Blue KC members a $49 "administrative fee" in addition to any amounts collected from insurers.

85.     One version of GS Labs's consent form states the following: "In order to set you up as a user in our system and give you access to same-day scheduling and same-day results, GS Labs is charging a $49 set up fee at participating locations. It is not a co-pay or coinsurance or a deductible." *See e.g.* **Exhibit F, page 1, paragraph 1.**

86.     GS Labs's claims for certain diagnostic tests are up to ten times higher than the MAC allowable rates and the Kansas City metropolitan area is well-served by many other providers offering the same or similar tests at substantially lower prices.

87.     The following chart compares GS Labs pricing to a small sample of other local testing providers:

| Test Type | GS Labs's "Cash Price" | MAC Allowable Rates | Rapid Test KC Drive-Thru Clinic[20] | CVS[21] | Performance Health KC[22] | Truman Med. Ctr.[23] |
|---|---|---|---|---|---|---|
| Rapid Antigen Test (87811) | $380 | $41.38 | $35 | No out of pocket cost | $150[24] | N.A. |
| Rapid Antibody Test (86328) | $380 | $45.23 | N.A. | $38[25] | $45 | $52[26] |
| PCR Test (87635) | $385.00 | $51.33 | $190 | $139 ($100 for the laboratory services, $39 for clinic visit) | $170 ($85 for visit and sample collection, $85 for lab fee) | $33.35 |

88. No unusual or exceptional circumstances justify GS Labs's exceptionally high purported cash prices.

89. GS Labs does not operate in remote communities or other communities where unusually high operating costs would be expected.

90. GS Labs does not provide additional services to its patients.

---

[20] https://www.rapidtestkc.com/book?gclid=EAIaIQobChMI5J7Vgund8QIV0z2tBh3aTgj_EAAYASAAEgIyAPD_BwE

[21] https://www.cvs.com/minuteclinic/covid-19-testing/?cid=ps_questtest&gclid=Cj0KCQjw5PGFBhC2ARIsAIFIMNdOO4zobpmC5BFAGy0574lHFK66-6uJxuKIMuerK80Icxbb-dhGPeEaAtZKEALw_wcB&gclsrc=aw.ds; Walgreens has a pricing structure similar to CVS. *See* https://www.walgreens.com/findcare/covid19/testing

[22] https://performancehealthkc.com/covid19-testing

[23] https://www.trumed.org/patients-visitors/billing-information/understanding-costs/ (downloadable spreadsheets at bottom of webpage)

[24] Performance Health KC's website does not indicate it charges an additional collection fee for this test.

[25] https://www.cvs.com/content/antibody-testing?icid=coronavirus-lp-nav-antibody-testing

[26] Truman Medical offers a slightly different antibody test using CPT Code 86769. CPT Code 86769 is used to report multiple-step antibody testing for severe acute respiratory syndrome coronavirus while 86328, the code used by GS Labs, is used to report to report single step antibody testing for severe acute respiratory syndrome coronavirus 2. *See generally* https://www.ama-assn.org/practice-management/cpt/covid-19-cpt-coding-and-guidance

91.     Rather than providing augmented (or even basic) medical services, GS Labs purports to provide its testing only for "informational" purposes, disclaims any physician-patient relationship, and demands that each member indemnify it for any claims, damages, or attorney's fees arising out of the testing services.

92.     GS Labs's consent forms include the following language:

a.)     "I am electing to have this antibody test for informational purposes only." **Exhibit F, page 1, paragraph 2;**

b.)     "Any results [with respect to antigen testing] I receive are for informational purposes only and do not constitute a medical diagnosis." **Exhibit F, page 1, paragraph 4;**

c.)     "I understand that I am not creating a patient relationship with GS Labs or its affiliates or providers by participating in testing. The lab is not acting as my medical provider and does not replace treatment by my primary medical provider. I assume complete and full responsibility to seek and obtain medical and other advice relating to this testing and any results I receive. Should I have question [sic] or concerns regarding my results, or a worsening of my condition, I shall promptly seek advice and treatment from an appropriate medical provider." **Exhibit F, page 2, paragraph 2;** and

d.)     "I agree to indemnify and hold harmless GS Labs and its staff against any and all claims, suits, or actions of any kind whatsoever for liability, damages, compensation, or otherwise brought by me or anyone on my behalf, including attorney's fees and any related costs, if litigation arises pursuant to any claims made by me or anyone else acting on my behalf. If GS Labs or its staff or

19

representatives incurs any of these types of expenses, I agree to reimburse GS Labs for these expenses." **Exhibit F, page 2, paragraph 4.**

93. In light of the locations of GS Labs operations, its disclaimer of any actual physician-patient relationship, and its insistence on full indemnification from the patients it supposedly serves, GS Labs's purported cash prices are objectively unreasonable and excessive.

