UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF KANSAS CITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21-cv-00525-FJG |
| v. | ) | |
| | ) | |
| GS LABS LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT GS LABS LLC'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM FOR DAMAGES AND EQUITABLE RELIEF

COMES NOW Defendant, GS Labs LLC ("GS Labs"), by and through undersigned counsel, and for its Answer, Affirmative Defenses, and Counterclaim for Damages and Equitable Relief, states as follows:

## GENERAL DENIAL

Recognizing early the urgent need for expanded COVID-19 testing capacity as quickly as possible to slow the spread of the pandemic, GS Labs rapidly mobilized the resources necessary to open convenient, accessible, high-quality testing labs, incurring $37 million in costs to expand across the country to serve as many people as possible.  GS Labs is proud to have provided safe, accurate, and efficient COVID-19 rapid tests to over 12,000 members of Blue Cross Blue Shield of Kansas City ("Blue KC") and is prepared to do it again if that is what is needed based on the rapid spread of the Delta Variant.  In stark contrast and at a time when Missouri faces another precipitous rise in COVID-19 cases and hospitalizations due in part to the spread of the delta variant, Blue KC shunned its obligations, violated both the letter and spirit of the CARES Act, and

1

instead filed a meritless lawsuit and waged a public relations campaign calculated to shift focus from its refusal to pay for COVID-19 testing at the rates mandated by Congress.

## ANSWER

1. Deny. With this lawsuit, Blue KC wholly fails in its duty to its members by refusing to comply with federal laws and pay for the safe, accurate and efficient testing for SARS-CoV-1, the virus that causes COVID-19 ("COVID-19") provided by GS Labs. Stating further, the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act") was intended to provide for necessary widespread testing, and as a result Congress intentionally required out-of-network COVID-19 test payment at published cash prices, to support a greater supply of testing and incentivize companies just like GS Labs to pivot their business interests to support the public's need for rapid expansion of COVID-19-related diagnostic testing capacity.

2. GS Labs resoundingly admits that pursuant to the CARES Act, health insurers and plans, like Blue KC, must cover certain COVID-19 diagnostic testing. GS Labs further admits the CARES Act states, "such plan or issuer **shall** reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price." CARES Act § 3202(a)(2)(emphasis added). GS Labs denies the remaining allegations contained in this paragraph and counters that Blue KC has utterly failed to comply with the CARES Act—it refused to pay GS Labs' publicly posted cash prices or negotiate in good faith and instead blindsided GS Labs with this frivolous suit.

3. GS Labs admits that it provided valuable testing for Blue KC's members and that it submitted over 12,000 claims to Blue KC for COVID-19 rapid antigen testing pursuant to the

CARES Act. GS Labs also admits that its cash price for the rapid antigen test was $380, an amount posted on its COVID-19 price transparency website in accordance with the CARES Act. GS Labs admits that the cost of the supplies for a COVID-19 test is approximately $20, but denies that that price reflects in any way the cost of providing these critical tests as set forth in GS Labs' counterclaim. GS Labs denies the remaining allegations contained in this paragraph, except to note that Blue KC's reference to alleged wholesale prices demonstrates its underlying contempt for the valuable services that GS Labs provided. As just one example of the infrastructure that GS Labs put in place to meet its high service standards, GS Labs invested substantial resources toward the development of a custom technology platform built to support secure and high-volume scheduling, the convenient intake of patient information, and extraordinarily prompt delivery of results to patients. GS Labs vociferously denies that its published cash prices were excessive.

4. GS Labs denies this paragraph. Stating further, GS Labs notes that the quoted language is emblematic of Blue KC's lawsuit itself, as it is intentionally taken out of context to inflame and mislead, when the cited letter was addressed to all providers and not specifically GS Labs. The letter also stated, "it is widely accepted that efficient and effective testing for the virus is a key measure to eventually restoring public health and ending the pandemic" and as such, included the standing order for COVID-19 testing issued by the State of Kansas through the Department of Health and Environment Secretary Dr. Lee Norman. See Kansas Standing Order for COVID-19 Testing, available at https://www.coronavirus.kdheks.gov/DocumentCenter /View/1599/Secretary-Norman-COVID-19-Testing-Standing-Order.

5. Deny. GS Labs properly complied with federal law by billing Blue KC the cash price posted on its website at the time of billing. GS Labs admits that it provided some free or discounted testing to individuals with a supported financial need in an effort to combat the public

health crisis, and denies that because of that, Blue KC is *entitled* to pay only a small fraction of the published cash price. The Department of Health and Human Services specifically noted, "[w]e do not believe that posting a 'cash price' should prevent a provider of a diagnostic test for COVID–19 from offering testing for free to individuals as charity care or in an effort to combat the public health crisis, rather, the ''cash price'' would be the maximum charge that may apply to a self-pay individual paying out-of-pocket." 85 Fed. Reg. 71142, 71152 (Nov. 6, 2020).

6.      Deny.  In accordance with the CARES Act, GS Labs properly submitted claims relating to COVID-19 testing of Blue KC's members totaling over $9.7 million.  GS Labs also admits that Blue KC only paid GS Labs $108,945, *a mere 1%* of the total billed to Blue KC based on the published cash price for COVID-19 testing.  GS Labs further admits that despite the plain language of the CARES Act calling for payment of the publicly stated cash price or the result of good faith negotiations, Blue KC instead opted to file suit without extending even a single meaningful offer that might result in a negotiated price.

7.      Deny, save that GS Labs admits that it continues to demand payment for the claims at issue in this lawsuit, which were properly submitted for payment in accordance with the CARES Act.

      a) Stating further, GS Labs denies the allegations of subpart a.) and restates that its publicly listed cash prices were the same prices that it submitted to Blue KC as demonstrated in the letter cited by Blue KC in its complaint and as admitted in paragraph 65.  Blue KC's contention that GS Labs "concealed or misrepresented … the true cash prices for the services in question" enjoys no factual support whatsoever.

b) Stating further, GS Labs denies the allegations of subpart b.) and restates the response directly above.

c) Stating further, GS Labs denies the allegations of subpart c.) and notes that unlike Blue KC's perfunctory allegation that GS Labs violated a duty of good faith and fair dealing, GS Labs in fact raises a cause of action against Blue KC for violation of its duty of good faith and fair dealing to GS Labs.

d) Stating further, GS Labs GS Labs denies the allegations of subpart d.) and states that Blue KC's current rate of payment speaks for itself, as Blue KC has paid GS Labs only $108,945, approximately 1% of the total billed to Blue KC based on the published cash price for COVID-19 testing. Blue KC's mischaracterizations of GS Labs fall flat when actual facts are presented.

e) Stating further, GS Labs denies the allegations of subpart e.) as a vague and conclusory allegation.

8. Deny. Stating further, conspicuously absent from this allegation is a claim that GS Labs has in any way sought to collect outstanding claims directly from Blue KC members, or so much as intimated such an intent to collect in this fashion. GS Labs has not and will not balance bill members of the public that it entered this line of business to help protect, and rather GS Labs seeks payment of the claims at issue in this lawsuit, which were properly submitted for payment in accordance with the CARES Act. In violation of the CARES Act, Blue KC inappropriately attempted to shift the burden of the cost of COVID-19 testing to its innocent Blue KC members by notifying its members that they are personally responsible for the cost of the COVID-19 as suggested by the following sample Explanation of Benefits ("EOB") redacted to protect patient privacy:



**Kansas City**

An Independent Licensee of the Blue Cross and Blue Shield Association

Should you have any questions, call
(816) 395-3686 or (800) 329-9550,
or visit our Web site at MyBlueKC.com

**Remittance Advice**

| Payee Name: | GS LABS |
| --- | --- |
| Payee ID #: | 64379013 |
| Payment Date: | 05/10/2021 |
| Payment: | $8,160.76 |
| Check | 2137169 |

| Claim # | | Patient: | | Provider: GS LABS | | | | Plan ID: PREFERRED-CARE | | | |
| Account # | | Member ID: | | Provider ID: 64379013 | | | | Original Claim | | | |

| Beginning Service Date | Units | Total Charge | Allowable Amount | Procedure Code | Other Carrier Paid Amount | Line No. | Provider Write-off | Member Other Liability | Capitated Service | Member Deductible | Member Copay | Member Coinsurance | Member Responsibility | Plan Payment |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 03/26/2021 | 1 | $380.00 | $82.76 | 87811 | $0.00 | 1 | $0.00 | $297.24 | | $0.00 | $0.00 | $0.00 | $297.24 | $82.76 |
| 03/26/2021 | 1 | $50.00 | $50.00 | G2023 | $0.00 | 2 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| 03/26/2021 | 1 | $380.00 | $90.46 | 86328 | $0.00 | 3 | $0.00 | $289.54 | | $0.00 | $0.00 | $0.00 | $289.54 | $90.46 |
| Totals: | 3 | $810.00 | $223.22 | | $0.00 | | $0.00 | $586.78 | | $0.00 | $0.00 | $0.00 | $586.78 | $223.22 |

## PARTIES

9.      GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

10.      GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

11.      GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

12.      GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

13.      GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

14.      Admit.

15.      Admit.

16.      Deny.

17.     GS Labs admits that a Certificate of Registration was issued in the State of Missouri is dated February 2, 2021.  GS Labs further admits that it filed an Application for Registration of a Foreign Covered Entity with the State of Kansas on December 7, 2020.  Unless specifically admitted, GS denies this allegation.

18.     This allegation is a legal conclusion to which no response is required.  To the extent a response is required, GS Labs denies the allegations of this paragraph.

19.     Deny.

20.     Deny.

21.     This allegation is a legal conclusion to which no response is required.  To the extent a response is required, GS Labs denies the allegations of this paragraph.

## JURISDICTION AND VENUE

22.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

23.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

24.     GS Labs admits that Blue KC owes GS Labs over $9.6 million relating to COVID-19 tests provided to its members.  GS Labs denies the remaining allegations contained in this paragraph.

25.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

26.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

27.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

28.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

29.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

30.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

31.     Deny.

## THE POLICIES AND HEALTH PLANS AT ISSUE

32.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

33.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

34.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

35.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

36.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

37.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

38.     This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

**BLUE KC'S RELATIONSHIPS WITH HEALTH CARE PROVIDERS**

39.     This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

40.      This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, GS Labs admits that non-participating providers have not agreed to accept in-network rates—rather they are to be reimbursed as provided in the CARES Act—and otherwise denies the allegations contained in this paragraph.

