UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No.: 4:21-cv-00525-FJG |
| GS LABS LLC, | ) ) | |
| Defendant. | ) ) | |

## <u>BLUE KC'S RESPONSE IN OPPOSITION TO GS LABS'S<br>PARTIAL MOTION TO DISMISS</u>

# TABLE OF CONTENTS

Page

I.     Response to GSL's Misleading and Inaccurate "Background" ................................. 4

II.    Blue KC has Satisfied Rule 9(b) With Respect to GS Lab's Inequitable Conduct ...... 8

III.   Blue KC's Count III Should not be Dismissed ............................................................ 9

       A.     GSL's Retention of Monies Paid to it Would be Unjust – those Payments are
              the Product of an Illegal Scheme .................................................................... 10

       B.     Blue KC Has Standing to Assert Unjust Enrichment Claims for Each Type of
              Plans and Programs Identified in Count III ................................................... 14

              i.      Blue KC Has Standing with Respect to Fully Insured Plans and
                      Policies .................................................................................................... 14

              ii.     Blue KC has Standing with Respect to the FEP Claims ..................... 15

              iii.    Blue KC has Standing with Respect to the National Alliance ASOs
                      That Have Assigned Their Rights to Blue KC .................................... 16

              iv.     Blue KC Has Standing with Respect to Local ASO and Cost Plus Plans
                      17

       C.     GS Labs Received the Money Paid as a Result of its Claim ........................... 17

       D.     The CARES Act Does not Explicitly or Implicitly Prohibit Blue KC's Claims
              for Unjust Enrichment ..................................................................................... 19

       E.     ERISA Does not Preempt Blue KC's State Law Claims for Unjust Enrichment
              .......................................................................................................................... 20

IV.    Blue KC States a Claim for Declaratory Judgment Regarding Both Non-ERISA Plans
       and Policies and ERISA-Governed Plans .................................................................... 23

       A.     Blue KC May Seek Declaratory Relief Under ERISA § 502(a)(3) .................. 23

       B.     ERISA Does Not Preempt Blue KC's Claims for Declaratory Judgement ..... 27

V.     Conclusion ................................................................................................................... 27

i

Page(s)

**Cases**

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,
300 U.S. 227 (1937)......................................................................................................21

*Allstate Indemnity Co. v. Dixon*,
932 F.3d 696 (8th Cir. 2019)..........................................................................................24

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
121 F. Supp. 3d 950 (C.D. Cal. 2015) ...........................................................................12

*Am. Cleaners & Laundry Co. Inc. v. Textile Processors, Serv. Trades, Health Care Pro. & Tech. Emps. Int'l Union Loc. 161*,
482 F. Supp. 2d 1103 (E.D. Mo. 2007) ............................................................................8

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*,
No. 13-CV-3422-WJM-CBS, 2015 WL 1041515 (D. Colo. Mar. 6, 2015)
...................................................................................................................8, 12, 15, 19

*Ark. BCBS v. St. Mary's Hosp., Inc.*,
947 F.2d 1341 (8th Cir. 1991) ........................................................................................19

*Ass'n of N.J. Chiropractors v. Aetna, Inc.*,
2012 WL 1638166 (D.N.J. May 8, 2012) ......................................................................20

*Bannister v. Sorenson*,
103 F.3d 632 (8th Cir. 1996)....................................................................................19, 25

*Bd. of Trustees of the Plumbers & Pipefitters Natl Pension Fund v. Fralick*,
601 Fed. App'x. 289 (5th Cir. 2015) ..............................................................................25

*Blue Cross & Blue Shield of Mississippi v. Sharkey-Issaquena Cmty. Hosp.*,
No. 3:17-CV-338-DPJ-FKB, 2017 WL 6375954 (S.D. Miss. Dec. 13, 2017) ...................13, 15, 19

*Briglia v. Horizon Healthcare Servs., Inc.*,
No. CIV.A.03-6033NLH, 2007 WL 1959249 (D.N.J. July 3, 2007 ) ..............................15

*Chesemore v. Alliance Holdings, Inc.*,
770 F. Supp. 2d 950 (W.D. Wis. 2011) ..........................................................................16

*Cipollone v. Liggett Group, Inc.*,
505 U.S. 504 (1992)........................................................................................................17

*CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*,
No. 4:18 CV 1749 JMB, 2020 WL 805848 (E.D. Mo. Feb. 18, 2020) .............................5

Case 4:21-cv-00525-FJG   Document 42   Filed 09/30/21   Page 3 of 33

*Conn. Gen. Life Ins. Co. v. Adv. Chiro. Healthcare,*
54 F. Supp. 3d 260 (E.D.N.Y. 2003)...................................................................................19

*Conn. Gen. Life Ins. Co. v. Adv. Surgery Ctr. of Bethesda, LLC,*
No: DKC 14-2376, 2015 WL 4394408 (D. Md. July 15, 2015)................................... 19, 20

*Coventry Health Care of Missouri, Inc. v. Nevils,*
137 S. Ct. 1190, 197 L. Ed. 2d 572 (2017)...........................................................................14

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993)..............................................................................................................17

*Dakotas & W. Minnesota Elec. Indus. Health & Welfare Fund by Stainbrook & Christian v.*
*First Agency, Inc.,*
865 F.3d 1098 (8th Cir. 2017) ........................................................................................ 21, 22

*Dorgan v. Ethicon, Inc.,*
No. 4:20-00529-CV-RK, 2020 WL 5372134 (W.D. Mo. Sept. 8, 2020) .............................16

*Employers Mut. Cas. Co v. Tavernaro,*
4 F.Supp.2d 868 (E.D. Mo. 1998) ........................................................................................24

*Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for So. Cal.,*
463 U.S. 1 (1983)...................................................................................................................23

*Freitas v. Wells Fargo Home Mortg., Inc.,*
703 F.3d 436 (8th Cir. 2013)...................................................................................................2

*Fryer v. GS Labs LLC,*
Case No. 2:21-cv-2347 .............................................................................................................3

*Fustok v. UnitedHealth Grp., Inc.,*
2013 WL 2189874 (S.D. Tex. May 20, 2013) ......................................................................20

*Geller v. County Line Auto Sales, Inc.,*
86 F.3d 18 (2d Cir. 1996) ........................................................................................ 18, 19, 25

*Gerosa v. Savasta & Co.,*
329 F.3d 317 (2d Cir. 2003).................................................................................................19

*Great-West Life & Annuity Ins. Co. v. Knudson,*
534 U.S. 204 (2002)...............................................................................................................21

*Hafley v. Lohman,*
90 F.3d 264 (8th Cir. 1996)...................................................................................................16

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,*
530 U.S. 238 (2000)...............................................................................................................21

iii

*In Home Health, Inc. v. Prudential Ins. Co. of Am.,*
    101 F.3d 600 (8th Cir. 1996)..........................................................................................19

*Johnson, v. Gilead Sciences, Inc., No. 4:20-CV-1523-MTS,*
    *2021 WL 4439246* (E.D. Mo. Sept. 28, 2021) ........................................................8

*Liberty Mut. Fire Ins. Co. v. Scott,*
    486 F.3d 418 (8th Cir. 2007)..........................................................................................5

*Lyons v. Philip Morris Inc.,*
    225 F.3d 909 (8th Cir. 2000)........................................................................................21

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 825 (1988)......................................................................................................18

*Martco P'ship v. Lincoln Nat. Life Ins. Co.,*
    86 F.3d 459 (5th Cir. 1996)..........................................................................................18

*Marvin v. State Farm Mut. Auto. Ins. Co.,*
    894 S.W.2d 712 (Mo. Ct. App. 1995) ..........................................................................14

*Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan,*
    577 U.S. 136 (2016)......................................................................................................22

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995)......................................................................................................18

*Nestle Purina PetCare Co. v. Blue Buffalo Co.,*
    No. 4:14 CV 859 RWS, 2015 WL 1782661 (E.D. Mo. Apr. 20, 2015) ........................6

*Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.,*
    No. 2:13-CV-2378, 2014 WL 1028351 (E.D. Cal. Mar. 14, 2014)..............................20

*Pharmacia Corp. Supp. Pension Plan, ex rel. Pfizer Inc. v. Weldon,*
    126 F. Supp. 3d 1061 (E.D. Mo. 2015)........................................................................16

*Pharmacia LLC v. Union Elec. Co.,*
    No. 4:12CV2275 CDP, 2013 WL 1965122 (E.D. Mo. May 10, 2013)............................17

*Prudential Ins. Co. of Am. v. Doe,*
    140 F.3d 785 (8th Cir. 1998)........................................................................................25

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947)......................................................................................................17

*RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.,*
    No. 5:18-CV-06037-DGK, 2019 WL 302515 (W.D. Mo. Jan. 23, 2019) ........6, 7, 19, 20

iv

*Ring v. First Interstate Mortg., Inc.*,
    984 F.2d 924 (8th Cir. 1993)...............................................................................................7, 10

*Roberts v. Francis*,
    128 F.3d 647 (8th Cir. 1997)....................................................................................................6

*Saint Luke's Hosp. of Kansas City v. Benefit Mgmt. Consultants, Inc.*,
    626 S.W.3d 731 (Mo. Ct. App. 2021), *reh'g and/or transfer denied* (June 1, 2021),
    *transfer denied* (Aug. 31, 2021) ............................................................................................14

*Schaller Tel. Co. v. Golden Sky Sys., Inc.*
    298 F.3d 736 (8th Cir. 2002)....................................................................................................6

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..................................................................................................................18

*Sheller, Ludwig & Sheller P.C. v. Equitrac*,
    No. CIV.A. 07-2310, 2008 WL 2370826 (E.D. Pa. June 9, 2008) ....................................16

*Sky Toxicology, Ltd. v. UnitedHealthcare Ins. Co.*,
    No. 5:16-cv-01094-BF-RBF, 2018 WL 4211742 (W.D. Tex. Sept. 4, 2018)....................19

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016), *as revised* (May 24, 2016) ..................................................................13

*Transamerica Occidental Life Ins. Co. v. Digregorio*,
    811 F.2d 1249 (9th Cir. 1987) ................................................................................................25

*Travelers Indem. Co. of Am. v. Willig*,
    No. 4:98CV713 RWS, 2000 WL 288396 (E.D. Mo. Mar. 10, 2000) ................................24

*United States v. Bedi*,
    No. 09-CV-616-WDS, 2011 WL 4974861 (S.D. Ill. Oct. 18, 2011) ....................................8

*UnitedHealthcare Services, Inc. v. Next Health, LLC*,
    3:17-CV-0243-S, 2018 WL 3520429 (N.D. Tex. July 20, 2018) ........................................13

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) ..................................................................................................14

*Winstead v. J.C. Penney Co.*,
    933 F.2d 576 (7th Cir. 1991)........................................................................................... 23, 24

**Statutes**

18 U.S.C. § 1347(a) ........................................................................................................................8, 10

Coronavirus Aid, Relief, and Economic Security Act (CARES Act) Pub. L. 116-136,
    134 Stat. 281 (Mar. 27, 2020), Sec. 3202(b) (1) ..................................1, 2, 10, 11, 12, 17, 23

v

29 U.S.C. § 1132(a) ................................................................................................ 18, 21, 22, 23, 25

Federal Employees Health Benefits Act 5 U.S.C. §§ 8901-8914 .......................................... 13

Fed.R.Civ.P. 9(b) ..................................................................................................................... 6, 7

Fed.R.Civ.P. 26(a) ..................................................................................................................... 15

Kan. Stat. Ann. § 50-6,106 ......................................................................................................... 9

Kan. Stat. Ann. § 40-2,118a ....................................................................................................... 5

Mo. Rev Stat. § 407.020 ........................................................................................................... 10

Mo. Rev Stat. Section 407.025 ................................................................................................... 9

Mo. Rev Stat. § 407.120 ............................................................................................................. 9

Mo. Rev Stat. § 407.929 ............................................................................................................. 9

**Regulations**

45 C.F.R. § 182.20 .................................................................................................................. 2, 11

MO. CODE REGS. ANN. tit. 15, §60-8.030 ................................................................................. 8

**Other Authorities**

*Executors' and Trustees' Bills for Instructions*, 44 Yale L.J. 1433, 1436 (1935) ................................ 22

Unchecked fraud poses a vast threat to the nation's healthcare delivery infrastructure and causes tens, if not hundreds, of billions of dollars in losses every year. The Federal Bureau of Investigation reports, "[Healthcare fraud] can raise health insurance premiums, expose [members of the public] to unnecessary medical procedures, and increase taxes."[1] Against this backdrop, GS Labs, LLC ("GSL" or "GS Labs") proposes a misguided reading of law that would only shield it and other unscrupulous providers from judicial scrutiny. This is neither the law nor good policy. The law must be (and is) interpreted to allow insurers, plan fiduciaries, and administrators to identify fraud, waste, and abuse and to bring those allegations to the Court for prompt resolution.

The core facts of this case are not in dispute. GS Labs is the proverbial kid caught with a hand in the cookie jar. GS Labs purported to set its prices for COVID-19 testing roughly an order of magnitude above other local providers. Instead of charging forty-one dollars ($41.00) for a basic antigen test, a test comparable in terms of clinical sophistication to an over-the-counter pregnancy test,[2] it charges three hundred eighty dollars ($380.00) plus a fifty-dollar ($50.00) collection fee. The large majority of GS Labs's patients received duplicative and unnecessary testing, typically resulting in an $810 per patient total charge. Doc. 14 ¶¶ 95, 107(a), 108, 109. By any measure, this is price gouging.

But even more concerning than the blatant price gouging, is the fact that the purported cash prices GS Labs publishes are not "cash prices" as that phrase is used by the CARES Act. Instead, its posted prices are false artifices designed to reap hundreds of millions of dollars of illegal profits at the public's expense. The Court need not rely on Blue KC's pleading to see that GS Labs's posted prices are not *bona fide* cash prices (although mere pleading would be sufficient to defeat its motion to dismiss)

---

[1] https://www.fbi.gov/scams-and-safety/common-scams-and-crimes/health-care-fraud; https://www.forbes.com/sites/georgecalhoun/2021/06/03/covid-19-testing-free-with-insurance-a-new-form-of-health-care-fraud/?sh=6b0724ac41ea (aggregating other government and private estimates of the extent and severity of healthcare fraud).

[2] https://www.yalemedicine.org/news/which-covid-test-is-accurate

1

– instead it can examine GS Labs's own admissions. *Compare* 45 C.F.R. § 182.20 (defining cash price as "the charge that applies to an individual who pays cash" *with* Exhibit A, page 4 (GSL's admission that its "cash prices" "apply to insurance companies only" and "GS Labs has *never* charged a consumer for the 'cash price' of a COVID-19 test, even if they have no health insurance). (emphasis in original)). When GS Labs told Blue KC on March 2, 2021 that its posted prices were "cash prices" and "[y]ou should anticipate that the claims submitted to your company by GS Labs will set out the GS Labs Cash Price on the date of service identified in the claim . . . [y]our company must pay GS Labs at its publicly posted cash price rates" (Doc. 14 ¶ 89), it misrepresented material facts in an effort to obtain payments it was not entitled to receive.

Public policy encourages, and long-standing state and federal law authorize, insurers and plan fiduciaries to assert suits for declaratory judgment and unjust enrichment under these circumstances. Accordingly, GS Labs's partial motion to dismiss should be denied.