94. GS Labs was unable to offer any credible justification or explanation regarding its facially excessive purported cash prices. Instead, GS Labs stated that its high prices were due to the fact that it is a "top notch lab" operating thirty sites in multiple states, it worked with consultants to develop a "unique model," and it offers "a call line," "extended hours," "prompt results," and "same day appointments."

95. Multiple media reports contradict GS Labs's claims regarding the quality of its services including the following:

 a.) "*I walked around with COVID for a week, because of late results*" December 19, 2020;[27]

 b.) "*Kansas looks at whether Lenexa lab price gouged on Covid-19 tests*" December 22, 2020;[28]

 c.) "*Lab's 3-month data delay leads to abnormally high daily Covid total in Allegheny County*" April 14, 2021;[29] and

---

[27] https://www.kctv5.com/i-walked-around-with-covid-for-a-week-because-of-late-results-gs-labs-subcontractor/article_be3f0647-7948-5cd1-ba8e-fb5f75c432cd.html

[28] https://www.bizjournals.com/kansascity/news/2020/12/22/covid-19-test-price-gouging-inquiry-gs-labs.html

[29] https://triblive.com/local/westmoreland/labs-3-month-data-delay-leads-to-abnormally-high-daily-covid-total-in-allegheny-county

d.) "*Slow reporting from labs can hinder coronavirus response, create doubt*" May 7, 2021 (stating, "The late reports potentially sow doubt in data used to gauge the severity of virus spread").[30]

96.     Moreover, public records describe serious quality control and public health concerns at the GS Labs Lee's Summit, Missouri facility.  These concerns include the following:

a.) GS Labs informing patients their test results were negative when they were in fact positive;

b.) GS Labs providing patients with incorrect lab results (another patient's results);

c.) GS Labs not providing results to patients;

d.) GS Labs providing results to patients, but only days after the testing;

e.) GS Labs providing false or unverified testing results to patients so that those patients could board airplanes or otherwise use proof of a negative test result;

f.) GS Labs operating in unsafe and non-sterile working conditions; and

g.) GS Labs failing to properly handle medical waste.

97.     Via correspondance dated February 15, 2021, GS Labs admitted that testing it performed "may be inaccurate due to incomplete equipment validation studies and quality control records." **Exhibit H.**

98.     On March 18, 2021, the Nebraska Department of Health and Human Services sent correspondance to GS Labs noting,  GS Labs "is not in compliance with all of the Conditions required for certification in the CLIA[31] program." **Exhibit I, page 1, paragraph 2.**

---

[30] https://triblive.com/local/westmoreland/slow-reporting-from-labs-can-hinder-response-to-coronavirus-outbreaks
[31] CLIA (Clinical Laboratory Improvement Amendments) is a CMS program with the objective of ensuring quality laboratory testing.

99. Via correspondance dated May 14, 2021, GS Labs admitted that it failed to follow certain unidentified "applicable laboratory standards for testing facilities" protocols. **Exhibit J, paragraph 1.**

100. GS Labs did not operate a "top notch" lab and, instead, operated testing facilities that produce flawed, delayed, and unreliable results.

101. GS Labs's purported cash pricing would still be objectively excessive and unreasonable even if its statements regarding the quality of its services were true.

102. GS Labs's purported cash prices are objectively excessive and unreasonable and were not set in good faith.

103. Instead, GS Labs's posted "cash prices" and claims for those prices amount to unlawful price gouging and disaster profiteering. *See generally* K.S.A. 50-6,106; Mo. Rev. Stat. § 407.010, *et seq.*, 15 C.S.R. 60-8.030.

104. The prices posted and claimed by GS Labs are contrary to the public interest as articulated by K.S.A. 50-6,106; Mo. Rev. Stat. § 407.010, *et seq.*, 15 C.S.R. 60-8.030-.04.

## GS LABS USED A FALSE "CASH PRICE" IN CONNECTION WITH ITS CLAIMS

105. Not only are GS Labs's charges excessive, objectively unreasonable, and posted in bad faith, they are also fraudulent.

106. GS Labs knowingly and intentionally posted on its website sham cash prices which did not represent the actual cash prices GS Labs offered to the public.

107. Despite the CARES Act's requirement that GS Labs post accurate cash prices on its website, GS Labs did not post accurate cash prices.[32]

---

[32] *See* CARES Act § 3202(b)(1)("each provider … shall make public the cash price for such test on a public internet website of such provider."). "Cash price means the charge that applies to an individual who pays cash (or cash equivalent) for a COVID–19 diagnostic test." 45 C.F.R. § 182.20 (effective January 1, 2021).