41.     Admit.

42.     This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

43.     This paragraph asserts a legal conclusion to which no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.

**THE COVID-19 PANDEMIC**

44.     This allegation or statement is not directed at GS Labs and is a matter of public record, and as such, no response is required.  To the extent a response is required, GS Labs states that it expanded its laboratory services to assist with the urgent need for more COVID-19 testing with the encouragement and assurances of Congress as voiced by the Senator from Missouri: "testing for the coronavirus is going to be paid for. It is going to be paid for by Medicare. It is going to be paid for by Medicaid. It is going to be paid for by private insurance."  166 Cong. Rec. S1976-03, 166 Cong. Rec. S1976-03, S1996 (Sen. Blunt, R-Mo).

45.     Admit.

46.     This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, admits that the article cited was accurately quoted.

47.     This allegation or statement is not directed at GS Labs, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.  Stating further, Blue KC appears to be downplaying the severity of the pandemic with this allegation in an attempt to justify its refusal to pay for COVID-19 testing in accordance with the CARES Act.  As of the date of filing this responsive pleading, per Centers for Disease Control and Prevention, the deaths associated from COVID-19 total in excess of 600,000 and this number continues to increase each day.  Any effort to downplay the number of lost lives is despicable.

48.     This allegation or statement is not directed at GS Labs and is a matter of public record, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.  Stating further, GS Labs again must object to any characterization by Blue KC that less vigilance is warranted in combating the pandemic, regardless whether an official state of emergency remains in place.  GS Labs was formed to provide quality, safe, effective testing to citizens and continues to serve in this capacity.

49.     GS Labs admits that Missouri was declared in a state of emergency as of March 13, 2020 which continues as of the date of this pleading as ordered by Missouri Governor Michael Parson.

50.     This allegation or statement is not directed at GS Labs and is a matter of public record, and as such, no response is required. To the extent a response is required, GS Labs admits that in March of 2020, there was insufficient COVID-19 testing.  GS Labs rapidly reacted to begin to fill the very void that Blue KC identifies in this allegation, and as identified by members of Congress in passing the landmark CARES Act legislation that so clearly entitles GS Labs to

payment in this matter.  As articulated by one member of Congress:

> In the end, the only way to end this crisis-and the only way to get the American economy moving again-is to contain the disease. **This will require, as soon as possible, adopting a new goal. That goal should be to test every American who needs it for COVID-19 as soon as possible**, and then isolate and care for the few who are sick and fast-track treatments and vaccines so that Americans can go back to work and go out to eat and resume a normal life again. This legislation will make all COVID-19 tests free. The government has shut down the economy to fight this disease, and the government has to help pay the cost of the suffering that this disease has caused, but **the sooner we make more tests available and stop telling Americans not to get a test, the better.**

166 Cong. Rec. S1895-03, 166 Cong. Rec. S1895-03, S1895 (Sen. Alexander, R-Tenn.).

51.     Admit.

52.     Admit.

53.     This allegation or statement is not directed at GS Labs and is a matter of public record, and as such, no response is required. To the extent a response is required, GS Labs denies the allegations contained in this paragraph.  Stating further, GS Labs is not a Medicare participating provider, and therefore MAC rates are not at issue in this matter and certainly not an authority on the cash price required by the CARES Act.

54.     GS Labs admits that it has worked together with federal, state, and local governments to build a robust testing infrastructure in the Kansas City Metropolitan area, serving thousands of citizens.

55.     GS Labs lacks sufficient knowledge or information sufficient to form a belief about the truth of this allegation, and as such, this statement is denied.

### COVID-19 DIAGNOSTIC TESTING UNDER THE FFCRA AND CARES ACT

56.     Admit.

57.     Admit.

58.     Admit.  Stating further, GS Labs reiterates that this is the precise state of affairs

that spurred it into action.  As expressed by another Congressman:

> **Testing of the coronavirus-it is clear that the coronavirus got an 8- to 10-week head start in this country, and we were woefully unprepared, especially with respect to tests to try to identify the spread of the virus and where it was and how fast it was moving. We were also unprepared on our testing infrastructure.**
>
> **\*\*\***
>
> We are also hearing of shortages in swabs-simple swabs-simply to take the test. **We need to ramp up the testing supply. We also need to knock down the barriers to getting tests.** We need to adopt the South Korean model, and many of us have been calling for this for a long time. We see States and Governors moving forward with this, but the Federal Government needs to take a much more active role in establishing that infrastructure.

166 Cong. Rec. S1882-01, 166 Cong. Rec. S1882-01, S1884 (Sen. Van Hollen, D-Md).

59.    Admit.

60.    Admit.

61.    Admit.  Stating further, CARES Act requires that an insurer such as Blue KC pay this cash price or negotiate in good faith, neither of which occurred in this matter.

62.    Admit.

## GS LABS PROVIDES SAFE, EFFECTIVE TESTING FOR COVID-19 ON BLUE KC MEMBERS AS URGED BY CONGRESS

63.    Admit that the correspondence attached as **Exhibit B** was sent on behalf of GS Labs, seeking among other things to ensure that Blue KC would not balance bill its members for the services GS Labs had provided—one of the very avenues of relief sought by Blue KC in this lawsuit.

64.    GS Labs admits that Blue KC quoted only selected portions of the letter sent to Blue KC on March 2, 2021.  The exact language set out in this section of the letter states as follows with the language that was omitted in bold:

You should anticipate that the claims submitted to your company by GS Labs will set out the GS Labs Cash Price on the date of service identified in the claim. **GS labs expects to be reimbursed in the full amount of the Cash Price, and to receive payment directly.**

**Please note that Blue Cross Blue Shield of Nebraska has confirmed its agreement to pay $385 per test for both antigen and antibody tests for COVID-19, and to pay GS Labs directly as an OON provider.**

**GS Labs also expects that your company will not show a balance owing by the enrollee in responsive EOBs. This was confirmed by a subsequent FAQ issued by the Departments on June 23, 2020. The Departments clarified that balance billing of plan members was prohibited. The FAQ regarding balance billing prohibitions provides:**
**Q9. Does section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?**

**The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test. Section 3202(a) contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website. In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due . . .**

**(Emphasis added).**

**As indicated in the FAQ guidance quoted above,** your company must pay GS Labs at its publicly posted cash price rates, **which are currently: .**

 **. .**

**See www.gslabstesting.com/covid-19-pricing-transparency/. If you wish to negotiate a lower rate with GS Labs on future COVID-19 tests, you may contact me to open discussions regarding pricing and payment terms.**

65.     GS Labs admits that it provided its publicly posted cash price rates in the letter to

Blue KC dated March 2, 2021.

66.     Deny.

67. GS Labs admits that it submitted 34,964 claims for COVID-19 testing amounting to $9,747,145 in services provided to Blue KC's members, and denies the allegations contained in this paragraph.

68. Deny.

69. GS Labs admits that it submitted the following claims for testing to Blue KC members:

| Test | CPT Code | Claims | Amount Billed | Paid by Blue KC |
|---|---|---|---|---|
| Rapid Antigen | 87811 | 11,970 | $4,496,540 | $52,060 |
| Antibody | 86328 | 9,773 | $3,671,180 | $42,560 |
| Biofire (PCR) High Risk | 0202U | 629 | $608,938 | $6,853 |
| ePlex (PCR) High Risk | 0225U | 109 | $103,774 | $2,937 |
| Low Risk PCR | 87635 | 336 | $128,975 | $385 |
| Intermediate Risk PCR | 87637 | 57 | $28,443 | $0 |
| Specimen Collection | G2023 | 12,090 | $600,350 | $4,150 |
| | | Total | $ 9,747,145 | $108,945 |

70. GS Labs admits that the PCR full panel test was performed for most PCR testing, but carefully coded and charged the appropriate fee based on an individualized patient assessment. Unless admitted, GS Labs denies all other allegations. Stating further, certain low and intermediate risk Blue KC members received Luminex, Biofire, or ePlex tests due to supply availability, but were billed the appropriate corresponding low or intermediate risk code to align with GS Labs' standing order.

71.     GS Labs admits that it submitted numerous claim forms to Blue KC and while GS Labs recognizes the confidential nature of claim form fully set out in the Complaint, GS cannot admit or deny a purported claim form without such information.  As such, GS denies the allegations contained in this paragraph.

72.     Deny.  Pursuant to the FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief and Economic Security Act, Implementation Part 44 (the "FAQs"), issued by the Department of Labor, Health and Human Services ("HHS") and the Treasury, dated February 26, 2021, if an individual seeks and receives a Covid-19 diagnostic test from a licensed or authorized provider, including from a "drive-through" site, and/or a site that does not require appointments, plans and issuers generally must assume that the receipt of the test reflects an "individualized clinical assessment."

73.     Deny.  Moreover, the FAQs clarify that plans and issuers are prohibited from imposing specific screening criteria on coverage of COVID-19 diagnostic testing for an asymptomatic person who has no known or suspected exposure to COVID-19. Thus, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements." FAQs, Part 44, pp. 2-3.

74.     Deny.     Pursuant to the FAQs, if an individual seeks and receives a Covid-19 diagnostic test from a licensed or authorized provider, including from a "drive-through" site, and/or a site that does not require appointments, plans and issuers generally must assume that the receipt of the test reflects an "individualized clinical assessment." In addition, the Secretary of the

Kansas Department of Health and Human and Environment and State Health Officer issued a state-wide standing order for COVID-19 testing to "alleviate a patient from having to get an order from their health care provider." See Kansas Standing Order for COVID-19 Testing, available at https://www.coronavirus.kdheks.gov/DocumentCenter/View/1599/Secretary-Norman-COVID-19-Testing-Standing-Order.

75.     Deny. Stating further, Blue KC's halfhearted and irresponsible accusation that GS Labs' conduct amounts to the unlawful practice of medicine while the pandemic rages outside the doors of regular Missourians—alleged "upon information and belief", no less—underscores Blue KC's showmanship at the expense of substantive legal claims and allegations.