## I. <u>Response to GSL's Misleading and Inaccurate "Background"</u>

When evaluating a motion to dismiss the Court must construe the complaint in a light most favorable to the non-moving party. *See Freitas v. Wells Fargo Home Mortg., Inc.,* 703 F.3d 436, 438 (8th Cir. 2013). GS Labs strays far from this established rule and instead articulates the facts as it wishes they were and not as they are pleaded in the Amended Complaint (and actually are). GS Labs misstates the facts pleaded in Blue KC's Amended Complaint in a number of critical respects:

| GS Labs' Mischaracterization of the Amended Complaint: | What Was Actually Pleaded in the Amended Complaint: |
|---|---|
| "It is undisputed that GS Labs publicly posted cash prices on its website as required by the CARES Act." Doc. 31 at p. 9. | It is disputed that GS Labs posted its cash prices. GS Labs did not post an actual "cash price." Its purported cash prices were not "the charge that applies to an individual who pays cash." *See* 45 C.F.R. § 182.20. Blue KC pleaded, "GS Labs knowingly and intentionally posted on its website sham cash prices which did not represent the actual cash prices GS Labs |

2

| | |
|---|---|
| | established for uninsured patients." Doc. 14, ¶ 142. |
| "Plaintiff does not specifically allege the material [false] facts at issue or omitted material facts." Doc. 31 at p. 9. | Blue KC's Amended Complaint identifies numerous material and false statements and omissions. For instance: |
| | "GS Labs's statements regarding its cash prices were material and false. GS Labs had not established cash prices at the rates identified above." Doc. 14, ¶¶ 90-91. |
| | "Despite the CARES Act's requirement that GS Labs post accurate cash prices on its website, GS Labs did not post accurate cash prices." Doc. 14, ¶ 143. |
| | "Despite GS Labs's statement to the contrary, GS Labs is not a 'top notch lab,' instead its testing was often inaccurate, delayed, and not in compliance with applicable federal regulations." Doc. 14, ¶¶ 129-136. |
| | "GS Labs's certifications in its electronic claims submissions are material and false since the ordering physicians did not personally furnish the tests or personally direct his employees to furnish the tests." Doc. 14, ¶ 100. |
| "Blue KC's entire argument rests on the premise that because other entities may have paid a lower price than GS Labs's published cash price. . . therefore the Third-Party Payors overpaid." Doc. 31 at p. 7-8. | This argument does not appear in Blue KC's Amended Complaint. The mere fact that other local providers charged much, much less is telling, but only one fact regarding GS Labs's objectively unreasonable and bad faith pricing. Other indica include (1) GSL's flawed, delayed, and unreliable testing injurious to public health (Doc. 14 ¶¶ 130-140); (2) the lack of patient-specific clinician judgment in providing the tests (Doc. 14 ¶ 101); (3) GSL's collection of an additional administrative fee directly from patients (Doc. 14 ¶ 117); (4) GS Lab's additional fifty-dollar $50 collection fee (Doc. 14 ¶ 116); (5) GSL's operation at low-cost locations (Doc. 14 ¶ 122); (6) GSL's unusually low labor costs (Doc. 14 ¶ 123), *see generally Fryer v. GS Labs LLC*, Case No. 2:21-cv-2347, pending in the U.S. District Court of Kansas); (7) the lack of even basic |

3

| | medical services provided to GSL patients (Doc. 14 ¶ 124); (8) the fact that GS Labs disclaims any liability and informs all patients that its testing is non-diagnostic and "informational" only (Doc. 14 ¶¶ 124-126); (9) its failure to offer any credible explanation for its facially excessive prices (Doc. 14 ¶¶ 128-129); and, (10) the huge disparity between the cost of the tests in question and amounts billed. (Doc. 14 ¶ 115). |
|---|---|
| GSL makes numerous self-serving and unsupported allegations regarding the exceptionally high quality of its services. *See e.g.,* Doc. 31 at p. 2 ("has incurred over $37 million in investment costs to assist in eliminating barriers to testing by opening convenient, accessible, high-quality testing sites around the nation.") | These allegations not only do not appear in Blue KC's Amended Complaint, but are contradicted in great detail. *See* Doc. 14-1, KS Insurance Dept. Letter to COVID 19 Testing Providers at page 1; Doc. 14-8, GS Labs Letter re Inaccurate Testing at page 1; Doc. 14-9, NE Dept. of Health Letter to GS Labs re Compliance at page 1; Doc. 14-10, GS Labs Letter re GenMark ePlex Test at page 1. Public records and GS Labs's own admissions show over and over again that GS Labs provided substandard, inaccurate testing services. Doc. 14 ¶¶130-136. GS Labs has not provided a valuable service, rather, it has provided a service which—according to one Jackson County Health Department employee—made *"it much more difficult to control the spread of COVID-19."* Doc. 14, ¶132; *see* Doc. 24-1, Jackson County Department of Health Records at page 9. |
| "Blue KC neglected to pursue" negotiations with GS Labs. Doc. 31 at p. 8. | Blue KC negotiated with GS Labs, however, "the negotiations reached an impasse after GS Labs refused Blue KC's offer to accept reasonable rates and demanded that Blue KC pay its sham cash prices less a small discount." Doc. 14, ¶¶ 154-158. |
| "GS Labs provided a discounted price to patients seeking COVID-19 testing after demonstrating a financial need." Doc. 31 at 18. | No place in Blue KC's Amended Complaint does Blue KC plead that GS Labs had a legitimate "charity care" program. To be "uninsured" and to "demonstrate a financial need" are two very different concepts that GS Labs conflates. GS Labs accepted cash payment at a fraction of its posted sham "cash price" for any *uninsured* person, not only people with financial need. A screen capture of the GS Labs's website demonstrating that mere uninsured status, irrespective of financial need, |

4

| | resulted in substantially reduced price is attached. Exhibit B. *See also* Doc. 14 ¶ 152. |
|---|---|
| "Blue KC does not allege, because it would be untrue, that no individuals paid the cash price—in fact, many other carriers and individuals did so, recognizing the value of GS Labs' service, including the Third-Party Payors." Doc. 31 at p. 9. | Blue KC not only alleges that no individuals paid the full sham cash price, but even cites to public records containing GS Labs's own admission that no person paid the full sham cash price. Exhibit A. Those records contain GS Labs's clear and unequivocal admission: "GS Labs has *never* charged a consumer for the 'cash price' of a COVID-19 test, even if they have no health insurance" Exhibit A, page 8; *see also* Doc. 14, ¶¶ 145, 147-148. |

GS Labs also states, "Blue KC makes the unsupported and outrageous claim that GS Labs is not entitled to be paid — not one penny — for its COVID-19 testing services, and is therefore unjustly enriched by having received some portion of payment from the Third-Party Payors." Doc. 31, p. 10. There is nothing outrageous, or even controversial about Blue KC's position – it the well-established law in both Kansas and Missouri. *See* Kan. Stat. Ann. § 40-2,118a. ("A person who violates this statute [regarding fraudulent insurance acts] shall be ordered to make restitution to the insurer or any other person or entity for any financial loss sustained as a result of such violation. ***An insurer shall not be required to provide coverage or pay any claim involving a fraudulent insurance act***.") (emphasis added); *Liberty Mut. Fire Ins. Co. v. Scott,* 486 F.3d 418, 423 (8th Cir. 2007) ("[claimant's] material misrepresentation as to her personal property voids her coverage under the policy."); *CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC,* No. 4:18 CV 1749 JMB, 2020 WL 805848, at *12 (E.D. Mo. Feb. 18, 2020) ("A misrepresentation as to a portion of the loss may void coverage to the entire claim." (citations omitted)). GS Labs's false statements in connection with its claims are functionally equivalent to the familiar circumstance where an insured whose home is lost to fire makes an insurance claim for ten television sets (where really only one has been lost). Just like that insured homeowner

5

who may have had a modest legitimate claim but who chooses to engage in a fraudulent insurance act to inflate the claim, GS Labs has forfeited its right, if any, to demand anything.