108.     Instead, GS Labs posted inflated and illusory prices.

109.     At the same time GS Labs posted its excessive purported cash prices and demanded that insurers pay those false "cash prices," GS Labs facilities in both Lenexa, Kansas and Lee's Summit, Missouri routinely refused to provide treatment to patients who sought to pay cash for COVID-19 diagnostic testing.

110.     In fact, GS Labs's consent forms include the following language: GS Labs "*only accepts insurance patients* who are seeking testing for diagnostic purposes." **Exhibit G, page 3, paragraph 4.** (emphasis added).

111.     For a large portion, or even all of the period in which testing services were purportedly provided, GS Labs refused patients who sought to pay GS Labs in cash (or cash equivalents). Therefore, the publicly posted purported cash prices were a sham and not a true "cash prices" as that term is used by Section 3202 of the CARES Act.

112.     Upon information and belief, at an unknown time in 2021 GS Labs may have changed its practices and began accepting cash patients. However, when GS Labs began to accept cash patients, the actual rates charged to these patients were substantially lower than the purported cash prices GS Labs posted on its website.

113.     GS Labs's website currently states it accepts patients who pay cash. However, GS Labs does not collect the posted "cash price" from uninsured patients. Instead, GS Labs accepts less than one-third of the posted purported cash price as payment in full for testing services offered.

114.     For instance, at the same time GS Labs told uninsured patients that it would accept $114.00 to conduct basic rapid antigen testing, GS Labs represented to insurers that its "cash price" for the same service is $380.

115.     GS Labs knowingly and willfully executed a scheme or artifice to defraud health insurers and plans by posting a false "cash price" that GS Labs never actually collected from individual

23

cash-paying consumers and then demanded payment of those same false cash prices from insurance companies.

## GS LABS MAKES UNREASONABLE DEMANDS

116. After receiving the March 2, 2021 correspondence and the claims, Blue KC approached GS Labs to negotiate reasonable rates for the claims, as envisioned by applicable law. *See* CARES Act 3202(a)(2)(stating, "[i]f the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer . . . may negotiate a rate with such provider for less than such cash price").

117. Blue KC and GS Labs had several discussions regarding the services offered, lack of medical records, and excessive cash prices.

118. Nevertheless, the negotiations reached an impasse, after GS Labs refused Blue KC's offer to accept reasonable rates and demanded that Blue KC pay its sham cash prices less a small discount.

## COUNT I. DECLARATORY JUDGMENT

119. Plaintiff realleges each and every allegation set forth in paragraphs 1 – 118 as if fully set forth herein.

120. Plaintiff brings this action seeking declarations of the parties' rights and obligations under various health insurance plans and policies Blue KC administers or insures and each claim GS Labs has made on any one of them.

121. The above-described events give rise to a substantial, ripe, and justiciable dispute between the parties to this action, namely whether Blue KC is obligated to pay the claims described above.

122. GS Labs knowingly and willfully concealed or misrepresented material facts or circumstances relating to its claims and, in so doing, has forfeited its rights, if any, to reimbursement for the claims made.

24

123. GS Labs knowingly and willfully acted in bad faith in connection with the claims described above and, in so doing, has forfeited its rights, if any, to reimbursement for the claims made.

124. GS Labs knowingly and willfully disregarded its statutory obligation under the CARES Act to post its actual cash prices for the services in question and, in so doing, has forfeited its rights, if any, to reimbursement for the claims made.

125. GS Labs knowingly and willfully violated state law regarding disaster profiteering and price gouging and, in so doing, has forfeited its rights, if any, to reimbursement for the claims made.

126. The cash prices GS Labs purported to set establish are objectively unreasonable and grossly excessive and are impermissible under the CARES Act.

127. GS Labs continues to demand that Blue KC pay grossly and unnecessarily excessive reimbursement rates for the claims described above.

128. Blue KC refuses to submit to GS Labs's demands.

129. Accordingly, pursuant to 28 U.S.C. § 2201, a judicial declaration is necessary and appropriate to specify that the rights of the parties with respect to claims submitted to Blue KC by GS Labs.

130. Plaintiff has sustained damage as a result of GS Labs's bad faith, concealments, misrepresentations, and use of sham "cash prices," in that it has incurred substantial costs and expenses for claim response, investigation, and attorney's fees, which continue to accrue.

131. Plaintiff is entitled to recover its attorneys' fees in this matter and such an award is proper under Federal Rules of Civil Procedure 54 and 58, 28 U.S.C. § 2202 or, in the alternative, Missouri's declaratory judgment statute, Mo. Rev. Stat. Section 527.010, *et seq.*

## COUNT II. INJUNCTIVE RELIEF

132. Plaintiff realleges each and every allegation set forth in paragraphs 1 – 131 as if fully set forth herein.

133.    At all times relevant, GS Labs was a "non-participating" provider purportedly providing "out of network services" to Blue KC members.