76.     GS Labs admits that all patients who received a COVID-19 test verified that they were seeking a diagnostic COVID-19 test due to experiencing symptoms or having an exposure to COVID-19. GS Labs denies all other allegations set out in this paragraph. Stating further, GS Labs complied at all time with the CDC's Overview of Testing for [COVID-19], available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html, and coded its services appropriately and consistently with the guidance at the time for how to do so during a pandemic. In addition, GS Labs' testing is inline with Blue KC's guidance to its members as to when to seek a COVID-19 test:

## When to seek a test

> You have COVID-19 **symptoms**.

> You've been in close contact (within 6 feet for a total of 15 minutes or more) with someone with confirmed COVID-19.

> You've taken part in a high-risk activity such as travel, attending a large social or mass gathering, or been in a crowded indoor setting.

> You've been referred to get a test from a healthcare provider or state health department.

*See* Blue Cross Kansas City COVID-19 website, available at: https://www.bluekc.com
/consumer/covid/tests.html.

77.    Deny**.**

78.    Deny.

a)      Stating further, GS Labs states that, as developed more fully below in GS Labs'
counterclaim, GS Labs provides three different types of COVID-19 tests: (1) a
"Rapid Antigen" ("Antigen") test; (2) a "Polymerase Chain Reaction" ("PCR")
test; and (3) a "Rapid Antibody" ("Antibody") test. Each test has a unique set of
inherent tradeoffs, so the three tests are complementary and often performed in
conjunction with one another.

b)      Stating further, GS Labs denies Blue KC's misrepresentation as to the appropriate
tests needed by its members.

c)      Stating further, GS Labs reiterates the complementary nature of these tests and
outright rejects Blue KC's characterization of these critical services and the needs
of its own members to receive this testing.

## BLUE KC NEGLECTS TO PAY GS LABS'S CASH PRICES OR NEGOTIATE IN GOOD FAITH AS REQUIRED BY THE CARES ACT

79.    Deny.

80.    GS Labs admits that the cash prices reflected in the image in allegation 80 are
consistent with its cash prices posted on GS Labs' website.

81.    The allegations of paragraph 81 are vague as to "most frequently billed" and so GS
Labs must deny the same.

82.    Deny.

83. GS Labs admits that it typically charges a fee for specimen collection using the code G2023 established by CMS's rule issued on April 6, 2020 to establish the new Medicare HCPCS code, G2023 for "specimen collection" for COVID-19 testing.

84. GS Labs admits that for a limited period of time, it charged an administrative fee. GS Labs further states that it has not charged Blue KC any administrative fees. Any further allegations are denied.

85. GS Labs admits that for a limited period of time it used a consent form that included the language quoted in this allegation. Any further allegations are denied.

86. Deny. Stating further and as outlined further in its counterclaim, there was overwhelming demand for testing in Blue KC's footprint, and Blue KC's characterization of this footprint as "well-served" demonstrates its callous disregard for its own members.

87. Deny. Stating further, the CARES Act requires Blue KC to pay the published cash price for the COVID-19 tests their members received, not the price of some random rates Blue KC discovered.

88. Deny.

89. Deny. Stating further, Blue KC wholly mischaracterizes GS Labs' business. As an example, GS Labs operates in Seattle, where citizens enjoy one of the highest costs of living in the United States.

90. Deny.

91. Deny.

92. Deny.

93. Deny.

94. Deny.

95.    Deny.

96.    Deny.

97.    Deny. This allegation is not warranted or supported by the Exhibit referenced and is entirely misrepresented here.

98.    Deny.

99.    Deny.

100.    Deny.  Stating further, GS Labs retains all necessary licenses for reimbursement as a provider under the CARES Act.   As discussed herein, GS Labs was an industry leader in providing testing, and Blue KC's mischaracterization of GS Labs will not withstand the scrutiny of discovery in this matter.

101.    Deny.

102.    Deny.

103.    Deny.

104.    Deny.

**BLUE KC VIOLATES THE CARES ACT BY NOT PAYING GS LABS' CASH PRICE**

105.    Deny.

106.    Deny.

107.    Deny.

108.    Deny.

109.    Deny

110.    Deny.

111.    Deny.

112.    Deny.

113.    Deny.

114.    Deny.

115.    Deny.

**BLUE KC ABRUPTLY CEASES NEGOTIATIONS AND FILES SUIT IN CONTRAVENTION TO THE CARES ACT'S REQUIREMENT TO NEGOTIATE IN GOOD FAITH**

116.    Deny.

117.    Deny.

118.    Deny

**COUNT I. DECLARATORY JUDGMENT**

119.    Defendant realleges each and every denial or other response to the allegations set forth in paragraphs 1 – 118 as if fully set forth herein.

120.    Deny.

121.    GS Labs admits that there is a ripe and justiciable controversy, and that Blue KC is clearly obligated to pay GS Labs pursuant to the CARES Act.

122.    Deny.

123.    Deny.

124.    Deny.

125.    Deny.

126.    Deny.

127.    Deny.

128.    Deny.

129.    GS Labs admits that there is a ripe and justiciable controversy, and that Blue KC is clearly obligated to pay GS Labs pursuant to the CARES Act.

130.    Deny.

131.    Deny.

## COUNT II. INJUNCTIVE RELIEF

132.    Defendant realleges each and every denial or other response to the allegations set forth in paragraphs 1 – 131 as if fully set forth herein

133.    GS Labs admits that it was a non-participating provider providing out of network services to Blue KC members.

134.    Deny.

135.    Deny.

136.    Deny.

137.    Deny.

138.    Deny.

139.    Deny.

140.    Deny.

141.    Deny.

142.    Deny.

143.    Deny.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations in the Complaint, GS Labs asserts and alleges the following affirmative defenses. By alleging the defenses below, GS Labs does not in any way agree or concede that Plaintiff has properly stated any cause of action or that GS Labs has the burden of proof or persuasion with respect to any of its defenses. In further answer and as for its affirmative defenses to the Complaint and each of the counts contained therein, GS Labs states as follows:

1.      Plaintiff's Complaint fails to state a claim, in whole or in part, upon which relief may be granted.

2.      Plaintiff's declaratory judgement claim fails to present a justiciable controversy between the parties.  Stating further, Plaintiff's declaratory judgment is moot in particular as to its meritless request that Defendant be enjoined from "balance billing" Plaintiff's members. Further, assuming there is a justiciable controversy—which there is not—this Court should decline to exercise its discretionary jurisdiction over Plaintiff's declaratory judgment claim.

3.      Plaintiff's claims are preempted by federal law.

4.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has ratified and acquiesced to the conduct alleged in the Complaint.

5.      Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel by reason of Plaintiff's knowledge, conduct, or own wrongful acts.

6.      Plaintiff's claims are barred under the doctrine of unclean hands.

7.      Plaintiff's claims are barred, in whole or in part, by the doctrine of unjust enrichment.

8.      Plaintiff's claims are barred by the doctrine of laches.

9.      Plaintiff's claims are barred or reduced by its failure to mitigate the alleged damages, if any.

10.      Plaintiff's claims are barred in that the claims are contrary to public policy.

11.      Plaintiff's claims for attorneys' fees are not permissible and must be barred.

Defendant does not knowingly and intentionally waive any affirmative defenses. Defendant's investigation continues. Plaintiff's claims for damages may be barred or reduced based on any affirmative defenses that may become available through the course of discovery. GS

Labs reserves the right to plead additional and further affirmative defenses upon the completion of discovery.

## COUNTERCLAIM FOR DAMAGES AND EQUITABLE RELIEF

### I.      Introduction

1.      On July 20, 2021, Blue KC filed the instant lawsuit against GS Labs seeking to escape its obligation to pay for COVID-19 testing for Missouri and Kansas citizens at the required rates.  Simply put, this is the very specter envisioned by Congress, and <u>Congress passed the CARES Act to avoid just this scenario</u>.  As one of Missouri's own Senators stated in this regard:

> Then we need to do things in this bill that will support healthcare workers and healthcare providers. This bill will make sure, I think, to do that in any form it is taking at this moment. Certainly, in the healthcare part that I have worked on as the chairman of the subcommittee, **testing for the coronavirus is going to be paid for. It is going to be paid for by Medicare. It is going to be paid for by Medicaid. It is going to be paid for by private insurance.** Hospitals will get relief in terms of the payments they are supposed to make. It will be the regulatory relief they need to have as they are trying to adapt to a new situation.

166 Cong. Rec. S1976-03, 166 Cong. Rec. S1976-03, S1996 (Sen. Blunt, R-Mo).

2.      In other words, in the midst of a resurgence of the COVID-19 virus in the State of Missouri, Blue KC filed a baseless lawsuit asking this Court to approve of Blue KC's refusal to pay for critical, accurate and efficient COVID-19 testing for its members.

3.      In direct contravention of laws enacted explicitly in response to the pandemic, Blue KC is boldly attempting to use the legal system to bully a COVID-19 testing company, refusing to compensate GS Labs for the clinical services provided to Missouri and Kansas residents, and making it harder for consumers to get fast and accurate COVID-19 tests.

4.      Such conduct is unconscionable, especially during this critical time in the United States, particularly in Missouri.

5.     Blue KC's entire Complaint rests on one fundamental flaw: with no legal authority, the insurer suggests it can refuse to pay GS Labs for COVID-19 testing at the required rates simply because Blue KC deems the published prices too high. Never mind that thousands of Blue KC's insureds benefitted from those services, or that Congress intended to incentivize providers to pivot their businesses to supply this crucial testing in an attempt to curb the virus' spread.

6.     Blue KC's position has no support in law and directly contradicts the language of the CARES Act, which requires insurers like Blue KC to pay out-of-network providers like GS Labs the cash prices published on the providers' websites.

7.     GS Labs asks this Court to deny the relief sought by Blue KC and grant GS Labs' relief under the Counts discussed further herein.

## II.     The Current State of the COVID-19 Pandemic

8.     While the COVID-19 virus continues to rage through the State of Missouri, rather than partnering with providers like GS Labs to stop the spread, Blue KC has instead chosen to abruptly discontinue negotiations and file a baseless lawsuit asking this Court to condone its reckless disregard for the law.

9.     On the exact same day as this lawsuit was filed, the Kansas City Star reported "Missouri is experiencing a rise in COVID-19 cases and hospitalizations due in part to the spread of the delta variant" and that Missouri is the second in the nation, behind only Arkansas, in the most newly confirmed COVID cases per capita on a weekly basis.[1]

---

[1]     Here's what we know about COVID-19 surge in Missouri: St. Louis crisis, masks and more, July 20, 2021 (available at: https://www.kansascity.com/news/coronavirus/article252903873.html).