## II. Blue KC has Satisfied Rule 9(b) With Respect to GS Labs's Inequitable Conduct

Although Blue KC does not concede it is required to meet the heighted pleading standard of Rule 9(b) where no fraud count is asserted, it has easily satisfied Rule 9(b) by pleading the nature of the misconduct, a description of the claims sufficient to allow GS Labs to respond, and the relief sought. *See Nestle Purina PetCare Co. v. Blue Buffalo Co.*, No. 4:14 CV 859 RWS, 2015 WL 1782661, at *10 (E.D. Mo. Apr. 20, 2015) (Rule 9(b) inapplicable to unjust enrichment claim that did not require proof of fraud). "Rule 9(b)'s requirement must be read "in harmony with the principles of notice pleading." *Schaller Tel. Co. v. Golden Sky Sys., Inc.* 298 F.3d 736, 746 (8th Cir. 2002) (internal quotations and citation omitted). Thus, "the special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Id.* (internal quotations and citation omitted)." *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.,* No. 5:18-CV-06037-DGK, 2019 WL 302515, at *8 (W.D. Mo. Jan. 23, 2019). To determine whether the circumstances constituting misconduct are stated with sufficient particularity to meet the pleading requirements, courts examine the pleading for details such as "the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud." *Id.* (citation omitted). However, "a plaintiff [need not] show all of these factors under Rule 9(b) to plead fraud with sufficient particularity. A plaintiff must state enough so that his/her pleadings are not merely conclusory." *Roberts v. Francis*, 128 F.3d 647, 651 n. 5 (8th Cir. 1997).

6

Blue KC has identified the places where the scheme took place, Doc. 14, ¶¶ 21, 30, 31, the dates of the scheme, Doc. 14, ¶ 88, 93-95, critical false statements made by GS Labs, Doc. 14, ¶¶ 90-91, 100, 129-136, 143, the nature of the misconduct, Doc. 14, ¶¶ 88-153, the identity of the people engaged in the scheme, (identifying name of person making a false statement) Doc. 14-2, and the amount and descriptions of the amounts paid as a result of the scheme, Doc. 14 ¶¶ 93, 96, 195. Most importantly, after reviewing these allegations, GS Labs knows exactly what this lawsuit is about. This more than satisfies Rule 9(b) where a common law fraud is not even pleaded – the nature of the unlawful conduct has been spelled out in great detail over a 38-page complaint. There is no confusion over what happened, when the events took place, which transactions were involved, or what GS Labs stood to gain through the misconduct described.

Dismissal is appropriate "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Ring v. First Interstate Mortg., Inc.,* 984 F.2d 924, 926 (8th Cir. 1993) (internal quotations omitted). Here, there is no bar to relief, and additional detail on any of the elements of the causes pleaded may be supplied at the court's request. Detailed claim data is not necessary at this phase of the litigation (although will be supplied as the data is processed). As the pleadings currently stand, GS Labs is able to identify its misconduct and nature of the litigation so that it may attempt to muster its defenses – this is all that is required.

### III.     Blue KC's Count III Should not be Dismissed

Blue KC's Count III for unjust enrichment and money had and received states a claim and should not be dismissed.[3]

---

[3] "Missouri treats unjust enrichment and money had and received as the same suit." *RightCHOICE Managed Care, Inc.* at *9. The essence of each claim is that "the defendant obtained a benefit, the plaintiff suffered an economic detriment as a result, and it would be inequitable for the defendant to keep the benefit under the circumstances." *Id.* For purposes of this brief, Blue KC does not distinguish

7

**A.** **GSL's Retention of Monies Paid to it Would be Unjust - those Payments are the Product of an Illegal Scheme**

Although it is not necessary to plead a criminal scheme to state a claim for unjust enrichment, a criminal scheme certainly satisfies the "unjust" or "inequitable" element. *Johnson, v. Gilead Sciences, Inc., No. 4:20-CV-1523-MTS, 2021 WL 4439246,* at *7 (E.D. Mo. Sept. 28, 2021) (plaintiff stated claim for unjust enrichment where the facts, if taken as true, amounted to violation of Missouri Merchandising Practices Act); *see United States v. Bedi,* No. 09-CV-616-WDS, 2011 WL 4974861, at *9 (S.D. Ill. Oct. 18, 2011) (scheme violating 18 USC 1347(a) sufficient for unjust enrichment claim); *Am. Cleaners & Laundry Co. Inc. v. Textile Processors, Serv. Trades, Health Care Pro. & Tech. Emps. Int'l Union Loc. 161,* 482 F. Supp. 2d 1103, 1118 (E.D. Mo. 2007) (denying motion to dismiss unjust enrichment claim because to prevail on this Count, it is not necessary to prove fraud, only that the circumstances surrounding the retention of such funds is unjust). An "unjust" retention of money often occurs when a plan or insurer overpays a medical claim for any number of reasons. *See e.g., Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, No. 13-CV-3422-WJM-CBS, 2015 WL 1041515, at *8 (D. Colo. Mar. 6, 2015). GS Labs's scheme runs afoul of both (1) laws regarding false claims made to health care benefit programs, and (2) price gouging laws. These facts are certainly sufficient to satisfy the "unjust" retention of a benefit element.

GS Labs's posting of excessive pricing violates state price gouging and disaster profiteering laws. Under Missouri law it is illegal "for any person in connection with the advertisement or sale of merchandise (including services) to . . . [c]harge within a disaster area an excessive price for any necessity [or] [c]harge any person an excessive price for any necessity which the seller has reason to know is likely to be provided to consumers within a disaster area." MO. CODE REGS. ANN. tit. 15, §60-

_____

between its two legal theories asserted in Count III and its references to "unjust enrichment" are meant to also include its claims for money had and received.

8

8.030; *see Mo. Rev Stat. § 407.929.1* (establishing such practices are unlawful); Mo. Rev Stat. § 407.929.3 (establishing engaging in such practices is criminal); *see also* Kan. Stat. Ann. § 50-6,106. For the reasons described at length in the Complaint and in this brief, GS Labs's pricing is unlawful under state law. *See e.g.,* Doc. 14, ¶¶ 115- 137.[4]

      GS Labs insinuates its prices are not illegal because they are driven by its investments and actual costs. *See* Exhibit A, p. 5, Doc. 31 at p. 6. Placing aside the fact that these attempted justifications do not appear in the Amended Complaint and may not be considered in evaluating the instant motion to dismiss, even a pre-discovery, back-of-the-envelope calculation demonstrates GS Labs's pricing far exceeds its actual costs. GS Labs's annual gross revenue per testing site, if the sham cash prices were paid, would exceed twenty-nine million, five hundred sixty-five thousand dollars ($29,565,000.00). GS Labs has admitted that its facilities see approximately 100 patients per day (but had capacity to test 1,000 individuals at each site). *See* Doc. 4, ¶¶ 22-23. Most patient interactions resulted in an eight hundred ten dollar ($810.00) bill ($380.00 +$380.00+ $50.00).  Doc. 14 ¶¶ 95, 107(a), 108, 109. Thus, each location, would, if its bills were not illegal, expect to be paid eighty-one thousand dollars ($81,000.00) per day, or twenty-nine million, five hundred sixty-five thousand dollars ($29,565,000.00) per year. Against this estimated gross per location revenue of nearly thirty million dollars, the annual per location cost of the COVID-19 testing was no more than one million, four hundred sixty dollars ($1,460,000) (100 people per day, two $20 test each, times 365 days). While GS Labs likely incurred overhead, labor costs, IT costs, and other equipment and supply costs, these costs could not have reasonably exceeded a few million dollars per location and do not justify GS Labs's inflated pricing. As

---

[4] The Missouri Merchandising Practices Act's provision of a limited statutory remedy under Mo. Rev Stat. Section 407.025 does not preempt Blue KC's unjust enrichment claim. *See* Mo. Rev Stat. § 407.120 ("The provisions of sections 407.010 to 407.130 shall not bar any civil claim against any person who has acquired any moneys or property, real or personal, by means of any practice declared to be unlawful by this chapter.")

9

these estimates reveal, GS Labs was attempting to extract enormous profits from the public, over twenty-five million dollars ($25,000,000.00) per location, during the most severe public health emergency in generations.

Further, not only did GS Labs price gouge, but it also used false artifices in connection with its claims. 18 U.S.C. § 1347(a) establishes criminal liability for any person who "knowingly and willfully executes, or attempts to execute, a scheme or artifice . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." *See also* Mo. Rev Stat. § 407.020 (declaring the use of deception, fraud, false pretense, or misrepresentation in trade or commerce an unlawful practice). Here, Blue KC explained in its Complaint facts amounting to GS Labs executing a scheme to use a false statement (the sham cash price) to obtain money under the control of a health care benefit program.