134.    In a section titled "ATTENTION BLUE CROSS/BLUE SHIELD MEMBERS," GS Labs's consent forms state, "I hereby authorize GS Labs to charge my credit card for the full amount of all services rendered by GS Labs or its contractors fifteen (15) days after the test." **Exhibit G, page 2, paragraph 5.**

135.    In a section titled "Financial Responsibility," GS Labs's consent forms state, "I agree that I am personally financially responsible for payment of fees for all tests ordered and collected by GS Labs or its representatives or contractors at my request. It is my responsibility to know my own insurance benefits, including whether GS Labs is a contracted provider and any covered benefits and exclusions . . . " and "**I understand that if my insurance company denies coverage or payment for the services provided to me, or fails to remit timely payment on my claim (within thirty (30) days), I assume full financial responsibility and will pay all charges in full.**" **Exhibit G, page 3, paragraph 3.** (emphasis in original).[33]

136.    Prior to filing this lawsuit, Blue KC demanded that GS Labs agree that it would not balance bill Blue KC's members.

137.    GS Labs has not promptly agreed to refrain from balance billing Blue KC members.

138.    In light of the unique circumstances of this dispute, GS Labs should be enjoined from balance billing Blue KC members.

139.    Guidance issued by CMS provides that the CARES Act generally precludes balance billing:

---

[33] GS Labs's website makes contradictory representations to its patients stating, "*You are not responsible for paying any outstanding balance shown on your [Explanation of Benefits]*." https://gslabstesting.com/covid-19-pricing-transparency

**Q9. Does section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?**

The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test. Section 3202(a) contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website. In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due. Therefore, *the statute generally precludes balance billing for COVID-19 testing*. However, section 3202(a) of the CARES Act does not preclude balance billing for items and services not subject to section 3202(a), although balance billing may be prohibited by applicable state law and other applicable contractual agreements.[34]

140.    Blue KC has a substantial interest in preventing GS Labs from balance billing its members.

141.    If GS Labs were to balance bill Blue KC's members, it would inevitably cause hundreds or thousands of complaints, appeals, and a substantial and unnecessary administrative burden.

142.    Additionally, if GS Labs were to balance bill Blue KC's members, Blue KC would be harmed in that a portion of its members and the employers and other entities who select Blue KC to administer its plans would likely, incorrectly, fault Blue KC for GS Labs's bills. Balance billing could result in a loss of membership that would be practicably difficult to prevent or precisely quantify.

143.    Further, if GS Labs were to attempt to collect the claims from the members directly it would discourage Blue KC members and others who learn of the balance billing from obtaining additional appropriate COVID-19 diagnostic testing services in the future. Balance billing under these circumstances would create the real possibility of harm to both Blue KC members and the broader community.

---

[34] https://www.cms.gov/files/document/FFCRA-Part-43-FAQs.pdf (emphasis added).

144.    Neither public health nor innocent Blue KC members should be harmed by Blue KC's efforts to thwart GS Labs's scheme.

**PRAYER FOR RELIEF**

WHEREFORE, Blue KC respectfully requests that this Court determine the rights and obligations of the parties with respect to GS Labs's claims for payment and enter a judgment in favor of Plaintiff Blue KC and against Defendant GS Labs:

a.)    Declaring that GS Labs forfeited its right to payment for the claims described in this Complaint, if any, because it intentionally concealed or misrepresented one or more material facts or circumstances relating to the claims;

b.)    Declaring the claims GS Labs submitted to Blue KC are the product of a fraudulent scheme or artifice and, therefore, Blue KC has no obligation to pay the claims;

c.)    Declaring that GS Labs violated its duty of good faith when it purported to set a "cash price" for COVID-19 diagnostic tests covered by the CARES Act and, therefore, Blue KC has no obligation to pay the claims;

d.)    Declaring the claims are defective or otherwise non-payable for the reasons stated in this pleading;

e.)    Enjoining GS Labs from balance billing or otherwise attempting to collect the claims from Blue KC's members;

f.)    Awarding Blue KC its costs and expenses incurred in bringing this action, including a reasonable provision for attorneys' fees; and

g.)    Entering any other and further relief as the Court deems just and appropriate under the circumstances.

28

Respectfully Submitted,

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**

By: _/s/ Aaron E. Schwartz_
Aaron E. Schwartz, #58745
8182 Maryland Avenue, Fifteenth Floor
St. Louis, MO 63105
Phone: 314-721-7701
Fax: 314-721-0554
schwartz@capessokol.com

*Attorney for Blue Cross and Blue Shield of Kansas City*