10.     In addition, on that same day, it was reported that "St. Louis County has had a 28.6% increase in cases in the past seven days compared to the previous week" and the City of St. Louis "has seen a 40.8% increase in cases in the past seven days."[2]

11.     As of the date of the filing of this lawsuit, there were over half a million confirmed COVID-19 cases documented in Missouri and 9,518 deaths of Missouri residents.

12.     Less than a week after Blue KC filed a lawsuit to avoid paying for critical COVID-19 testing, St. Louis City and County re-issued mandatory mask mandates in an attempt to slow the spread of this deadly virus.

13.     In addition, following new masking guidance issued by the U.S. Centers for Disease Control and Prevention to curb the spread of COVID-19, on July 28, 2021, Kansas City Mayor Quinton Lucas announced reinstatement of an indoor mask mandate.

14.     The importance of COVID-19 testing during a worldwide pandemic cannot be overlooked and continues to be a significant mitigation mechanism to identify and curtail the spread of the COVID-19 virus.

III.    **GS Labs Rapidly Shifted Its Business Model, Made Significant Investments, and Took on Risk to Ensure Safe, Effective, and Accurate COVID-19 Testing.**

15.     GS Labs was formed in January 2020, with the aim of providing various clinical testing services from a clinical lab based in Omaha, Nebraska.

16.     In the months that followed, as businesses closed and scientists around the world scrambled to understand COVID-19, GS Labs responded to the public health emergency by investing in groundbreaking COVID-19 testing technology.

17.     GS Labs shifted its entire business model by launching twenty-seven COVID-19 testing sites across the nation. Unlike most facilities that offer COVID-19 testing (e.g., hospitals,

---

[2]      *Id.*

clinics), GS Labs had to develop the infrastructure for delivering its testing services from the ground up, which required an enormous investment.

18.     Recognizing the urgent need for expanding COVID-19 testing capacity as quickly as possible to slow the spread of the pandemic, GS Labs' founders decided to utilize their experience as successful businesspeople to rapidly mobilize the resources necessary to open convenient and accessible testing labs.

19.     With a serious and highly communicable disease such as COVID-19, the timing of testing is critical, and as such, GS Labs' focus was on available appointments, accessible testing (allowing patients to visit a laboratory site but safely remain in their vehicles at testing locations), with same-day results. Additionally, to maximize testing capacity, GS Labs committed to ensuring that its sites would remain open 8 am – 8pm each day, 7 days per week.

20.     To meet these high service standards, GS Labs committed to investing substantial resources toward the development of a technology platform built to support secure scheduling and intake of patient information, and a very quick delivery of results to patients. Furthermore, to better support a seamless operation and a better patient experience in all locations, GS Labs invested in hiring its own in-house staffing, billing, accounting, financial employees, and on-site registered nurses to administer tests during all operating hours.

21.     With the rapid onset of the pandemic in March 2020, GS Labs invested extraordinary resources toward the development of a custom technology platform to support secure and high-volume scheduling, convenient intake process, and rapid delivery of results to patients.

22.     Ultimately, its investment has given GS Labs the ability to service up to 1,000 patients per day, at each site. These patients have the unique ability to book within 15 minutes of their proposed appointment and are provided with timely and rapid results in as little as 20 minutes.

23.    The following is an image showing the demand for GS Labs' services at Lee's Summit, Missouri.  On average, these sites provided testing for nearly 100 patients per day at Lee's Summit and nearly 60 patients per day at Lenexa.  Over 30,000 patients were tested at these two locations.



24.    The costs for the provision of this critical testing are certainly more than the mere cost of the supplies for the testing as alleged by Blue KC. In order to provide timely and quality testing, GS Labs pays approximately 30 percent higher wages than the industry average for registered nurses in this area to properly swab patients.

25.    In addition to registered nurses, GS Labs employs runners, administration staff and laboratory technicians, and GS Labs pays almost 40 percent higher than similar positions in the area to ensure proper and appropriate staffing.

26.     The reason for the steep pay rates is because the nature of the job is "essential" and at-risk.  GS Labs' workers have a demanding job to support a busy test operation, requiring PPE and extensive precautions potentially putting themselves at greater risk by working at a COVID-19 test site.  On top of pay rates being an extraordinary cost – GS Labs offers incentives to ensure that it can provide testing after hours and on holidays.

27.     GS Labs provides three different types of COVID-19 tests: (1) a "Rapid Antigen" ("Antigen") test; (2) a "Polymerase Chain Reaction" ("PCR") test; and (3) a "Rapid Antibody" ("Antibody") test. Each test has a unique set of inherent tradeoffs, so the three tests are complementary and often performed in conjunction with one another.

28.     The Antigen test requires a nasal swab, and it detects protein fragments that are specific to COVID-19—if found, these protein fragments indicate that the patient is currently infected with COVID-19.  All GS Labs Antigen testing products fall under the FDA's Emergency Use Authorization, and Antigen testing is specifically contemplated in the CARES Act. Results can take as little as 20 minutes, depending on the volume of tests being processed. These results are relatively quick, but the tradeoff is that the protein fragments can take many days to develop, so a patient infected with COVID-19 may nevertheless test negative if the Antigen test is performed within a week (or more) after exposure.  There is approximately a 15 percent false negative rate for Antigen testing, which partly serves to explain the need for complementary tests.

29.     The PCR test requires a nasal or oral swab and detects genetic material that is specific to COVID-19—if found, this genetic material indicates that the patient is currently infected with COVID-19.  All GS Labs PCR testing products fall under the FDA's Emergency Use Authorization, and PCR testing is specifically contemplated in the CARES Act. Results can take between 2-5 days, or longer, depending on the volume of tests being processed. These results

are relatively slow, but the tradeoff is that the genetic material is produced relatively quickly, so the PCR test is less prone to "false negatives" than the Antigen test and can more reliably indicate whether a patient is currently infected with COVID-19.

30.     The Antibody test requires a blood sample (via finger prick) and detects antibodies that often develop in someone after they have been infected with COVID-19. All GS Labs Antibody testing products fall under the FDA's Emergency Use Authorization, and Antibody testing is specifically contemplated in the CARES Act. Results can take as little as 20 minutes, depending on the volume of tests being processed. Unlike the Antigen test and PCR test, the Antibody test does not indicate that the patient is currently infected with COVID-19. The extent to which antibodies can protect a person from becoming re-infected with COVID-19 remains unclear, but the Antibody test *can* confirm that the patient has been infected with COVID-19 at some point in the past.

31.     Unlike most facilities that offer COVID-19 tests (e.g., hospitals, clinics), GS Labs was built from the ground up *during* the pandemic, and without the luxury of relying on an already-established infrastructure. GS Labs had to invest an enormous amount of capital to develop quickly its capacity to deliver COVID-19 testing services. Likewise, GS Labs is unable to allocate developmental costs across different industries or services because GS Labs provides *only* COVID-19 testing services.

32.     In addition to the enormous amount of capital that GS Labs invested in infrastructure this past year, which necessarily increases GS Labs' costs and consequently its prices, GS Labs provides testing services that are unmatched by any other testing facility.

33. In its complaint, Blue KC wholly ignores any underlying costs borne by GS Labs, instead choosing to simply mischaracterize GS Labs in an effort to smear the company and advance its preferred narrative.

34. Realizing the stakes for the public in this unprecedented situation, GS Labs scaled to nearly 30 locations across the country, investing millions of dollars into its own high-throughput and high-volume PCR laboratory in Omaha, Nebraska. Moreover, as existing providers were not rising to the challenge of improving testing, GS Labs responded to Congress' call, rapidly expanding to new locations to serve the American public. Simply put, GS Labs raised the standard of diagnostic testing in parts of the country where it operated by providing safe, innovative, accessible, rapid and quality tests to hundreds of thousands of Americans.

35. In addition to high quality and efficient testing, a core tenet of GS Labs is legal and regulatory compliance. In October 2020, GS Labs retained McKesson Laboratory Solutions to provide a dedicated laboratory consultant, who would be responsible for advising on lab testing regulations and compliance.

36. Congress recognized the critical need for GS Labs and others to step up during this health care crisis by requiring insurance companies such as Blue KC to pay such labs out-of-network rates to support a greater supply of testing, particularly from smaller labs, with higher marginal costs, which are unlikely to have a contract with insurers.

37. As noted in an article published through the USC-Brookings Schaeffer Initiative for Health Policy, a partnership between Economic Studies at Brookings and the University of Southern California Schaeffer Center for Health Policy & Economics, "when pursuing widespread testing through the insurance model … there is good reason to require, temporarily, generous out-of-network COVID-19 test payment to support a greater supply of

testing, <u>particularly from smaller labs with higher marginal costs that insurers have little incentive to contract with</u>."[3] The CARES Act took that approach, explicitly requiring insurers like Blue KC to pay the publicly listed cash price.

38.     Stated differently, Congress explicitly incentivized businesses like GS Labs to do their part during the pandemic. Secure in the knowledge that complying with the CARES Act would assure payment of the publicly listed cash price, GS Labs answered that call.

## IV.     Federal Law Requires Blue KC to Pay GS Labs its Cash Price for COVID-19 Testing.

39.     Congress enacted the Families First Coronavirus Recovery Act (FFCRA) on March 18, 2020 with broad bipartisan support in response to the unprecedented Covid-19 pandemic and public health emergency.  To encourage COVID-19 testing to help slow the virus, FFCRA ensured that Americans would not incur the cost of those tests.  Section 6001 requires group health plans and health issuers offering group or individual health insurance coverage to provide benefits for certain items and services related to COVID-19 testing during the public health emergency, and they must do so without imposing cost-sharing, prior authorization, or other medical management requirements.

40.     The CARES Act was enacted on March 27, 2020 with even more overwhelming Congressional support (96-0 in the U.S. Senate and by voice vote acclamation in the House of Representatives). Section 3201 of the CARES Act amended Section 6001 to include a broader range of diagnostic items and services that must be covered.

---

[3]     Expanded coverage for COVID-19 testing must include limits on costs, Loren Adler and Sabrina Cortlette, USC-Brookings Schaeffer on Health Policy, available at https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2021/02/03/expanded-coverage-for-covid-19-testing-must-include-limits-on-costs/

41. Congress specifically addressed the "pricing of diagnostic testing" with Section 3202(a) of the CARES Act stating:

> A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
> (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.
> (2) *If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.*

42. In other words, Congress specifically set the price for COVID-19 testing to be the "cash price," not a specific rate, not Medicare rates, and not an average price set by providers of this necessary and critical service.