GS Labs maintains that its pricing is not "unjust," as the CARES Act authorizes it to post *any* price (be it forty dollars, four hundred dollars, or four million dollars), label it a "cash price," and demand that insurers and group health plans pay it without question. Essentially, according to GS Labs, it can charge any price because the CARES Act affords it complete and unreviewable discretion. GSL's interpretation not only is an assault on common sense, but also is in plain conflict with the statutory text, regulations, and guidance:

*First*, GS Labs disregards the statutory text. The CARES Act requires providers of COVID-19 testing to "make public the *cash* price for such test on a public internet website of such provider." Coronavirus Aid, Relief, and Economic Security Act Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020), Sec. 3202(b) (1) (emphasis added). It does not speak in terms of a gross price, list price, or arbitrary price. Instead, the CARES Act requires that the provider post an actual established *cash* price, or

10

price an uninsured member of the public is allowed to pay for the test in cash. GS Lab's construction of the CARES Act impermissibly reads the word "cash" out of the text.

*Second*, GS Labs disregards controlling regulation. The relevant regulation defining "cash price" confirms the word "cash" is significant and requires that the provider must post the actual price uninsured people pay for the test. *See* 45 C.F.R. § 182.20 ("Cash price means the charge that applies to an individual who pays cash (or cash equivalent) for a COVID–19 diagnostic test.").

*Third*, GS Labs disregards congressional intent. Congress was well aware of the different types of prices used in the healthcare setting such as "list price" or "gross charge." Had Congress intended to allow a provider to post any price untethered to the price an ordinary uninsured consumer would pay, it could have used one of these other terms that connote as much. *Compare* 45 C.F.R. § 180.20 ("Gross charge means the charge for an individual item or service that is reflected on a hospital's chargemaster, absent any discounts.") *with* 45 C.F.R. § 182.20 ("Cash price means the charge that applies to an individual who pays cash (or cash equivalent) for a COVID–19 diagnostic test."). The use of the term "cash price" rather than "gross charge" reflects Congress's intent that the price must be linked to the charge accepted to test from uninsured members of the public.

*Fourth*, guidance confirms that "cash price" means the actual price the provider sets for self-pay patients. The Department of Health and Human Services directly addressed this issue:

> The "cash price" is generally analogous to the "discounted cash price" as defined at 45 CFR 180.20 for purposes of the Hospital Price Transparency final rule. As we explained in that rule, providers often offer discounts off their gross charges or make other concessions to individuals who pay for their own care (referred to as self-pay individuals) (84 FR 65524). *We also stated that the discounted cash price may be generally analogous to the "walk-in" rate that would apply to all self-pay individuals, regardless of insurance status, who pay in cash at the time of the service, and that such charges are often lower than the rate the hospital negotiates with third party payers because billing self-pay individuals would not require many of the administrative functions that exist for hospitals to seek payment from third party payers (for example, prior authorization and billing functions).* <u>*It is therefore our expectation that the "cash price" established by the provider will be generally similar to, or lower than, rates negotiated with in-network plans and insurers.*</u>

11

Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 FR 71142-01 (emphasis added).

Thus, the clear language of the CARES Act, administrative guidance, and regulations all make clear that "cash price" is not any arbitrary price the provider plucks from the ether, but it must be the provider's actual, established, publicly posted "walk-in" price applicable to self-pay individuals. Here, of course, Blue KC has pled that GS Labs's posted prices were not cash prices because it did not permit, as a matter of policy, cash customers to pay the cash price. Doc. 14, ¶ 145 ("GS Labs routinely, and as a matter of policy, refused to provide treatment to patients who sought to pay cash for COVID-19 diagnostic testing."). GS Labs's statement that its established cash price was three hundred eighty dollars ($380.00) was material, false, and made with the intent to deceive. These allegations are sufficient to establish an "unjust" payment of money.

**B.** **Blue KC Has Standing to Assert Unjust Enrichment Claims for Each Type of Plans and Programs Identified in Count III**

Although GS Labs's claims have touched nearly every line of Blue KC's business, Blue KC seeks to recoup money paid related to only a handful of programs - approximately 379 claims in total. Blue KC has standing to recoup money paid as a result of each of these claims:

**i.** **Blue KC Has Standing with Respect to Fully Insured Plans and Policies**

As an initial matter, GS Labs cannot deny Blue KC's standing to seek relief for overpayments made on behalf of Blue KC's fully-insured plans and policies. (Compl. ¶¶ 40(a), 41, 195.) As to these claims, Blue KC has been directly injured by GS Labs's misconduct. Blue KC has alleged that it seeks reimbursement for monies it paid directly from its accounts. *See Arapahoe Surgery Ctr., LLC,* 2015 WL 1041515 at *3 (insurer has standing to bring an unjust enrichment claim); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.,* 121 F. Supp. 3d 950, 984–85 (C.D. Cal. 2015) (holding that insurer had Article III standing to assert claims on behalf of the plans it administered because trustees and

Case 4:21-cv-00525-FJG   Document 42   Filed 09/30/21   Page 19 of 33

executors "have a stake in the litigation."); *Blue Cross & Blue Shield of Mississippi v. Sharkey-Issaquena Cmty. Hosp.,* No. 3:17-CV-338-DPJ-FKB, 2017 WL 6375954, at *11 (S.D. Miss. Dec. 13, 2017) (same).

Addressing a similar scenario, the court in *Aetna Life Ins. Co. v. Huntington Valley Surgery Center* found general allegations an insurer was harmed as a result of a providers fraudulent claims to self-insured plans sufficient to withstand dismissal. 2014 WL 4116963, at *4 (E.D. Pa. Aug. 19, 2014). The court held that the insurer had standing to pursue state law claims to recover amounts paid under self-insured plans because the insurer was the victim of defendants' misdeeds, and the insurer, as the recipient of the alleged fraud, was the party damaged and entitled to seek redress. *Id.*

Blue KC has pled it suffered a concrete injury and has standing to assert a claim for unjust enrichment with respect to the claims it insured and paid. At the motion to dismiss stage, an insurer like Blue KC has standing to recoup monies paid as a result of abusive billing.

### ii. Blue KC has Standing with Respect to the FEP Claims

Blue KC has Article III standing to assert an unjust enrichment claim on behalf of claims arising from the Federal Employee Program ("FEP"). The FEP program arises under the Federal Employees' Health Benefits Program ("FEHBP"), which is a health benefits plan for federal employees, retirees, and their dependents created by the Federal Employees Health Benefits Act ("FEHBA") 5 U.S.C. §§ 8901-8914. *See* Doc. 14. at ¶¶ 46-53. Crucially, Blue KC has standing because it paid GS Labs's FEP claims from Blue KC's own accounts. Doc. 14, ¶ 54, 196. This fact alone satisfies the standing requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), *as revised* (May 24, 2016) (The injury-in-fact component of constitutional standing requires a plaintiff to "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"); *see also UnitedHealthcare Services, Inc. v. Next Health, LLC,* 3:17-CV-0243-S, 2018 WL 3520429, at *4 (N.D. Tex. July 20, 2018). Moreover, the Supreme Court has held that under FEHBA, "[w]hen a carrier exercises its right to either

13

reimbursement or subrogation, it receives from either the beneficiary or a third party 'payment' respecting the benefits the carrier had previously paid. The carrier's very provision of benefits triggers [the carrier's] right to payment." *Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1197, 197 L. Ed. 2d 572 (2017). Thus, just like the carrier in *Coventry* permitted to seek subrogation, Blue KC has standing to assert a claim for unjust enrichment. The fact that Blue KC has *already* paid GS Labs's claims from its own account satisfies the concrete and particularized injury requirement.