43. This out-of-network testing provision in the CARES Act was strategically intended to incentivize testing during the public health crisis.

44. Congress also did not include adjectives such as "objectively reasonable" as Blue KC has used in its Complaint.

45. The language Congress used was intentional.

46. As noted above, Missouri Senator Roy Blunt from Missouri stated, "testing for the coronavirus is going to be paid for. It is going to be paid for by Medicare. It is going to be paid for by Medicaid. *It is going to be paid for by private insurance*." 166 Cong. Rec. S1976-03, 166 Cong. Rec. S1976-03, S1996 (Sen. Blunt, R-Mo) (emphasis added).

47. Senator Lamar Alexander from Tennessee stated,

> In addition, in the end, the only way to end this crisis-and the only way to get the American economy moving again-is to contain the disease. **This will**

**require, as soon as possible, adopting a new goal. That goal should be to test every American who needs it for COVID-19 as soon as possible,** and then isolate and care for the few who are sick and fast-track treatments and vaccines so that Americans can go back to work and go out to eat and resume a normal life again. This legislation will make all COVID-19 tests free.

The government has shut down the economy to fight this disease, and the government has to help pay the cost of the suffering that this disease has caused, but **the sooner we make more tests available and stop telling Americans not to get a test, the better.**

166 Cong. Rec. S1895-03, 166 Cong. Rec. S1895-03, S1895 (Sen. Alexander, R-Tenn)(emphasis added).

48. See also, comments from Senator Chris Van Hollen from Maryland:

**Testing of the coronavirus-it is clear that the coronavirus got an 8- to 10-week head start in this country, and we were woefully unprepared, especially with respect to tests to try to identify the spread of the virus and where it was and how fast it was moving. We were also unprepared on our testing infrastructure.**

**While we are now ramping up, we are still far behind.** There are still far too many bottlenecks in the system. At Johns Hopkins University in Baltimore, they are doing their own testing, but their testing has been limited by shortages in reagents. That was true a week ago; it continues to be true today. And the University of Maryland Medical System, another major research hospital system in our State, has not yet begun to do their testing because of continued shortages of reagents. That is absolutely unacceptable.

We are also hearing of shortages in swabs-simple swabs-simply to take the test. **We need to ramp up the testing supply. We also need to knock down the barriers to getting tests.** We need to adopt the South Korean model, and many of us have been calling for this for a long time. We see States and Governors moving forward with this, but the Federal Government needs to take a much more active role in establishing that infrastructure.

166 Cong. Rec. S1882-01, 166 Cong. Rec. S1882-01, S1884 (Sen. Van Hollen, D-Md) (emphasis added).

49. Moreover, when the Centers for Medicare & Medicaid Services ("CMS") and the Department of Health and Human Services ("HHS") drafted the regulations for the implementation of the CARES Act, "cash price" was defined as the "the charge that applies to an individual who

pays cash (or cash equivalent) for a COVID–19 diagnostic test." See 85 Fed. Reg. 216, 71142, at 71204, 42 C.F.R. § 182.20.

50.    Congress, as well as both the Trump and Biden Administrations, have clarified that group health plans and health insurance issuers like Blue KC must cover and reimburse COVID-19 testing and related services.

51.    Such rules have been laid out not just in the text of the FFCRA and CARES Act, but also in a series of "Frequently Asked Questions" ("FAQs") documents issued and publicly posted by HHS.

52.    In compliance with Section 3202(b)(1), GS Labs posted on its public website the cash price of its COVID-19 diagnostic test.

53.    Because Blue KC has not negotiated a rate with GS Labs (or even attempted to do so), Blue KC is obligated to reimburse GS Labs for COVID-19 testing services at its published rates, unless reimbursement for the type of claim at issue is adjusted by contract or by statute.

54.    Federal guidance under the FFCRA and CARES Act is also clear that Blue KC's obligation extends to a wide array of coverage and testing types. The FFCRA/CARES Act payment rules apply to "group health plans and health insurance issuers offering group or individual health insurance coverage (including grandfathered health plans)." This definition specifically includes "both insured and self-insured group health plans," including "private employment based group health plans (ERISA plans), non-federal governmental plans…and church plans." *See* FAQs, Part 42, Q1 (April 11, 2020).

55.    Blue KC's reimbursement obligations also apply to all manners of in vitro COVID-19 diagnostic testing, including serological (otherwise known as "antibody") testing. *See* FAQs, Part 42, Q1 (April 11, 2020); FAQs, Part 43, Q4 (June 23, 2020).

56.     In other words, there can be no debate that federal law requires Blue KC to pay for COVID-19 testing services provided by GS Labs.  Regulators have even warned that plans and issuers shall not attempt to "limit or eliminate other benefits . . . to offset the costs of increasing the generosity of benefits related to the diagnosis and/or treatment of COVID-19." *See* FAQs, Part 42, Q9 (April 11, 2020).

57.     Blue KC's failure to pay approximately 34,621 claims is a clear violation of those obligations.

58.     Blue KC's actions are particularly reprehensible given the increased operational costs and burdens that GS Labs has undertaken to join the fight against COVID-19.

59.     GS Labs remained open and tested thousands and thousands of patients during the heart of the pandemic, absorbing increased costs to protect patients and employees, as well as obtaining and providing test results in a timely manner.  To force GS Labs to absorb this risk without reimbursement is the exact opposite of what Congress mandated that health plans must do in the FFCRA and CARES Act.

60.     Many other insurers have recognized the value proposition that GS Labs presents in providing expanded hours, same-day appointments, drive-through testing, rapid test results, and nursing support.

61.     These insurers have chosen to reimburse GS Labs for the full cash price on its public website, as provided in the CARES Act.  These insurers also include other "Blues" companies affiliated with Blue KC as part of the national trade association that forms Blue Cross Blue Shield Association.

**V.     Federal Law Prohibits Blue KC from Paying Anything Other Than GS Labs' Cash Price for the COVID-19 Testing Provided to Its Members.**

62.     GS Labs' test cash price reflect its expanded hours, same day appointments, drive through testing, rapid test results, and nursing support.

63.     Existing providers were not rising to the challenge of improving testing capacity in their communities, so GS Labs established and rapidly expanded its operations, which came at a significant cost.

64.     As intended by the CARES Act, the cash price was set to cover GS Labs' startup and operating costs; our mobilization into many communities of need and our high standard of service means that our costs are higher than that of other providers.

65.     Moreover, GS Labs' prices are not out of the ordinary.

66.     A recent survey by Kaiser Family Foundation found that one in five or 20% of COVID-19 had a cash price of more than $300.00.  See COVID-19 test prices and payment policy, available at https://www.healthsystemtracker.org/brief/covid-19-test-prices-and-payment-policy.

67.     Finally, GS Labs' prices are not unreasonable, as many third-party payers around the country have agreed to reimburse claims at GS Labs' full cash price.

68.     The fee for a self-pay consumer is the same as the amount charged the insurance carrier ($380) however, if the consumer needs financial assistance, it is available at up to 70% off the test price.  For consumers who indicate they have no insurance or an economic hardship, at the time of signing up on the web-site there is an invitation to request financial assistance, by interacting with GS Labs online or by phone as indicated below:

OUT-OF-POCKET STARTING AT $380.

*Please use the form next to here if you're in need of our Community Financial Assistance program.

Book Rapid Test Now!

Complete the form below to qualify for up to a 70% discount on the Out-Of-Pocket costs.

Name

First      Last

Email

Phone Number

Household Information (Check One That Applies)
- I do not currently have insurance.
- I do not currently have insurance with out-of-network benefits
- I am not currently covered by Medicaid or a Medicaid HMO plan.
- I am currently unemployed.
- My monthly income is below $2,000/mo. per dependent.
- None of the above.

69.     The Department of Health and Human Services specifically noted, "[w]e do not believe that posting a 'cash price' should prevent a provider of a diagnostic test for COVID–19 from offering testing for free to individuals as charity care or in an effort to combat the public health crisis, rather, the 'cash price' would be the maximum charge that may apply to a self-pay individual paying out-of-pocket." 85 Fed. Reg. 71142, 71152 (Nov. 6, 2020).

70.     Nothing in the CARES Act suggests that Blue KC is *entitled* to pay only a small fraction of the published cash price simply because GS Labs provided certain patients discounts based on a financial hardship.

## VI.     Federal Law Prohibits Blue KC from Shifting Costs to Its Members

71.     Insurance carriers, such as Blue KC, "must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorization, or other medical management requirements." *See* FFCRA, § 6001(a); FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation (hereinafter "FAQs"), Part 44, pp. 1-2 (February 26, 2021).

72.     The FAQs advise plans and issuers to maintain their claims processing and other information technology systems in ways that protect patients from inappropriate cost sharing and

37

to document any steps they are taking to do so.  HHS has stated that it will take enforcement action, where appropriate, to ensure that consumers receive the protections to which they are entitled under the FFCRA and the CARES Act.  FAQs, Part 42, pp. 8-9 (April 11, 2020) ("The Departments would continue to take enforcement action against any health insurance issuer or plan that attempts to limit or eliminate other benefits, or to increase cost-sharing, to offset the costs of increasing the generosity of benefits related to the diagnosis and/or treatment of COVID19.").