### iii.   Blue KC has Standing with Respect to the National Alliance ASOs That Have Assigned Their Rights to Blue KC

Blue KC has Article III standing to assert an unjust enrichment claims on behalf of certain non-parties because Blue KC has alleged valid assignments of rights, including the ability to bring suit. Doc. 14 ¶ 59, 195, 196. Supreme Court precedent regarding an assignment of rights and the assignee's ability to bring suit is unequivocal. In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, the Supreme Court stated "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." 529 U.S. 765, 773 (2000). In *Sprint Communications Co. v. APCC Services, Inc.*, the Supreme Court stated "[a]ssignees of a claim, including assignees for collection, have long been permitted to bring suit." 554 U.S. 269, 275 (2008). Blue KC has alleged facts to confer Article III standing, because such assignments are expressly described in the Amended Complaint. *See* Doc. 14 at ¶¶ 58 and 59. Such an assignment confers legal title or ownership of claims to Blue KC "and thus fulfills the constitutional requirement of an 'injury-in-fact.'" *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008). *See Sprint Communications Co.*, 554 U.S. at 275 ("[a]ssignees of a claim, including assignees for collection, have long been permitted to bring suit."); *Marvin v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 712, 713 (Mo. Ct. App. 1995) ("an assignment passes all the assignor's title or interest in the subject matter to the assignee and divests the assignor of all right of control over the subject matter."); *Saint Luke's Hosp. of Kansas City v.*

14

*Benefit Mgmt. Consultants, Inc.*, 626 S.W.3d 731, 745 (Mo. Ct. App. 2021), *reh'g and/or transfer denied* (June 1, 2021), *transfer denied* (Aug. 31, 2021) (employee's assignment to hospital of rights under the employer health insurance plan provided hospital with standing to sue school district). Moreover, these executed written assignments have been produced to GS Labs as part of automatic Rule 26(a) disclosures, thus providing notice of Blue KC's authority to bring suit for unjust enrichment. The purpose of a pleading is to provide factual allegations that notify the opposing party of the claim. Blue KC has met its burden.

### iv.    <u>Blue KC Has Standing with Respect to Local ASO and Cost Plus Plans</u>

Blue KC has standing to assert a claim for unjust enrichment on behalf of the local ASO plans and Cost-Plus plans because the agreements described in the Amended Complaint operate as assignments. The Amended Complaint expressly provides the requisite assignment for both plan types. *See* Doc. 14 at ¶ 58, 62. *See Briglia v. Horizon Healthcare Servs., Inc.*, No. CIV.A.03-6033NLH, 2007 WL 1959249, at *6–7 (D.N.J. July 3, 2007 ) (denying motion to dismiss challenging BCBS company's standing to bring claims on behalf of ASO plans and holding "that the plain language of this contract provides an assignment by [plan] of its right to sue to [the provider]); *Arapahoe Surgery Ctr., LLC* 2015 WL 1041515 at *3 (denying motion to dismiss for lack of standing where administrative agreements explicitly authorized under the plans terms to recover overpayments on the plans' behalf"); *Blue Cross & Blue Shield of Mississippi*, 2017 WL 6375954 at *11 (BCBS company had standing to assert damages claims on behalf of plans it administered – including administrative services only arrangements).

### C.    <u>GS Labs Received the Money Paid as a Result of its Claim</u>

Blue KC pleaded that several types of plans and policies paid GSL's claims at its full sham cash price and allowing GS Labs to retain the money would be unjust. Doc. 14 ¶¶ 187, 190, 197, 200. The only reasonable reading and inference from these allegations is that GS Labs received funds paid

as result of its claims. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996) (all reasonable inferences must be drawn in favor of the non-moving party).

With respect to the FEP claims, which were paid to enrollees of the program rather than to GSL directly, Blue KC also states a claim. Doc. 14. ¶ 195. The pleadings are sufficient for this early motion to dismiss stage. Blue KC has pled that GS Labs claims have caused certain FEP claims to be paid at full sham price and has provided documents indicating those monies were to be paid over to GS Labs.[5] "The claim of unjust enrichment simply requires that plaintiff 'confer' benefits on a defendant; it does not require that plaintiff 'directly confer' those benefits." *Sheller, Ludwig & Sheller P.C. v. Equitrac*, No. CIV.A. 07-2310, 2008 WL 2370826 (E.D. Pa. June 9, 2008) (noting that while the plaintiff directly paid its lessor for office equipment under the terms of the lease, the plaintiff "conferred a benefit" on the equipment manufacturer because those payments were remitted from the lessor to the manufacturer); *Dorgan v. Ethicon, Inc.*, No. 4:20-00529-CV-RK, 2020 WL 5372134, at *4 (W.D. Mo. Sept. 8, 2020) (Unjust enrichment is a broad doctrine and includes the conferral of indirect benefits, including benefits conferred by third parties).

GS Labs asserts that it may not have received all monies paid as a result of its FEP claims. Doc. 31, p. 16. Blue KC paid the claims to FEP enrollees, who then, according to GS Labs's consent forms, were obligated to pay those monies over to GS Lab. Essentially, GS Lab presents a premature factual attack without supporting evidence. *See Pharmacia Corp. Supp. Pension Plan, ex rel. Pfizer Inc. v. Weldon*, 126 F. Supp. 3d 1061, 1069-70 (E.D. Mo. 2015) ("[T]he location of the funds is not necessary at the pleading stage."); *Chesemore v. Alliance Holdings, Inc.*, 770 F. Supp. 2d 950, 979 (W.D. Wis. 2011) ("At this early stage, plaintiffs cannot be expected to identify a specific account in which the funds are

---

[5] GS Lab's consent forms state, in part, "GS Labs is not currently a participating provider with any Blue Cross/Blue Shield ("BCBS") plans. GS Labs will submit claim(s) on your behalf, however, if any payment for the claims are made directly to you, as the member, you are responsible for remitting this payment from BCBS to GS Labs." Doc 14-7, p.2

16

held or string of transactions that show that the proceeds can be traced. To require as much would shut the door on most, if not all, claims for such equitable relief."). Whether some of those funds may not have made their way to GS Labs is an improper, premature factual attack.

### D. The CARES Act Does not Explicitly or Implicitly Prohibit Blue KC's Claims for Unjust Enrichment

GS Labs seems to argue that the CARES Act preempts state law claims for unjust enrichment. Blue KC's claims for unjust enrichment, however, are neither explicitly nor implicitly preempted. Indeed, the CARES Act does not contain *any* provision that would negate decades of precedent concerning the right to seek reimbursement of medical overpayments.

When considering a novel preemption defense, courts start "with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). The Supreme Court has stated "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517 (1992). The CARES Act contains no express language preempting Blue KC's claims, nor does it even imply a cause of action under these circumstances. *See* Doc. 24 at pgs. 6-8. Nor does the CARES Act implicitly preempt the claims. "[A] court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993). Implicit preemption applies only if (1) Congress intended the federal law to exclusively "occupy the field," or (2) it is impossible for a private party to comply with both sets of law or the state law stands as an obstacle to the purpose or objectives of the federal law. *Pharmacia LLC v. Union Elec. Co.,* No. 4:12CV2275 CDP, 2013 WL 1965122, at *2 (E.D. Mo. May 10, 2013). Here, of course, GS Lab can establish neither. As noted above, there is no evidence of field preemption and GS Lab could have easily complied with both the CARES Act and state law by

17

establishing legal, reasonable, and accurate cash prices. There can be no implicit preemption under these circumstances.

### E. ERISA Does not Preempt Blue KC's State Law Claims for Unjust Enrichment

GS Labs makes the odd argument that "the type of legal restitution Blue KC seeks under Count III is prohibited by ERISA." Doc. 31, p 16. However the claims pleaded in Count III are *common law* claims, not ERISA claims. Accordingly, its argument that Blue KC has not sufficiently pleaded a cause of action for equitable restitution under ERISA § 502(a) simply misses the mark – Blue KC is not required to plead facts to satisfy standards under ERISA § 502(a) because, with respect to its Count III, it has not asserted a claim under ERISA § 502(a).