73.     In addition to not paying the cash price as required by the CARES Act, Blue KC attempted to shift its burden to its members by informing them in the Explanation of Benefits that they were responsible for a portion of the fee in direct violation of the CARES Act. See the following example EOB (redacted to protect patient privacy):

2021051024



Should you have any questions, call
(816) 395-3686 or (800) 320-9550,
or visit our Web site at MyBlueKC.com

**Remittance Advice**

| Payee Name: | GS LABS |
| Payee ID #: | 64379013 |
| Payment Date: | 05/10/2021 |
| Payment: | $8,160.76 |
| Check | 2137169 |

| Claim #<br>Account # | | | | | | Patient:<br>Member ID: | | Provider:GS LABS<br>Provider ID:64379013 | | | | Plan ID: PREFERRED-CARE<br>Original Claim | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning<br>Service<br>Date | Units | Total<br>Charge | Allowable<br>Amount | Procedure<br>Code | Other<br>Carrier<br>Paid Amount | Line<br>No. | Provider<br>Write-off | Member<br>Other<br>Liability | Capitated<br>Service | Member<br>Deductible | Member<br>Copay | Member<br>Coinsurance | Member<br>Responsibility | Plan<br>Payment |
| 03/26/2021 | 1 | $380.00 | $82.76 | 87811 | $0.00 | 1 | $0.00 | $297.24 | | $0.00 | $0.00 | $0.00 | $297.24 | $82.76 |
| 03/26/2021 | 1 | $50.00 | $50.00 | G2023 | $0.00 | 2 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| 03/26/2021 | 1 | $380.00 | $90.46 | 86328 | $0.00 | 3 | $0.00 | $289.54 | | $0.00 | $0.00 | $0.00 | $289.54 | $90.46 |
| Totals: | 3 | $810.00 | $223.22 | | $0.00 | | $0.00 | $586.78 | | $0.00 | $0.00 | $0.00 | $586.78 | $223.22 |

74.     In addition, on Blue KC's website regarding COVID-19 directed to its members, it specifically warns of out-of-pocket fees for going to an out of network provider for COVID-19 testing, in violation of the CARES Act.  *See* https://www.bluekc.com/consumer/covid/tests.html.

75.     Moreover, the FAQs clarify that plans and issuers are prohibited from imposing specific screening criteria on coverage of COVID-19 diagnostic testing for an asymptomatic person who has no known or suspected exposure to COVID-19.

76.     Thus, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, or other medical management requirements." FAQs, Part 44, pp. 2-3.

77.     In an effort to open up access for testing related to the coronavirus pandemic. CMS published "CMS NEWS" for immediate release on April 30, 2020, clarifying that "a written practitioner's order is no longer required for the COVID-19 test" listing indications for getting a COVID-19 Test.

78.     Notably, CMS will no longer require a written order from the treating physician or other practitioner for beneficiaries to get COVID-19 tests, nor for influenza tests meant to rule out other infections.

79.     GS Labs employs a medical director who is licensed in every state where GS Labs is located and he has issued standing orders compliant with CMS's guidelines and indications for obtaining a COVID-19 test.

80.     Blue KC's refusal to pay for testing for its members by imposing additional screening criteria is in violation of the CARES Act.

**VII. Blue KC Inappropriately Withheld Full Payment for COVID-19 Testing Services in Bad Faith.**

81.    In connection with the COVID-19 diagnostic testing and related testing provided to Blue KC members who received testing services at issue in this lawsuit, GS Labs timely submitted claims for payment to Blue KC and billed the cash price for the relevant service publicly posted on GS Labs' website, as permitted by the CARES Act.

82.    As noted by Blue KC, counsel for GS Labs sent counsel for Blue KC a letter dated March 2, 2021 providing notice of claims for COVID-19 testing for Blue KC's members, outlining Blue KC's obligations under the CARES Act, providing the cash prices publicly posted, and noting that another Blue Cross plan agreed to pay GS Labs its rates posted.

83.    In addition, the letter provides an invitation to negotiate a lower rate with GS Labs on future COVID-19 testing.

84.    Blue KC had the opportunity, as recognized by the CARES Act, to "negotiate a rate with [GS Labs] for less than [the cash price on the website]," but Blue KC did not make any meaningful effort to do so.

85.    In addition, Blue KC did not provide a consistent or logical response to the submitted claims.

86.    For a limited number of claims, Blue KC appropriately paid the claims for COVID-19 tests in full.  See the following example EOB (redacted to protect patient privacy):



**Kansas City**
An Independent Licensee of the Blue Cross and Blue Shield Association

Should you have any questions, call
(816) 395-3686 or (800) 320-9550,
or visit our Web site at MyBlueKC.com

**Remittance Advice**

| Payee Name: | GS LABS |
| --- | --- |
| Payee ID #: | 64379013 |
| Payment Date: | 05/03/2021 |
| Payment: | $2,540.07 |
| Check | 2132343 |

| Claim # Account # | | Patient: Member ID: | | Provider:GS LABS Provider ID:64379013 | | | | Plan ID: PREFERRED-CARE Original Claim | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Beginning Service Date | Units | Total Charge | Allowable Amount | Procedure Code | Other Carrier Paid Amount | Line No. | Provider Write-off | Member Other Liability | Capitated Service | Member Deductible | Member Copay | Member Coinsurance | Member Responsibility | Plan Payment |
| 03/16/2021 | 1 | $380.00 | $380.00 | 87811 | $0.00 | 1 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $380.00 |
| 03/16/2021 | 1 | $50.00 | $50.00 | G2023 | $0.00 | 2 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| 03/16/2021 | 1 | $380.00 | $380.00 | 86328 | $0.00 | 3 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $380.00 |
| Totals: | 3 | $810.00 | $810.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $810.00 |

87.     For other claims, Blue KC paid an arbitrary fraction of the required amount while informing its members they were responsible for the rest of the claims instead of promptly paying for the necessary COVID-19 testing. See the following example EOB (redacted to protect patient privacy):



**Kansas City**
An Independent Licensee of the Blue Cross and Blue Shield Association

Should you have any questions, call
(816) 395-3686 or (800) 320-9550,
or visit our Web site at MyBlueKC.com

**Remittance Advice**

| Payee Name: | GS LABS |
| --- | --- |
| Payee ID #: | 64379013 |
| Payment Date: | 05/10/2021 |
| Payment: | $8,160.76 |
| Check | 2137169 |

| Claim # Account # | | Patient: Member ID: | | Provider:GS LABS Provider ID:64379013 | | | | Plan ID: PREFERRED-CARE Original Claim | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Beginning Service Date | Units | Total Charge | Allowable Amount | Procedure Code | Other Carrier Paid Amount | Line No. | Provider Write-off | Member Other Liability | Capitated Service | Member Deductible | Member Copay | Member Coinsurance | Member Responsibility | Plan Payment |
| 03/26/2021 | 1 | $380.00 | $82.76 | 87811 | $0.00 | 1 | $0.00 | $297.24 | | $0.00 | $0.00 | $0.00 | $297.24 | $82.76 |
| 03/26/2021 | 1 | $50.00 | $50.00 | G2023 | $0.00 | 2 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| 03/26/2021 | 1 | $380.00 | $90.46 | 86328 | $0.00 | 3 | $0.00 | $289.54 | | $0.00 | $0.00 | $0.00 | $289.54 | $90.46 |
| Totals: | 3 | $810.00 | $223.22 | | $0.00 | | $0.00 | $586.78 | | $0.00 | $0.00 | $0.00 | $586.78 | $223.22 |

88.     For over ***5,000 claims***, Blue KC demanded production of medical records and refused to pay for the COVID-19 testing.  For example,



**Kansas City**
*An Independent Licensee of the Blue Cross and Blue Shield Association*

Should you have any questions, call
(816) 395-3686 or (800) 320-9550,
or visit our Web site at MyBlueKC.com

**Remittance Advice**

| Payee Name: | GS LABS |
| --- | --- |
| Payee ID #: | 64379013 |
| Payment Date: | 05/03/2021 |
| Payment: | $2,540.07 |
| Check | 2132343 |

Line 1 - Explanation of Other Non Covered: YMQ - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $380.00
Line 2 - Explanation of Other Non Covered: YMQ - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $50.00
Line 3 - Explanation of Other Non Covered: YMQ - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $380.00

| Claim #: ▮▮▮ Account #: ▮▮▮ | | | | Patient: ▮▮▮ Member ID: ▮▮▮ | | | Provider: GS LABS Provider ID: 64379013 | | | | | Plan ID: BLUE CROSS BLUE SHIELD Original Claim | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Beginning Service Date | Units | Total Charge | Allowable Amount | Procedure Code | Other Carrier Paid Amount | Line No. | Provider Write-off | Member Other Liability | Capitated Service | Member Deductible | Member Copay | Member Coinsurance | Member Responsibility | Plan Payment |
| 12/30/2020 | 1 | $380.00 | $0.00 | 87811 | $0.00 | 1 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/30/2020 | 1 | $50.00 | $0.00 | G2023 | $0.00 | 2 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/30/2020 | 1 | $380.00 | $0.00 | 86328 | $0.00 | 3 | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Totals: | 3 | $810.00 | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Line 1 - Explanation of Other Non Covered: YNP - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $380.00
Line 2 - Explanation of Other Non Covered: YNP - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $50.00
Line 3 - Explanation of Other Non Covered: YNP - Please submit a copy of the Medical Records. Once this information is received, we will reprocess the claim. $380.00

89.     To date, GS Labs produced 3,000 medical records amounting to over 20,000 pages of documents, and still has not been paid in full for the services provided and documented in the medical records.

90.     Regardless of access to records, Blue KC's requests contravene the instructions in the FFCRA, CARES Act, and FAQs, which clarify that Blue KC must reimburse out-of-network laboratories like GS Labs without engaging in "medical management."  It is disingenuous, not to mention illegal, for Blue KC to claim that it must review detailed clinical records to determine a patient's symptoms before covering the COVID-19 test.

91.     Federal guidance states that, under the FFCRA and CARES Act, plans and issuers cannot "use medical screening criteria to deny (or impose cost sharing on) a claim for COVID-19 diagnostic testing" for asymptomatic patients, and they "cannot require the presence of symptoms

or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." FAQs, Part 44 Q1 (Feb. 26, 2021).

92.     Blue KC's actions in withholding payment on legitimate claims for services GS Labs provided and demanding an unreasonable volume of documentation are clear violations of Blue KC's FFCRA and CARES Act reimbursement obligations.

93.     Blue KC's abusive records requests and withholding of payment directly violate a Congressional mandate requiring carriers to reimburse in- and out-of-network COVID-19 testing services during the pandemic.

94.     The parties had a few negotiation discussions regarding the COVID-19 testing provided to Blue KC members including a discussion on July 1, 2021, where Blue KC made various false accusations including alleging that GS Labs was not CLIA certified, but offered to pay GS Labs a fraction of the required cash price.

95.     In addition, Blue KC agreed to look into the number of records requests made to GS Labs and attempt to work to reduce the number significantly, acknowledging the outrageous number of such requests.

96.     In response, GS Labs agreed to provide a significant discount of its fees to resolve the dispute.

97.     Blue KC does not dispute the testing was performed for its members, but solely objects to the price of the testing.