District Courts have held that the common law and statutory duties to refrain from making misrepresentations in the submission of insurance claims exist independently of ERISA and are not preempted. Conflict preemption applies as a defense to a claim that "relates to" ERISA plans. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). While this language is broad, the Supreme Court has warned that ERISA does not preempt "run-of-the-mill state-law claims," even though such claims "affect[] and involve[] ERISA plans and their trustees." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833 (1988). In other words, "pre-emption does not occur … if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *Martco P'ship v. Lincoln Nat. Life Ins. Co.*, 86 F.3d 459, 462 (5th Cir. 1996) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995)). As the Second Circuit observed in *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996), a claim "which seeks to advance the rights and expectations created by ERISA, is not preempted simply because it may have a tangential impact on employee benefit plans." *Id.* at 23. Allowing the fraud claim to proceed "would in no way compromise the purpose of Congress;" "[t]o the contrary, 'insuring the honest administration of financially sound plans' is critical to the accomplishment of ERISAs

18

mission." *Id.; accord Gerosa v. Savasta & Co.,* 329 F.3d 317, 330 (2d Cir. 2003) ("immunizing [service provider] could harm the financial integrity of the plans Congress intended to protect.")

The following factors should be weighed to determine if a state law claim is ERISA-preempted:

> (1) whether the state law negates a plan provision; (2) the effect on primary ERISA entities and impact on plan structure; (3) the impact on plan administration; (4) the economic on the plan; (5) whether preemption is consistent with other provisions of ERISA; and (6) whether the state law at issue is an exercise of traditional state power.

*Bannister v. Sorenson,* 103 F.3d 632, 636 (8th Cir. 1996) (*citing Ark. BCBS v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1345-50 (8th Cir. 1991)); *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600, 605 (8th Cir. 1996) (noting that a state claim is less likely to be preempted "if it affects relations between [a primary ERISA entity] and an outside party" (internal quotations and citation omitted)).

This Court should follow the recent opinion in *RightCHOICE Managed Care,* 2019 WL 302515, at *5 and find the state law claims against a provider engaged in an unlawful scheme are not preempted. *RightCHOICE* involved a pass-through billing scheme at a Missouri Hospital. Applying the factors identified in *Bannister,* Judge Kays held ERISA did not preempt state law claims, including a claim for unjust enrichment. The *RightCHOICE* opinion is in excellent company as numerous federal courts have held that ERISA does not preempt state law claims where plans seeks to recover payments made as a result of fraud, waste, abuse, or other illegal schemes. *See Conn. Gen. Life Ins. Co. v. Adv. Chiro. Healthcare,* 54 F. Supp. 3d 260, 268 (E.D.N.Y. 2003) (denying motion to dismiss in which Defendant provider claimed ERISA preempted state law claims including claims for unjust enrichment); *Conn. Gen. Life Ins. Co. v. Adv. Surgery Ctr. of Bethesda, LLC*, No: DKC 14-2376, 2015 WL 4394408, at *17 (D. Md. July 15, 2015) (same); *Sky Toxicology, Ltd. v. UnitedHealthcare Ins. Co.*, No. 5:16-cv-01094-BF-RBF, 2018 WL 4211742, at *4 (W.D. Tex. Sept. 4, 2018) (same); *Blue Cross & Blue Shield of Mississippi v. Sharkey-Issaquena Cmty. Hosp.,* No. 3:17-CV-338-DPJ-FKB, 2017 WL 6375954, at *9 (S.D. Miss. Dec. 13, 2017); (same), *Arapahoe Surgery Ctr., LLC,* 2015 WL 1041515, at *7 (rejecting

19

conflict-preemption defense and stating that "the availability of a remedy under ERISA is not relevant to the preemption analysis") (citation and internal quotation marks omitted); *Advanced Surgery Ctr. of Bethesda, LLC*, 2015 WL 4394408, at *15–19 (finding no preemption in carrier's billing-fraud case that included state-law and ERISA claims); *True View Surgery Ctr.*, 128 F. Supp. 3d at 517 (same); *Nutrishare, Inc. v. Conn. Gen. Life Ins. Co.*, No. 2:13-CV-2378, 2014 WL 1028351, at *6 (E.D. Cal. Mar. 14, 2014) (same); *Fustok v. UnitedHealth Grp., Inc.*, 2013 WL 2189874, at *5 (S.D. Tex. May 20, 2013) (finding no ERISA preemption of insurer's fraud counterclaim against a provider who submitted false insurance claims); *Ass'n of N.J. Chiropractors v. Aetna, Inc.*, 2012 WL 1638166, at *7 (D.N.J. May 8, 2012) (holding even if insurer is acting as a fiduciary, state law claims for unjust enrichment are permissible because of insurer's independent legal duty to prevent fraud, including submitting fraudulent bills to an insurer for payment).

The same result should be reached here; Blue KC's state law claims for unjust enrichment are not preempted by ERISA. Like the claims in *RightCHOICE*, Blue KC's claims do not hinge on rights, responsibilities, or prohibitions created by ERISA. The unjust enrichment claims do not involve a participant or beneficiary's claim for plan benefits. Blue KC's state law claims do not interfere with the relationship among ERISA entities or between the ERISA plan and its participants or beneficiaries. The unjust enrichment claim would have no deleterious effect on ERISA plans or impact plan structure, governance, or administration; instead, this action could only advance the interests of the plans and plan beneficiaries. Finally, Blue KC's claims arise out of the GS Labs's violation of duties that exist independent of ERISA in areas where states traditionally exercise police powers (fraud, waste, abuse, and price gouging).

**IV. Blue KC States a Claim for Declaratory Judgment Regarding Both Non-ERISA Plans and Polices and ERISA-Governed Plans**

GS Labs also takes a fleeting shot at an attempt to dismiss a fraction of the claims involved in Blue KC's Count I. Its half-hearted attempt fails; Blue KC may obtain declaratory judgment under either ERISA § 502(a)(3) or the Declaratory Judgment Act.[6]

**A. Blue KC may Seek Declaratory Relief Under ERISA § 502(a)(3)**

ERISA authorizes plan fiduciaries to file suit against any person to obtain "appropriate equitable relief" related to an ERISA-governed plan. 29 U.S. Code § 1132(a)(3). This other "appropriate equitable relief" includes the right of a plan fiduciary to sue a stranger to the plan to resolve a disputed claim for benefits. *See generally Dakotas & W. Minnesota Elec. Indus. Health & Welfare Fund by Stainbrook & Christian v. First Agency, Inc.,* 865 F.3d 1098, 1103 (8th Cir. 2017).

It is well-settled that ERISA § 502(a)(3) limits its remedies to *equitable relief* and does not permit *legal relief. See Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204 (2002). The equitable relief limitation, however, is the only limitation in the statute. *Lyons v. Philip Morris Inc.,* 225 F.3d 909, 913 (8th Cir. 2000). ERISA § 502(a)(3) "admits of no limit on the universe of possible defendants." *Id.* (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 246 (2000) (internal quotations omitted)). As long as plan fiduciaries are seeking *equitable relief,* the statute "makes no mention at all of which parties may be proper defendants." *Harris Trust,* 530 U.S. at 246.

The Supreme Court has held that the ERISA's "other appropriate equitable relief" is broad enough to encompass "those categories of relief that were *typically* available in equity" during the days of the divided bench (meaning, the period before 1938, when courts of law and equity were separate).

---

[6] GS Labs has not filed a motion to dismiss with respect to Blue KC's Count I insofar as it relates to non-ERISA plans or policies. Those claims must proceed. In non-ERISA contexts, it is undisputed that insurers can, and do, often seek declarations that relevant policies do not cover claims made. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 244 (1937) (Insurer may bring federal declaratory judgment actions to determine non-coverage under an insurance contract.)

*Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan,* 577 U.S. 136, 142 (2016) (internal citation omitted). "To determine how to characterize the basis of a plaintiff's claim and the nature of the remedies sought, we turn to standard treatises on equity, which establish the 'basic contours' of what equitable relief was typically available in premerger equity courts." *Id.*

Before the courts of equity and law were merged, trustees could apply to a court of equity for a "bill for instruction" to guide the proper course of action in novel circumstances. The bill for instruction operated as follows:

> The fiduciary who is in doubt must set forth the particular portion of the instrument concerning which he requests the determination of the court, and the facts on which he grounds his right to relief, showing that he has a present interest in a definitive adjudication of the question raised and supplying the names of any other parties who may be affected by the determination. The court, if it sees fit to grant the application, will then cite such parties as it deems requisite to show cause why the determination requested by the fiduciary should not be made. Whatever decree is then made, unless reversed or modified, is thereafter conclusive on all parties to the proceeding and compliance with instructions given relieves the fiduciary from liability.

*Executors' and Trustees' Bills for Instructions*, 44 Yale L.J. 1433, 1436 (1935). The bill for instruction was employed in the situation where "[t]here may be uncertainty as to the scope of his duty to collect debts [or] to discharge obligations." *Id.* at 1433–34. In an analogous situation, "[f]ederal courts sitting in equity had considered declaratory actions to determine the liability of parties under insurance contracts." *Dakotas,* 865 F.3d at 1103.

With this background, it is not surprising that the Eighth Circuit permits ERISA fiduciaries to assert claims for declaratory judgment under ERISA § 502(a)(3) where the plan seeks declaration as to whether it was obligated to pay certain claims. In *Dakotas,* the Eighth Circuit reviewed the lower court's decision in a case brought by a welfare benefit plan seeking declaratory judgment against an insurer under ERISA § 502(a)(3). 865 F.3d at 1103. The welfare benefit plan sought an order enforcing the plan's coordination of benefits provision by declaring that it did not provide primary coverage for certain medical benefits. The Court of Appeals held the District Court correctly held the

Case 4:21-cv-00525-FJG   Document 42   Filed 09/30/21   Page 29 of 33

plaintiff's declaratory judgment action was an equitable claim seeking remedies typically available in equity and therefore available under ERISA § 502(a)(3). It reasoned:

> ERISA abounds with the language and terminology of trust law. A benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan. Since the seventeenth century, chancery courts in England and the United States have entertained a proceeding, known as a bill for instructions, in which trustees may obtain a judicial ruling as to the proper course to pursue in handling property for the benefit of others, so as to immunize the trustees from liability when the issue is doubtful. The court, if it sees fit to grant the application, will then cite such parties as it deems requisite to show cause why the determination requested by the fiduciary should not be made. This power to grant instructions to trustees has long been viewed ... as inherent in the equitable powers of courts having jurisdiction over trusts, although this authority is generally now based on declaratory-judgment legislation.

*Id.* (internal citation omitted). Under the historical principles of equity that govern ERISA, a plan fiduciary may obtain a judicial ruling as to the proper course with respect to a claim for benefits. The Seventh Circuit explained three decades earlier, "[w]e do no semantic violence to [§ 502(a)(3)] when we interpret it to allow an ERISA plan to bring a declaratory judgment action to determine the extent of its liability, and we promote the goals of ERISA by that interpretation." *Winstead v. J.C. Penney Co.*, 933 F.2d 576, 580 (7th Cir. 1991). *See also Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for So. Cal.,* 463 U.S. 1, 27 n.31 (1983) ("Section 502(a)(3)(B) of ERISA has been interpreted as creating a cause of action for a declaratory judgment.").

This historic situation where the trustee would apply to the court to determine how to discharge its duties closely resembles the current situation where Blue KC has assembled evidence that the claims ought not be paid, but there is no controlling precedent regarding an application of CARES Act to abusive COVID-19 testing schemes. The need for prospective declaratory relief is even more acute in light of GS Labs's threat to balance bill Blue KC's members. Doc. 14, ¶¶ 175-176. Blue KC has a right under ERISA § 502(a)(3) to apply to the court for a declaration affirming that it need not pay the claims at issue.

23

Moreover, allowing ERISA fiduciaries the right to seek a declaratory judgment against claimants engaged in fraudulent schemes would afford ERISA fiduciaries the basic tools needed to combat fraud. Long before ERISA was enacted, "a common way in which disputes over which insurance carrier is liable to a particular claimant are resolved is by a suit for a declaratory judgment brought by one of the carriers against the other." *Winstead*, 933 F.2d at 577. Non-ERISA insurers continue to seek declarations that they should not be required to pay certain claims when they fear the claim is fraudulent or otherwise non-payable. *See e.g. Allstate Indemnity Co. v. Dixon*, 932 F.3d 696 (8th Cir. 2019) (insurer brought action against insureds seeking declaratory judgment that insureds had violated intentional acts exclusion of joint insurance policy and that it was entitled to recover its payment to mortgagees.); *Travelers Indem. Co. of Am. v. Willig,* No. 4:98CV713 RWS, 2000 WL 288396, at *1 (E.D. Mo. Mar. 10, 2000) (insurer brought suit seeking a declaratory judgment that it was not obligated to pay claims because Defendant had committed fraud by making material misrepresentations in his claims); *Employers Mut. Cas. Co v. Tavernaro*, 4 F.Supp.2d 868 (E.D. Mo. 1998) (insurer brought action against insured and innocent co-insured for declaratory judgment that arson by insured voided coverage under business-owners policy and that insurer was entitled to recoup payment to mortgagee.) An ERISA-fiduciary should, and does, have a full toolbox available to combat fraudulent or illegal claims – including the right to seek declaratory judgment.

Whether drawing from an analysis of the meaning of "equitable relief" in the days of the divided bench, or the common-sense notion that trustees and insurers should be permitted to apply to the court to resolve serious allegations of fraud, abuse, or waste, the result is the same. It serves neither the statutory text of ERISA nor the practical dynamics of the claims to deprive the ERISA plans of a judicial forum to promptly resolve disputes.

**B.**     <u>ERISA does not Preempt Blue KC's Claims for Declaratory Judgment</u>

Alternatively, irrespective of whether ERISA § 502(a)(3) affords Blue KC a means to obtain declaratory relief, ERISA would not preempt Blue KC's claim for declaratory relief proceeding under the Declaratory Judgment Act. Numerous cases have confirmed a Section 2201 declaratory judgment action may be brought with respect to an ERISA plan. *See, e.g., Bd. of Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Fralick,* 601 Fed. App'x. 289 (5th Cir. 2015); *Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 790 (8th Cir. 1998) (proceeding under both ERISA and the Declaratory Judgment Act); *Transamerica Occidental Life Ins. Co. v. Digregorio,* 811 F.2d 1249, 1253 (9th Cir. 1987) (federal court had jurisdiction under the Declaratory Judgment Act to hear the suit brought by an insurer seeking a declaration that its policy did not provide double indemnity to beneficiary). As explained above, ERISA does not preempt every cause of action that possibly has some bearing on an ERISA governed plan. Just as with the claims of unjust enrichment, none of the *Bannister* factors weigh in favor of preemption. Claims for declaratory relief against individuals attempting to defraud the plan would not frustrate ERISA's core purposes. Instead, the instant declaratory judgment action only works to promote "honest administration of financially sound plans." *Geller*, 86 F.3d at 23. ERISA does not preempt any portion of Blue KC's Amended Complaint.

**V.**     <u>Conclusion</u>

GS Labs proposes a specious interpretation of law that would only protect unscrupulous providers engaging in price gouging or illegal schemes. Its partial motion to dismiss should be Denied.

Respectfully Submitted,

25

CAPES, SOKOL, GOODMAN & SARACHAN, P.C.

By: */s/ Aaron E. Schwartz*
      Aaron E. Schwartz, #58745
      8182 Maryland Avenue, Fifteenth Floor
      St. Louis, MO 63105
      (314) 721-7701 (Telephone)
      (314) 721-0554 (Facsimile)
      schwartz@capessokol.com

*Attorney for Blue Cross and Blue Shield of Kansas City*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a true and accurate copy of the foregoing was served on all parties of record by operation of the Court's electronic case filing and case management system on this 30th day of September, 2021.

                                         */s/ Aaron E. Schwartz*

26