98.     A little more than two weeks after the July 1, 2021 conversation when Blue KC agreed to work with GS Labs on the medical records requests, Blue KC filed a 29-page complaint including 144 separate paragraphs. Clearly, this pleading was drafted or in the process of being

drafted at the time when GS Labs thought it was negotiating with Blue KC in good faith to resolve the cost of providing critical testing to Blue KC's members.

99.     In Missouri, Blue KC has a duty to acknowledge and promptly adjudicate claims, in addition to its duties to engage in good faith and fair dealing with regard to the implied contractual relationship that exists between GS Labs and Blue KC.  Blue KC has breached these duties and GS Labs has suffered damages.

100.    GS Labs attempted to engage in communications and discussions with Blue KC in an effort to resolve this dispute through good faith negotiations, but in the midst of the beginning stages of negotiation, Blue KC blind-sided GS Labs by filing this lawsuit and press release.

## COUNT I
## VIOLATION OF FAMILIES FIRST CORONAVIRUS RESPONSE ACT AND CARES ACT

101.    GS Labs incorporates by reference the allegations contained in paragraphs 1-100, as if fully restated here.

102.    Blue KC offers group health plans and is a health insurance issuer offering group or individual health insurance coverage, as those terms are defined under section 6001 of the FFCRA.

103.    The COVID-19-related testing services that GS Labs provided to Blue KC's health plan members and beneficiaries constitute in vitro diagnostic products for the detection of COVID-19 or the diagnosis of the virus that causes COVID–19, as provided by section 6001 of the FFCRA.

104.    GS Labs and Blue KC have not entered into an agreement for the provision of health care services, and as such, there are no negotiated rates agreed upon by the parties for the provision of COVID-19 testing or any other services.

105.     In compliance with the CARES Act, GS Labs posted its cash price for COVID-19 testing on its public website.

106.     Under section 3202(a)(2) of the CARES Act, if a health plan such as Blue KC does not have a negotiated rate with a provider such as GS Labs for providing COVID-19 testing related services, the health plan is obligated to pay the provider its posted cash price for providing those services.

107.     Blue KC, despite numerous and persistent demands and requests, has failed and refused to provide anything remotely close to GS Labs' cash price for providing the COVID-19 testing related services.

108.     The following chart reflects the amount of testing provided by GS Labs to Blue KC members and the total amounts that Blue KC has paid to GS Labs for COVID-19 testing for the period between November 28, 2020 and July 28, 2021, ***a mere 1% of the cash price, the rate required by Congress***.

| Test | CPT Code | Claims | Amount Billed | Paid by Blue KC |
|---|---|---|---|---|
| Rapid Antigen | 87811 | 11,970 | $4,605,485 | $52,060 |
| Antibody | 86328 | 9,773 | $3,671,180 | $42,560 |
| Biofire (PCR) High Risk | 0202U | 629 | $608,938 | $6,853 |
| ePlex (PCR) High Risk | 0225U | 109 | $103,774 | $2,937 |
| Low Risk PCR | 87635 | 336 | $128,975 | $385 |
| Intermediate Risk PCR | 87637 | 57 | $28,443 | $0 |
| Specimen Collection | G2023 | 12,090 | $600,350 | $4,150 |
| | | | Total $ 9,747,145 | $108,945 |

109. By reason of the foregoing, GS Labs has been injured.

110. Based on the above, GS Labs is entitled to judgement against Blue KC in an amount to be determined at the trial of this matter, plus interest thereon, together with the costs and disbursement of this action, including reasonable attorneys' fees.

**COUNT II**
**DECLARATORY JUDGMENT**

111. GS Labs incorporates by reference the allegations contained in paragraphs 1-110, as if fully restated here.

112. The COVID-19-related testing services that GS Labs provided to Blue KC's health plan members and beneficiaries constitute in vitro diagnostic products for the detection of COVID-19 or the diagnosis of the virus that causes COVID–19, as provided by section 6001 of the Families First Coronavirus Response Act.

113.     GS Labs and Blue KC have not entered into an agreement to provide services and as such, there is no negotiated rate agreed upon for the provision of these services.

114.     In compliance with the CARES Act, GS Labs posted its cash price for COVID-19 testing on its public website.

115.     Under section 3202(a)(2) of the CARES Act, if a health plan such as Blue KC does not have a negotiated rate with a provider such as GS Labs for providing COVID-19 testing related services, the health plan is obligated to pay the provider its posted cash price for providing those services.

116.     Blue KC, despite numerous and persistent demands and requests, has failed and refused to provide anything remotely close to GS Labs' cash price for providing the COVID-19 testing related services.  Blue KC has paid nothing for the vast majority of COVID-19 tests that GS Labs has provided for Blue KC's members.

117.     An actual, present, and justiciable case or controversy exists between the parties as a result of Blue KC's continued refusal to pay GS Labs, in contravention of FFCRA and the CARES Act.

118.     The parties' dispute is appropriate for declaratory relief, as adjudication would address both the current outstanding payments owed to GS Labs and provide guidance for the parties regarding services that have yet to be provided.

119.     Pursuant to the CARES Act, GS Labs is entitled to receive its posted cash price from Blue KC for the COVID-19 tests GS Labs has provided, and continues to provide, to Blue KC's insureds.

120.     Pursuant to 28 U.S.C. § 2201, GS Labs seeks a declaratory judgment from this Court that Blue KC is required to pay GS Labs its posted cash price for COVID-19 testing services

GS Labs has provided and continues to provide to Blue KC's insureds, in accordance with the CARES Act.

WHEREFORE, GS Labs respectfully requests this Court enter a judgment declaring that Blue KC is required to pay GS Labs its posted cash price for COVID-19 testing services GS Labs has provided and continues to provide to Blue KC's insureds, in accordance with the CARES Act and for such other and further relief as this Court deems just and proper.

**COUNT III**
**BREACH OF IMPLIED CONTRACT/PROMISSORY ESTOPPEL**

121.    GS Labs incorporates by reference the allegations contained in paragraphs 1-120 as if fully restated here.

122.    Pleading in the alternative, Blue KC promised that, in exchange for GS Labs' provision of COVID-19 diagnostic testing, it would reimburse GS Labs for those services provided.

123.    Blue KC undertook conduct that conveyed to GS Labs that coverage for COVID-19 testing would be afforded to patients, but then refused to issue proper payment when the bills were submitted by GS Labs. GS Labs provided COVID-19 diagnostic testing in reliance upon Blue KC's promise.

124.    GS Labs' reliance was reasonable.

125.    GS Labs' reliance was detrimental, as Blue KC has not reimbursed it for those services.

126.    Blue KC expected, or reasonably should have expected, that GS Labs would rely on Blue KC's compliance with the CARES Act.

127.    GS Labs detrimentally relied on Blue KC's promises to pay by continuing to provide testing services to Blue KC members.  GS Labs' reliance on the promises caused it to suffer a definite and substantial detriment and has caused it damage.

128.    Blue KC should have foreseen or did foresee that GS Labs would rely on Blue KC's promise to reimburse GS Labs as set forth above given the parties' conduct.

129.    As a direct and proximate result of GS Labs' reasonable reliance on Blue KC's unambiguous promise, GS Labs has suffered at least $9,638,200 in damages, excluding interest, for unreimbursed testing. The full damages total will be proven at trial.

130.    Injustice can be avoided only by enforcing Blue KC's promise.

WHEREFORE, GS Labs respectfully requests this Court enter judgment in favor of GS Labs and against Blue KC in the amount of GS Labs' damages, including all costs and interest, and for such other and further relief as this Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

131.    GS Labs incorporates by reference the allegations contained in paragraphs 1-130 as if fully restated here.

132.    Pleading in the alternative, with Blue KC's knowledge and consent, GS Labs conferred benefits upon Blue KC by providing Blue KC's insureds with COVID-19 diagnostic testing.

133.    Blue KC appreciated that its insureds were receiving a benefit from GS Labs, the COVID-19 diagnostic testing. GS Labs provided valuable COVID-19 testing services to Blue KC members and to Blue KC as the claims administrator and/or insurer.

134.    By providing medically necessary testing services to Blue KC members, GS Labs conferred a benefit upon Blue KC because GS Labs' provision of healthcare services facilitated

Blue KC's obligations to arrange and pay for COVID-19 testing services and other testing services for its members.

135.     In addition, Blue KC benefited from the insurance premiums from members and beneficiaries in exchange for out-of-network healthcare coverage.  To satisfy its legal obligations, Blue KC required the services of GS Labs to render the testing services.  GS Labs rendered testing services to Blue KC's members and beneficiaries.  Thus, GS Labs conferred a benefit on Blue KC.

136.     Blue KC knew that GS Labs provided the medically necessary testing services to members in satisfaction of Blue KC's obligations to its members.

137.     Moreover, at all relevant times, Blue KC refused to pay GS Labs for the COVID-19 testing services GS Labs provided to the patients at all, or to pay correctly, contrary to the CARES Act requirements.

138.     Blue KC voluntarily accepted, retained, enjoyed, and continues to accept, retain, and enjoy the benefits conferred by GS Labs, with the knowledge that Blue KC expects to and is entitled to payment for such service

139.     Despite proper demand being made on Blue KC for payment for these services, Blue KC has failed to reimburse GS Labs for the services provided.  Blue KC has received and retained a benefit and has been unjustly enriched through the use of funds that earned interest or otherwise added to its profits when said money should have been paid in a timely and appropriate manner to GS Labs.

140.     Blue KC has wrongfully accepted and retained the benefit of GS Labs' provision of testing services to Blue KC's insureds under circumstances where it would be unjust to do so without payment for those services.

141.    As a direct and proximate result of Blue KC's conduct, GS Labs has suffered at least $9,638,200 in damages, excluding interest, for unreimbursed testing. The full damages total will be proven at trial.

WHEREFORE, GS Labs respectfully requests this Court enter judgment in favor of GS Labs and against Blue KC in the amount of GS Labs' damages, including all costs and interest, and for such other and further relief as this Court deems just and proper.

### COUNT V
### QUANTUM MERUIT

142.    GS Labs incorporates by reference the allegations contained in paragraphs 1-141, as if fully restated here.

143.    Pleading in the alternative, with Blue KC's knowledge and consent, GS Labs conferred benefits upon Blue KC by providing Blue KC's insureds with COVID-19 diagnostic testing.

144.    Blue KC acquiesced to GS Labs providing the diagnostic testing services to its insureds.

145.    Blue KC did not inform GS Labs at any time that the testing services were not needed or wanted.

146.    Blue KC has failed and refused to pay the required rate for the the diagnostic testing provided.

147.    As a direct and proximate result of Blue KC's conduct, GS Labs has suffered at least $9,638,200 in damages, excluding interest, for unreimbursed testing. The full damages total will be proved at trial.

WHEREFORE, GS Labs respectfully requests this Court enter judgment in favor of GS Labs and against Blue KC in the amount of GS Labs' damages, including all costs and interest, and for such other and further relief as this Court deems just and proper.

## COUNT VI
## BREACH OF QUASI-CONTRACT OR IMPLIED CONTRACT

148.     GS Labs incorporates by reference the allegations contained in paragraphs 1-147, as if fully restated here.

149.     Pleading in the alternative, Blue KC has shown, by a course of conduct, dealings, and the circumstances surrounding the relationship, to GS Labs, that Blue KC would pay for the COVID testing services provided to Blue KC's members and beneficiaries.

150.     Accordingly, an implied contract or quasi-contract has been created through Blue KC's court of conduct and interaction with GS Labs.

151.     With Blue KC's knowledge and consent, GS Labs conferred benefits upon Blue KC by providing Blue KC's insureds with COVID-19 diagnostic testing.

152.     Blue KC appreciated that its insureds were receiving a benefit from GS Labs, the COVID-19 diagnostic testing.

153.     In fact, with respect to a few limited claims, Blue KC paid GS Labs its cash prices for COVID testing because GS Labs rendered valuable testing services for the benefit of Blue KC and its members.

154.     The parties' implied contract indicated that Blue KC would pay GS Labs the statutorily defined value of GS Labs' services (as provided by the FFCRA and the CARES Act) for the COVID-19 testing services provided by GS Labs.

155.     GS Labs rendered medically necessary testing services to the patients identified, and in doing so, GS Labs reasonably expected Blue KC to properly compensate GS Labs.

156. A reasonable person in the position of Blue KC would know, or reasonably should have known, that GS Labs was performing the services expecting that Blue KC would pay for them appropriately.

157. Despite indicating to GS Labs by a course of conduct, dealings and the circumstances surrounding the relationship that Blue KC would properly and timely reimburse GS Labs for the cash price of testing services, Blue KC failed to do so on numerous occasions.

158. The failure of Blue KC to properly reimburse GS Labs constitutes a breach of the implied contract between Blue KC and GS Labs.

159. Blue KC has refused to appropriately reimburse GS Labs for the diagnostic testing provided to Blue KC's insureds.

160. Blue KC's acceptance of the diagnostic testing for its insureds without appropriate payment to GS Labs would be inequitable.

161. As a direct and proximate result of Blue KC's conduct, GS Labs has suffered at least $9.6 million in damages, excluding interest, for unreimbursed testing. The full damages total will be proven at trial.

WHEREFORE, GS Labs respectfully requests this Court enter judgment in favor of GS Labs and against Blue KC in the amount of GS Labs' damages, including all costs and interest, and for such other and further relief as this Court deems just and proper.

### COUNT VII
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

165. GS Labs incorporates by reference the allegations contained in paragraphs 1-161, as if fully restated here.

166. Through their respective acts, GS Labs and Blue KC entered into a valid and binding contract.

167. Missouri law imputes a duty of good faith and fair dealing in every contract, even with implied contracts.

168. The implied covenant of good faith and fair dealing binds each party to a contract to deal honestly with one another and to avoid denying the other party the expected benefit of the contract.

169. Blue KC benefitted from the contract by receiving COVID-19 diagnostic testing from GS Labs for Blue KC's insureds, but Blue KC has refused to reimburse GS Labs for that testing.

170. Blue KC acted in bad faith with the purpose of depriving GS Labs of the rights and benefits under the contract. Blue KC lacked any reasonable basis for denying GS Labs the rights and benefits under the implied contract. Blue KC breached the covenant through acts of commissions and omission described herein that are wrongful and without justification, and which denied GS Labs the "benefit of the bargain" intended by the parties' implied contract.

171. With the above-described actions, Blue KC breached its duty of good faith and fair dealing to GS Labs.

172. Blue KC's breach of its duty of good faith and fair dealing has caused and is continuing to cause GS Labs to suffer damages in an amount to be proven at trial.

WHEREFORE, GS Labs respectfully requests this Court enter judgment in favor of GS Labs and against Blue KC in the amount of GS Labs' damages, including all costs and interest, and for such other and further relief as this Court deems just and proper.

# COUNT VIII
## VIOLATION OF MISSOURI'S PROMPT PAY STATUTE (Mo. Rev. Stat. § 376.383)

173.    GS Labs incorporates by reference the allegations contained in paragraphs 1-172, as if fully restated here.

174.    Blue KC is considered to be "health carrier" as defined in Section 376.1350 of the Missouri Revised Statutes as Blue KC is "an entity subject to the insurance laws and regulations of [Missouri] that contracts or offers to contract to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services, including a sickness and accident insurance company, a health maintenance organization, a nonprofit hospital and health service corporation, or any other entity providing a plan of health insurance, health benefits or health services; except that such plan shall not include any coverage pursuant to a liability insurance policy, workers' compensation insurance policy, or medical payments insurance issued as a supplement to a liability policy."

175.    GS Labs is considered to be a "claimant" pursuant to Section 376.383 as it is a corporation "asserting a right to payment arising out of a contract or a contingency or loss under a health benefit plan as defined in section 376.1350."

176.    Missouri Prompt Pay Statute requires Blue KC to pay GS Lab's COVID-19 testing claims within 45 days of the date GS Labs electronically submits a clean claim, provided that the COVID-19 testing claims meet the requirements of a clean claim.

177.    With respect to the plans that Blue KC insures, Blue KC's processing of COVID-19 testing claims for beneficiaries it insures is governed by the prompt payment requirements of Section 376.383.6 (1) of the Missouri Revised Statutes which states, in part:

> If the health carrier has not paid the claimant on or before the forty-fifth processing day from the date of receipt of the claim, the health carrier shall pay the claimant one percent interest per month and a penalty in an amount equal to one percent of

55

the claim per day. On claims where the amount owed by a health carrier exceeds thirty-five thousand dollars on the unpaid balance of a claim, the health carrier shall pay the claimant one percent interest per month and a penalty in an amount equal to one percent of the claim per day for a maximum of one hundred days, and thereafter shall pay the claimant two percent interest per month. The interest and penalty shall be calculated based upon the unpaid balance of the claim as of the forty-fifth processing day. The interest and penalty paid pursuant to this subsection shall be included in any late reimbursement without the necessity for the person that filed the original claim to make an additional claim for that interest and penalty. A health carrier may combine interest payments and make payment once the aggregate amount reaches one hundred dollars.

178.    GS Labs' COVID-19 testing claims meet all the criteria for payment under the Missouri's Prompt Payment Statute. On the dates the COVID-19 testing services were provided, Blue KC members of fully-insured health plans and the COVID-19 testing services were covered under the terms of the relevant Blue KC health plans.

179.    Moreover, GS Labs was eligible for out-of-network payments under the terms of the relevant Blue KC health plans as mandated by the FFCRA and the CARES Act.

180.    GS Labs submitted claims electronically as required by Section 376.382 to Blue KC on various dates between February 24, 2021 and July 28, 2021 for COVID-19 testing of Blue KC's beneficiaries totaling 34,964 claims and amounting to $9,747,145.

181.    As of the date of this filing, over 75% of the claims are over 45 days past due and over $4 million dollars is over 90 days past due.

182.    Blue KC did not provide a consistent or logical response to the submitted claims.

183.    Blue KC appropriately paid a limited number of claims in full.

184.    For other claims, Blue KC paid an arbitrary fraction of the required amount while informing its members they were responsible for the rest of the claims instead of promptly paying for the necessary COVID-19 testing. See the following redacted example EOB:

185.    For over **5,000 claims**, Blue KC demanded production of medical records and refused to pay the cash price as required the CARES Act.  To date, GS Labs produced 3,000 medical records, and still has not been paid in full for the services provided and documented in the medical records.

186.    GS Labs made proper demands for services provided to Blue KC's beneficiaries.

187.    In response to these proper claims, Blue KC engaged in unscrupulous and fraudulent conduct to avoid its obligation to reimburse GS Labs in accordance with Section 3202(a) of the CARES Act. This unlawful conduct does not excuse Blue KC from delaying full payment and/or perpetually paying the improper amount on COVID-19 testing claims.

188.    By reason of the foregoing, GS Labs is entitled to recover from Blue KC the full underpaid amounts due to GS Labs on all relevant COVID-19 testing claims, together with any and all applicable statutory interests pursuant to Missouri Rev. Statute § 376.383.

189.    As a result of Blue KC's violations of Missouri's Prompt Pay Act, GS Labs has been damaged.

190.    Based on the above, GS Labs is entitled to compensatory damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

WHEREFORE, GS Labs prays that the Court grant the following relief:

(i)     Declaring that Blue KC must pay GS Labs for COVID-19 testing in accordance with the CARES Act by paying GS Labs the posted cash price;

(ii)    Declaring that Blue KC violated its duty of good faith in refusing to pay GS Labs' Cash Price in compliance with the CARES Act;

(iii)   Enjoin Blue KC from informing its members that they are responsible for portions of the charge for the COVID-19 tests;

(iv)    Compensatory damages plus interest thereon, as allowed by law;

(ii)    All costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

(iii)   Such other and further relief as the Court deems just and proper.

                                    Respectfully submitted,
                                    HUSCH BLACKWELL LLP

                                    */s/ Matthew P. Diehr*
                                    Jeffrey B. Jensen, #46745
                                    Tim Garrison, #51033
                                    Matthew Diehr, #61999
                                    HUSCH BLACKWELL LLP
                                    190 Carondelet Plaza, Suite 600
                                    St. Louis, Missouri 63105
                                    314.480.1500
                                    jeff.jensen@huschblackwell.com
                                    tim.garrison@huschblackwell.com
                                    matthew.diehr@huschblackwell.com

                                    *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

                                    */s/ Matthew P. Diehr*
                                    MATTHEW P. DIEHR