UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21-cv-00525-FJG |
| v. | ) | |
| | ) | |
| GS LABS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## SUGGESTIONS IN OPPOSITION TO
## BLUE KC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

GS LABS' RESPONSE TO BLUE KC'S STATEMENT OF FACTS ...................................... 1

GS LABS' STATEMENT OF ADDITONAL MATERIAL FACTS ..................................... 18

SUMMARY ................................................................................................................ 26

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 27

ARGUMENT AND AUTHORITIES .......................................................................... 29

I.    BLUE KC HAS FAILED TO MEET ITS BURDEN OF PRODUCTION
      BECAUSE IT FAILS TO SHOW THAT GS LABS LACKS SUFFICIENT
      EVIDENCE TO SUPPORT ITS COUNTERCLAIMS .......................................... 30

      A.    *Blue KC Does Not Point to an Absence of Evidence on an Essential
            Element of GS Labs' Counterclaims.* .................................................. 30

            1.    *GS Labs has produced evidence from which a reasonably jury
                  could find GS Labs is entitled to reimbursement from Blue KC* .............. 32

            2.    *Blue KC cannot credibly contend it has satisfied its burden to show
                  there is an absence of evidence to support GS Labs' counterclaims* ........ 35

      B.    *Blue KC's MPSJ Is Premature Because There Has Not Been Adequate
            Time For Discovery and Blue KC Provides No Persuasive Reason to
            Depart from the Discovery Cut-Off Date in the First Amended
            Scheduling Order.* ............................................................................ 38

II.   ALTERNATIVELY, THE COURT SHOULD DENY BLUE KC'S MPSJ
      PURSUANT TO RULE 56(D). ..................................................................... 39

CONCLUSION ........................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
   398 U.S. 144 (1970)..................................................................................................... 29, 30

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................................ 30

*Bedford v. Doe*,
   880 F.3d 993 (8th Cir. 2018) ................................................................................. 29, 30, 33, 38

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................................... 26, 29, 31, 35, 38

*Clark v. Coats & Clark, Inc.*,
   929 F.2d 604 (11th Cir. 1991) ........................................................................................ 31, 38

*Hughes v. Am. Jawa, Ltd.*,
   529 F.2d 21 (8th Cir. 1976) ............................................................................................... 30

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
   875 F.3d 107 (2d Cir. 2017)............................................................................................... 31

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,*
   210 F.3d 1099 (9th Cir. 2000) ...................................................................................... 31, 38, 39

*Stuart C. Irby Co. v. Tipton*,
   796 F.3d 918 (8th Cir. 2015) ............................................................................................ 30

*Torgerson v. City of Rochester*,
   643 F.3d 1031 (8th Cir. 2011) .......................................................................................... 30

**Statutes**

Pub. L. No. 115-136, § 3201, 134 Stat. 281 (2020).............................................................. 18, 27

Pub. L. No. 116-127, § 6001(a), 134 Stat. 178 (2020) ......................................................... 18, 27

**Rules**

Fed. R. Civ. P. 8.......................................................................................................................... 2

Fed. R. Civ. P. 56.......................................................................... 1, 18, 26, 27, 29, 31, 35, 38, 39

iii

Fed. R. Evid. 803(6) .................................................................................................... 35

Fed. R. Evid. 1006 ..................................................................................................... 35

**<u>Other Authorities</u>**

10A Fed. Prac. & Proc. Civ. § 2727.1 ....................................................................... 31

**GS LABS' RESPONSE TO BLUE KC'S STATEMENT OF FACTS**

Defendant/Counter-Plaintiff GS Labs LLC ("GS Labs"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(1), provides the following response to Plaintiff/Counter-Defendant Blue Cross Blue Shield of Kansas City's ("Blue KC") Statement of Uncontroverted Material Facts ("SOF").

1.      GSL's Counterclaim arises from its contention that it "submitted claims relating to COVID-19 testing of Blue KC's members totaling over $9.7 million" Doc. No. 4, ¶ 6.

**RESPONSE: GS Labs controverts and objects to this statement to the extent it refers to GS Labs' "Counterclaim" and does not specify to which of GS Labs' eight counterclaims this statement refers. GS Labs admits that in paragraph 6 of its Answer, filed on August 5, 2021, it stated, "GS Labs properly submitted claims relating to COVID-19 testing of Blue KC's members totaling over $9.7 million." Significantly, and as set forth in more detail below, GS Labs notes that despite Blue KC's failure and refusal to satisfy its reimbursement obligations under the Family First Coronavirus Response Act ("FFRCA") and the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), GS Labs continues to provide COVID-19 diagnostic and related testing services to Blue KC members and timely submit those claims to Blue KC for payment, but Blue KC continues to improperly withhold payment.**

2.      GSL rests its Counterclaim on the Family First Coronavirus Response Act (FFRCA) and the CARES Act. *See* Doc. No. 4, Counterclaim, ¶¶ 6, 39-41, 49, 51, 54-56, 71-72, 75-76, 80, 90-93, 101-107, 111-119, 121, 126, 131, 137, 142, 146, 148, 154, 165, 173, 179, 187, & 190.

**RESPONSE:** GS Labs controverts and objects to this statement to the extent it refers to GS Labs' "Counterclaim" and does not specify to which of GS Labs' eight counterclaims this statement refers. GS Labs admits that Count I of GS Labs' counterclaims seeks relief related to Blue KC's violations of the FFRCA and CARES Act.

3.      GSL has not specifically identified in its pleading the claims for which it seeks reimbursement. *See generally* Doc. No. 4; *see also* Doc. No. 24 (arguing claim-specific detail improperly omitted from pleading).

**RESPONSE:** GS Labs controverts and objects to this statement as both factually inaccurate and as a mischaracterization of GS Labs' obligation under Federal Rule of Civil Procedure 8. GS Labs has plainly satisfied its Rule 8 pleading requirements by providing a short and plain statement showing that it is entitled to relief. Further, GS Labs has identified a number of specific "claims for which it seeks reimbursement," and continues to produce evidence of those claims in discovery. *See, e.g.*, Counterclaim ¶ 82 (referencing letter to Blue KC's counsel providing notice of claims for COVID-19 testing for Blue KC members); ¶ 108 (depicting COVID-19 testing between November 28, 2020, and July 28, 2021, including the type of tests administered and number of claims submitted to Blue KC as well as the amount billed and amount paid by Blue KC); *see also id.* ¶¶ 73, 86–89, 94; GS Labs' Statement of Additional Material Facts ("SOAF") ¶¶ 13–24, 30–31. SOF ¶ 3 merely repeats allegations set out in Blue KC's Motion to Dismiss ("MTD") (Doc. 24). GS Labs denies this allegation for the reasons set forth in GS Labs' Suggestions in Opposition to Blue KC's Motion to Dismiss Counterclaim. *See* Doc. 38.

4.      On September 15, 2021, GSL served its Rule 26(a) automatic disclosures. Exhibit A1.

**RESPONSE:  Admit.**

5.      In its Rule 26(a) disclosures, GSL identified "Blue KC Member Patient Records including consent document and test results" as records it may use to support its defenses or claims. Exhibit A1.

**RESPONSE:  Admit.**

6.      GS Labs further stated in its Rule 26(a) disclosures that it would "produce the documents [described in its Rule 26(a) disclosures] within seven (7) days of the Court issuing a Protective Order." Exhibit A1.

**RESPONSE:  Admit that GS Labs stated the following it its Rule 26 Disclosures:**

**GS Labs continues to conduct its investigation and search for responsive documents, and expressly reserves the right to supplement this disclosure and identify additional documents, up to and including at trial. GS Labs will produce the documents outlined below within seven (7) days of the Court issuing a Protective Order.**

**MPSJ Exhibit A1.**

7.      On August 30, 2021, Blue KC requested that GSL produce "all medical records, certifications, billing records, records of collections or write-offs, consent forms, physician or nurses orders, or other records or data collected or generated as a result of any Blue KC member's receipt of services from GSL." Exhibit A2.

**RESPONSE:  GS Labs admits that Blue KC made this document request on August 31, 2021, not August 30, 2021 as indicated in MPSJ Exhibit A2.**

8.      On September 30, 2021, GSL responded to this discovery by stating that "once the parties have an executed protective order, GS Labs will provide a rolling production of the thousands of medical records at issue." Exhibit A3.

**RESPONSE:  As set forth in MPSJ Exhibit A3, on September 30, 2021, GS Labs responded as follows to Blue KC's request for "all medical records, certifications, billing**

records, records of collections or write-offs, consent forms, physician or nurses orders, or other records or data collected or generated as a result of any Blue KC member's receipt of services from GSL."

> **Both the Families First Coronavirus Response Act (FFCRA) and the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) generally require group health plans and health insurance issuers offering group or individual health insurance coverage to provide benefits for certain items and services related to diagnostic testing for the detection of SARS-CoV-2 or the diagnosis of COVID-19. Under both Acts, plans and issuers must provide this coverage without imposing any cost-sharing requirements or other medical management requirements. As such, GS Labs objects to this request as it seeks "*all* medical records, certifications, billing records, records of collections or write-offs, consent forms, physician or nurses orders, or other records or data collected or generated as a result of any Blue KC member's receipt of services from GSL." This Request is overly burdensome, specifically in light of the Congress' directives set out in the FFCRA and CARES Act.**
>
> **Further, GS Labs objects to this Request as overly burdensome and not proportional to the claims and defenses in this case as Blue KC has already requested and received thousands of medical records from GS Labs despite the fact that such requests were rendered unnecessary and irrelevant by the FFCRA and CARES Act. In order to produce the thousands of medical records requested by this Request, an individual will need to manually request and print to produce each individual patient record. This is a time consuming**
> **process that will take many man hours. GS Labs further objects to this Request to the extent it seeks information protected under HIPAA, and such information will not be produced unless adequate steps are taken to safeguard such information, including an executed HIPAA-compliant protective order.**
>
> **Subject to this objection and once the parties have an executed protective order, GS Labs will provide a rolling production of the thousands of medical records at issue.**

9.      The Court entered a stipulated protective order on October 14, 2021. Doc. No. 56.

**RESPONSE: Admit.**

10.      GSL has not produced intake and consent forms and test results for the large majority of the testing for which it seeks relief. *See* Exhibit A, A27

**RESPONSE:** GS Labs admits that it has not yet completed its production of all intake and consent forms related to COVID-19 testing services provided to Blue KC members and for which Blue KC continues to improperly withhold payment. As set forth in GS Labs' discovery response, GS Labs must manually request and print these records on an individual record-by-record basis. Blue KC's request for over 20,000 medical records is overly burdensome and not proportional to the needs of the case. Further, requiring such documentation is neither allowable nor proper under the FFCRA and CARES Act. Nevertheless, as set forth in SOAF ¶¶ 27–28, GS Labs has agreed to produce intake and consent forms and tests results for the unpaid claims at issue prior to the close of discovery on May 15, 2022. Had Blue KC complied with its Rule 37.1(a) obligations, it could have confirmed that this remained GS Labs' intention without incurring the significant costs and expenses associated with this motion. *See* **March 31, 2022 Decl. of Christina Moore In Support of Def.'s Suggestions In Opp'n to Pl.'s Mot. for Partial Summ. J. ¶ 4 ("Moore Decl.), attached as Exhibit 1.**

11.     GSL has also not agreed to complete its production of the records in question before the close of fact discovery on May 15, 2022. Exhibit A, paragraph 22.

**RESPONSE:** As set forth in GS Labs' SOAF, GS Labs has completed its production of many of the documents identified in the MPSJ and has agreed to produce the remainder of the outstanding records—including the patient intake and consent forms and test results Blue KC requests—prior to the close of discovery on Mary 15, 2022. *See, e.g.*, SOAF ¶¶ 28–31. Had Blue KC complied with its Rule 37.1(a) obligations, it could have confirmed that this remained GS Labs' intention without incurring the significant costs and expenses associated with this motion. *See* Moore Decl. ¶ 4.

12.     On or about December 29, 2021, GSL produced a document labeled GS LABS 00000002-A. GS LABS 00000002-A is marked as Exhibit A4.

**RESPONSE:  Admit.**

13.     Exhibit A4 contains approximately 13,632 unique claims and $10,128,722 in charges for services purportedly administered between November 28, 2020, and November 8, 2021. Exhibit A4

**RESPONSE:  Admit.**

14.     Exhibit A4 includes a "primary diagnosis code" for each of the claims and over 99% of the codes supplied are Z20.822 or Z20.828.[1]

**RESPONSE:   GS Labs admits SOF ¶ 14 to the extent it is accurate and not inconsistent with the data and information reflected in MPSJ Exhibit A4, as the document produced speaks for itself. GS Labs objects to the footnote added to Blue KC's SOF ¶ 14, which requests the Court "take judicial notice of the transaction of these codes." It is not clear what Blue KC means by taking notice of the "transaction of these codes." Further, GS Labs objects to the manner in which Blue KC seeks judicial notice and requests Blue KC identify exactly what information it seeks to have the Court take notice of so that GS Labs can properly respond. GS Labs further responds to Blue KC's footnote by referencing and referring the Court to the Centers for Disease Control and Prevention's ("CDC") ICD-10-CM Official Guidelines for Coding and Reporting FY2022, *available at* https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-**

---

[1]Blue KC requests the court take judicial notice of the transaction of these codes.  These codes were implemented by the Centers for Disease Control and Prevention's National Center for Health Statistics.  See generally, https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-coronavirus-19-508.pdf  and  https://www.cdc.gov/nchs/data/idc/COVID-19-guidelines-final.pdf (last visited March 7, 2022).

02012022.pdf. As set forth in GS Labs' SOAF, numerous federal departments and agencies have noted that "Category *Z20* indicates contact with, and suspected exposure to, communicable diseases," and that "[t]hese codes are for patients who are suspected to have been exposed to a disease by close personal contact with an infected individual *or are in an area where a disease is epidemic*." *Id.* 88 (emphasis added).

15.     On or about February 4, 2022, GSL produced GS LABS 00000002-B. GS LABS 00000002-B is marked as Exhibit A5.

**RESPONSE:  GS Labs admits that on or about January 31, 2022, GS Labs produced a supplemental clams data summary spreadsheet titled GS LABS 00000002-B AR Detail BCBS KS, which is marked as MPSJ Exhibit A5. This was produced as part of GSL014 (Jan. 31, 2022 Production). GS Labs controverts SOF ¶ 15 to the extent it states GS LABS 00000002-B was produced on February 4, 2022.**

16.     Specifically, Exhibit A5 contains approximately 20,473 unique claims and $13,056,082 in charges for services purportedly administered between November 28, 2020, and January 10, 2022. Exhibit A5.

**RESPONSE:  Admit.**

17.     Unlike GS LABS 00000002-A, GS LABS 00000002-B does not include a column identifying primary diagnosis code. Compare Exhibit A4 with Exhibit A5.

**RESPONSE:  Admit.**

18.     GSL has also produced reimbursement claim forms ("Form 1500s") that include claim information such as patient name, date of purported service, and diagnostic code. Examples are attached and marked as Exhibits A6, A7, A8, A9, A10, A11.

**RESPONSE:  Admit. GS Labs further states that the Form 1500 also includes the patient's address, patient's date of birth, sex, patient relationship to the insured, insured's identification number, insured's name, insured's address, insured's policy group number, insured's dated of birth, referring provider, diagnosis codes, dates of service, place of service, services provided (with identifying CPT codes), charges, rendering provider identification, tax identification number for provider, patient account number, billing provider, and name and address of facility location.** *See* **MPSJ Exhibits A6, A7, A8, A9, A10, A11.**

19.     Blue KC estimates that GSL has produced corresponding consent and intake forms and test results for only approximately 13% of the claims identified on GSL's most recent claim summary (GS LABS 00000002-B). Exhibit A & Exhibit A27.

**RESPONSE:  GS Labs admits that Blue KC's estimate based on the information cited in SOF ¶ 19 appears to be correct, but denies SOF ¶ 19 to the extent it is inconsistent with the documents produced to date. As set forth in GS Labs' SOAF, GS Labs has agreed to produce the remaining medical records prior to the close of discovery.** *See* **SOAF ¶ 28.**

20.     With respect to the limited number of consent and intake forms produced by GSL in this litigation, those records contain material information inconsistent with the claim forms and summary claim data GSL produced. See infra ¶¶ 21-28.

**RESPONSE:  GS Labs controverts SOF ¶ 20 as inaccurate, incomplete, and misleading. The basis for Blue KC's contention that GS Labs' records "contain material information inconsistent with the claim forms and summary claim data" is misguided and reflects either a complete oversight or material misunderstanding of the applicable law and regulations. GS Labs' data and evidence is reliable and is consistent with the guidance provided by the Departments of Labor, Health, and Human Services ("HHS") and the**

Treasury, U.S. Department of Health and Human Services ("DHHS"), and other industry and agency guidance as set forth in SOAF ¶¶ 8–12.

21.     Blue KC's retained expert, R. Garrison Harvey, estimated that 47% of patient intake and consent forms produced by GSL contains diagnostic information inconsistent with the corresponding Form 1500's and the summary billing data. Exhibit A12, pg. 45-46.

**RESPONSE:  GS Labs admits that R. Garrison Harvey states in his expert report that based on "a preliminary investigation using a random sample of patient intake forms," that he "estimate[s] that about 47 percent of the intake forms show that the patient self-reported *no* suspected exposure to COVID-19 despite the fact that 99.9 percent of the associated claims include exposure-to-COVID-19 coding." Exhibit A12, ¶ 111 (footnote omitted). GS Labs notes that Mr. Harvey's estimate on the distribution of primary diagnosis codes is limited to GS Labs' "December production of [] claims data." *Id.* ¶ 108. Mr. Harvey emphasizes that the data on which he relies is "inadequate for a simple and complete investigation of the number of cases where the claims show a patient has potentially been exposed to COVID-19 but that claim is contradicted by the self-reported information." *Id.* ¶ 111. GS Labs, therefore, denies the accuracy of Mr. Harvey's estimates to the extent they are inconsistent with the data and evidence produced to date and to the extent even he admits such estimates are "preliminary" and based on complete information.**

22.     By way of example only, the following table summarizes a small subset of the documents produced:

**RESPONSE: GS Labs controverts SOF ¶ 22. As shown in the modified table below, GS Labs specifically responds to each claim identified in Blue KC's table to note instances**

in which the identified patients indicated experiencing COVID-19 symptoms and/or seeking

the COVID-19 test for diagnostic purposes. *See* GS Labs' Modified Table.

| Patient Initials | Diagnosis Code Used by GSL on the GS LABS 00000002-a | Diagnostic Code Used by GSL on Form 1500 | Translation of Diagnostic Code Used by GSL on Form 1500 and GS LABS 00000002-a | **GS LABS' RESPONSE**<br>**Did patient report contact with a COVID-19 patient on the consent and intake form?** |
|---|---|---|---|---|
| S.C. | Z20.822 | Z20.822 | Contact with and (suspected) exposure to COVID-19 *or are in an area where a disease is epidemic* | **Patient acknowledged that patient was seeking a diagnostic test indicating that patient was "experiencing COVID-19 symptoms or have had a potential exposure to Covid-19 to quality for a medically necessary diagnostic test." MPSJ Exhibit A13.** |
| R.F. | Z20.822 | Z20.822 | Contact with and (suspected) exposure to COVID-19 *or are in an area where a disease is epidemic* | **Patient noted suffering from muscle and body aches. MSPJ Exhibit A14.**<br><br>**Further, patient acknowledged that patient was seeking a diagnostic test indicating that patient was "experiencing COVID-19 symptoms or have had a potential exposure to Covid-19 to quality for a medically necessary diagnostic test." MPSJ Exhibit A14.** |
| E.H. | Z20.822 | Z20.822 | Contact with and (suspected) exposure to COVID-19 *or are in an area where a disease is epidemic* | **Patient noted sore throat and loss of taste or smell. MPSJ Exhibit A15.**<br><br>**Further, patient acknowledged that patient was seeking a diagnostic test indicating that patient was "experiencing COVID-19 symptoms or have had a potential exposure to Covid-19 to quality for a medically necessary diagnostic test." MPSJ Exhibit A15.** |
| A.H. | Z20.828 | Z20.828 | Contact with and (suspected) exposure to | No. |

| Patient Initials | Diagnosis Code Used by GSL on the GS LABS 00000002-a | Diagnostic Code Used by GSL on Form 1500 | Translation of Diagnostic Code Used by GSL on Form 1500 and GS LABS 00000002-a | **GS LABS' RESPONSE** **Did patient report contact with a COVID-19 patient on the consent and intake form?** |
|---|---|---|---|---|
| | | | COVID-19 *or are in an area where a disease is epidemic* | |
| Q.O. | Z20.822 | Z20.822 | Contact with and (suspected) exposure to COVID-19 *or are in an area where a disease is epidemic* | **Patient noted runny nose as a symptom. MPSJ Exhibit A17.** **Further, patient acknowledged that patient was seeking a diagnostic test indicating that patient was "experiencing COVID-19 symptoms or have had a potential exposure to Covid-19 to quality for a medically necessary diagnostic test." MPSJ Exhibit A17.** |
| T.S. | Z20.822 | Z20.822 | Contact with and (suspected) exposure to COVID-19 *or are in an area where a disease is epidemic* | **Patient noted symptoms, including a runny nose and fatigue.** **Further, patient acknowledged that patient was seeking a diagnostic test indicating that patient was "experiencing COVID-19 symptoms or have had a potential exposure to Covid-19 to quality for a medically necessary diagnostic test." MPSJ Exhibit A18.** |

*Compare* Summary Claim Data Exhibit A4, Form 1500 Exhibits A6, A7, A8, A9, A10, A11 with

Intake and Consent Form Exhibits A13, A14, A15, A16, A17, A18.

23. For example, Patient S.C.'s consent and intake form and the associated Form 1500 contain the following:[2] [picture removed].

**RESPONSE: GS Labs does not controvert or dispute the portion of SOF ¶ 23 copied from the Form 1500 or the answer to the one question Blue KC pulled from the GS Labs consent and intake as set forth in this statement, but notes that this information provides an incomplete and misleading picture of the facts. GS Labs notes that Patient S.C.'s records also contained the following information:**

GS Labs only accepts insurance patients who are seeking testing for diagnostic purposes. Patients must be experiencing Covid-19 symptoms or have had a potential exposure to Covid-19 to qualify for a medically necessary diagnostic test. *

☑ I acknowledge that I am seeking a diagnostic test.
**Have you experienced any of the following symptoms?** (last 14 days)

24. Similarly, the diagnostic code on the summary claims data is inconsistent with S.C.'s medical records. *See* Exhibit A4, line 34888-34890.

**RESPONSE: GS Labs controverts that this data demonstrates the diagnostic code is inconsistent with S.C.'s medical records. The diagnostic code reflected on GS Labs' summary claims data is Z20.822, which is used for asymptomatic individuals with actual or suspected exposure to COVID-19. As noted above in response to SOF ¶ 23, Patient S.C. acknowledged Covid-19 symptoms or had potential exposure to Covid-19.**

GS Labs only accepts insurance patients who are seeking testing for diagnostic purposes. Patients must be experiencing Covid-19 symptoms or have had a potential exposure to Covid-19 to qualify for a medically necessary diagnostic test. *

☑ I acknowledge that I am seeking a diagnostic test.
**Have you experienced any of the following symptoms?** (last 14 days)

***See* MPSJ Exhibit A13.**

---

[2] An arrow highlights the diagnosis code. That arrow does not appear in the original.

25. Beyond these discrepancies, GSL has also produced Form 1500s for patients that are not identified on Exhibit A4.

**RESPONSE**: **GS Labs controverts and objects to SOF ¶ 25's use of the vague phase, "[b]eyond these discrepancies," specifically denies any discrepancies, and refers the Court to GS Labs' preceding responses and SOAF. *See, e.g.*, GS Labs' Response to SOF ¶¶ 22–24; SOAF ¶¶ 8–12. GS Labs admits that has produced Form 1500s in response to Blue KC's requests for production and as ordered by the Court. Further GS Labs has produced a revised summary claims data worksheet, which includes information for these patients. *See* SOAF ¶ 22. Further, as it relates to Form 1500s that are not included in the summary claims data worksheets, those "discrepancies" are a product of Blue KC's request for claims information related to Blue Card and the National Alliance program, which would not have been included in GS Labs' AR Detail Report for Blue KC. *See* GS Labs' Resp. to SOF ¶ 26.**

26. As an example, GSL produced the following Form 1500s in this litigation which do not appear on Exhibit A4.

a. GS LABS 00074526. Exhibit A19.

**RESPONSE**: **GS Labs admits that the patient identified on A19 was not originally included in GS Labs' accounts receivable from Blue KC. As noted on the Form 1500 for this patient, this claim was submitted to BCBS of Missouri. *See* MPSJ Exhibit A19.**

b. GS LABS 00074507. Exhibit A20.

**RESPONSE**: **GS Labs admits that the patient identified on A20 was not originally included in GS Labs' accounts receivable from Blue KC. As noted on the Form 1500 for this patient, this claim was submitted to BCBS of Missouri. *See* MPSJ Exhibit A20.**

c. GS LABS 00074493. Exhibit A21.

**RESPONSE**: GS Labs admits that the patient identified on A21 was not originally included in GS Labs' accounts receivable from Blue KC. As noted on the Form 1500 for this patient, this claim was submitted to BCBS of Missouri. *See* MPSJ Exhibit A21.

27.     The intake and consent forms associated with each of these Form 1500s was produced and bates labeled:

a.     GS LABS 00074522. Exhibit A22.

b.     GS LABS 00074502. Exhibit A23.

c.     GS LABS 00074489. Exhibit A24.

**RESPONSE**: Admit.

28.     Eric Rubenstein discusses the significance of false or inconsistent information in claim information in his report dated March 1, 2022. Exhibit A25, pg. 7 & 27-28.

**RESPONSE**: Admit.

29.     Several witnesses with firsthand knowledge of GSL's operations reported frequent serious problems with the administration of COVID-19 tests and GSL's failure to deliver testing results to patients.  *See generally* declaration of KT Thiessen (Exhibit B) and Stacey Johnson-Sweany (Exhibit C).

**RESPONSE**: GS Labs controverts SOF ¶ 29 and denies that the underlying evidence cited therein supports, or is capable of supporting, that there were "frequent and serious problems with the administration of COVID-19 tests and GSL's failure to deliver testing results to patients," which GS Labs specifically denies. As an initial matter, GS Labs objects to Blue KC's unsupported assertion that this statement is based on "[s]everal witnesses with firsthand knowledge." Blue KC relies on two declarations from former GS Labs employees—neither of which was employed for longer than *one month*. *See* MPSJ Exhibit B ¶ 2; MPSJ

**Exhibit C ¶ 2. These declarations are not competent evidence to support Blue KC's contention. KT Thiessen states that she worked at GS Labs for approximately *one month*. MPSJ Exhibit B ¶ 2 ("I worked for GS Labs . . . approximately from early December of 2020 to January of 2021."). Stacey Johnson-Sweany states that she "worked for GS Labs . . . for *approximately three weeks in December 2020*." MPSJ Exhibit C ¶ 2 (emphasis added). GS Labs intends to depose both KT Thiessen and Stacey Johnson-Sweany. However, when GS Labs noticed these witnesses for deposition, Blue KC's counsel indicated that he could not provide an address for either witness. It is Blue KC's burden to prove the competency of its evidence, including that the evidence on which it relies can be presented in an admissible form at trial. If Blue KC's counsel lacks contact information for Ms. Thiessen and Ms. Johnson-Sweany, and they are not available to testify at trial, the information in their declarations is inadmissible. GS Labs intends to issues subpoenas to both KT Thiessen and Stacey Johnson-Sweany to demonstrate the unreliability of their statements.**

30.     Ms. Thiessen, a former assistant site manager at GSL's Lee's Summit facility, reported:

> I observed many instances - at least weekly and potentially more - where one person's results were mixed up with another person's results. On many occasions one person's results were mixed up and placed in the wrong person's file. Other times, incorrect results were accidently marked on the records. Customers called frequently about results not being sent on all three types of tests or the wrong person's results being delivered.

Exhibit B.

**RESPONSE: GS Labs admits that Ms. Thiessen executed a declaration to this effect based on her approximately one-month employment at GS Labs. However, for the reasons set forth in GS Labs' Response to SOF ¶ 29, Ms. Thiessen's declaration is not competent**

**evidence, especially given Blue KC's counsel's representation that he does not have an address for Ms. Thiessen and Blue KC's failure to carry its burden to demonstrate that Blue KC could present this purported evidence in admissible form at trial.**

31.    Ms. Johnson-Sweany a former site manager at GSL's Lee's Summit facility reported:

I observed many serious problems with the administration of COVID-19 tests and delivery of results at GS Labs. As an example, on many occasions one person's results were mixed up and placed in the wrong person's file. Other times, incorrect results were accidently marked on the records. Customers called frequently about results not being sent on all three types of tests or the or the wrong person's results being delivered . . . I observed problems with testing like those described above approximately 10 times per day and believe they may have impacted many more tests.

Exhibit C.

**RESPONSE: GS Labs admits that Ms. Johnson-Sweany executed a declaration to this effect based on her approximately three-week employment at GS Labs. However, for the reasons set forth in GS Labs' Response to SOF ¶ 29, Ms. Johnson-Sweany's declaration is not competent evidence, especially given Blue KC's counsel's representation that he does not have an address for Ms. Johnson-Sweany and Blue KC's failure to carry its burden to demonstrate that Blue KC could present this purported evidence in admissible form at trial.**

32.    An example of a GSL test result is included as Exhibit A26.

**RESPONSE: GS Labs admits that MPSJ Exhibit A26 is an example of a GS Labs test result. It is important to note that MPSJ Exhibit A26 contains two test results for a patient who was tested at GS Labs' Lee's Summit, Missouri testing site, CLIA #: 26D2205929**

**- a COVID-19 lgG/lgM Antibody Test and COVID-19 Rapid Antigen Test.** *See* **MPSJ Exhibit**

**A26.**

**GS LABS' STATEMENT OF ADDITONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(2), GS Labs

offers the following Statement of Additional Material Facts ("SOAF").

**The COVID-19 Pandemic and Federal Laws and Regulations Requiring
Blue KC to Reimburse GS Labs for COVID-19 Diagnostic Testing Services**

1.      The World Health Organization ("WHO") declared the novel coronavirus

(COVID-19) outbreak a global pandemic on March 11, 2020. *See* World Health Organization,

WHO Director-General's opening remarks at the media briefing on COVID-19-11 March 2020.[3]

2.      Congress enacted the FFCRA on March 18, 2020, in response to the unprecedented

COVID-19 pandemic and public health emergency. In an effort to encourage COVID-19 testing

to help slow the virus, Section 6001 of the FFCRA requires group health plans and health issuers,

like Blue KC, to provide benefits for certain items and services related to COVID-19 testing

without imposing cost-sharing, prior authorization, or other medical management requirements.

FFCRA, Pub. L. No. 116-127, § 6001(a), 134 Stat. 178 (2020) (providing health insurance issuer

"shall provide coverage . . . [for] [i]n vitro diagnostic products . . . for the detection of SARS-

CoV-2 or the diagnosis of the virus that causes COVID-19 . . . and the administration of such in

vitro diagnostic products").

3.      On March 27, 2020, Congress enacted the CARES Act, which amended Section

6001 to include coverage for a broader range of diagnostic items and services. *See* CARES Act,

Pub. L. No. 115-136, § 3201, 134 Stat. 281 (2020). It also required reimbursement of diagnostic

testing at the "cash price for such service as listed by the provider on a public internet website"

---

[3]*Available at* https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020?msclkid=882559b9b14e11eca155f6e450ed7520.

unless the parties agree to a different negotiated rate. *Id.* § 3202(a).

4.    GS Labs provided diagnostic COVID-19 testing services to Blue KC members. *See* Moore Decl. ¶¶ 3, 5–6, 10–11, 13–14, 16–17.

5.    Blue KC is required to reimburse GS Labs for in vitro COVID-19 diagnostic testing provided to members as set forth in the FFCRA and CARES Act. *See* FFCRA § 6001(a); CARES Act § 3201.

6.    Blue KC has refused, and continues to refuse, to reimburse GS Labs, for in vitro COVID-19 diagnostic testing provided to Blue KC's members as required under the FFCRA and CARES Act. *See* Moore Decl. ¶ 16.

7.    Blue KC objects to the publicly posted price GS Labs charges for its COVID-19 testing services, contending GS Labs "demand[s] facially excessive reimbursement rates for COVID-19 testing." Blue KC MTD, 1.

8.    HHS and the Treasury (collectively, the "Departments") have stated that plans and issuers "cannot require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." *FAQS About [FFCRA] and [CARES Act] Implementation Part 44*, U.S. DEP'T OF HEALTH & HUMAN SERVS. 2 (Q1) (Feb. 26, 2021), https://www.cms.gov/cciio/resources/fact-sheets-and-faqs (hereinafter "FAQs, Part 44").

9.    The Departments issued the following publicly available FAQ regarding COVID-19 diagnostic testing for asymptomatic patients with no known or suspected exposure to COVID-19:

> **Q1. Under the FFCRA, can plans and issuers use medical screening criteria to deny (or impose cost sharing on) a claim for COVID-19 diagnostic testing for an asymptomatic person who has no known or suspected exposure to COVID-19?**

No. The FFCRA prohibits plans and issuers from imposing medical management, including specific medical screening criteria, on coverage of COVID-19 diagnostic testing. Plans and issuers cannot require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests.

When an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an "individualized clinical assessment" and the test should be covered without cost sharing, prior authorization, or other medical management requirements.

This FAQ clarifies the Departments' guidance in FAQs Part 43, Q5, with respect to the testing of asymptomatic individuals with no known or suspected exposure to COVID-19. This FAQ does not modify previous guidance addressing coverage of testing for groups of asymptomatic employees or individuals with no known or suspected recent exposure to COVID-19, such as for public health surveillance or employment purposes (see Q2 below).

State and local public health authorities retain the authority to direct providers to limit eligibility for testing based on clinical risk or other criteria to manage testing supplies and access to testing. Responsibility for implementing such state or local limits on testing falls on attending health care providers, not on plans and issuers. Plans and issuers may not use such criteria to deny (or impose cost sharing on) a claim for COVID-19 diagnostic testing.

FAQs, Part 44, 2–3 (Q1) (footnotes omitted).

10. The DHHS provides guidelines for coding and reporting using the International Classification of Diseases (ICD-10-CM), which are available on the CDC's National Center for Health Statistics' website. *See ICD-10-CM Official Guidelines for Coding and Reporting FY2022 – UPDATED April 1, 2022 (October 1, 2021 – September 30, 2022)*, Nat'l Health Ctr. for Health Statistics, https://www.cms.gov/files/document/fy-2022-icd-10-cm-coding-guidelines-updated-02012022.pdf (hereinafter, "ICD-10-CM Guidelines FY2022"). "The ICD-10-CM is a morbidity classification published by the United States for classifying diagnoses and reason for visits in all health care settings." *Id.* 1.

11. The DHHS states: "Category Z20 indicates contact with, and suspected exposure

to, communicable diseases. These codes are for patients who are suspected to have been exposed to a disease by close personal contact with an infected individual or are in an area where a disease is epidemic." *Id*. at 88.[4] ICD-10-CM Guidelines FY2022, 88

12.     Consistent with these guidelines, the American Hospital Association's Central Office on ICD-10-CM/PCS Coding for COVID-19 and the American Health Information Management Association ("AHIMA") has provided the following specific guidance for testing codes related to COVID-19 encounters:

> *For encounters for COVID-19 testing, including preoperative testing, code as exposure to COVID-19 (code Z20.828 for encounters prior to January 1, 2021 or code Z20.822, Contact with and (suspected) exposure to COVID-19, for encounters after January 1, 2021).* The ICD-10-CM Official Guidelines for Coding and Reporting state that codes in category Z20, Contact with and (suspected) exposure to communicable diseases, are for patients who are suspected to have been exposed to a disease by close personal contact with an infected individual or are in an area where a disease is epidemic.

*Frequently Asked Questions Regarding ICD-10-CM/PCS Coding for COVID-19, Revised August 27, 2021*, AHA & AHIMA 14 (Q38) (Mar. 20, 2020), https://www.aha.org/fact-sheets/2020-03-30-frequently-asked-questions-regarding-icd-10-cm-coding-covid-19?msclkid=163178bfb15511ecb8726dd27276888c (emphasis added).

### GS Labs Document Productions "To Date" Support Its Counterclaims

13.     As set forth in more detail below, GS Labs has produced, and is continuing to produce, documents that support its counterclaims and demonstrate GS Labs is entitled to reimbursement pursuant to the FFCRA and the CARES Act for diagnostic COVID-19 testing services provided to Blue KC members. These documents include: (1) HCFA 1500 Initial Claim Forms, (2) claims data spreadsheets, (3) Explanation of Benefits ("EOB") or remittance documentation reflecting payment or denial or payment from Blue KC, and (4) medical intake and

---

[4]Prior versions of the ICD-10-CM Guidelines are available at https://www.cdc.gov/nchs/icd/icd10cm.htm?msclkid=e13981fab13b11ecaaab4bbb160dc07c.

consent forms. Moore Decl. ¶ 3.

### *HCFA 1500 Insurance Claim Forms*

14.     GS Labs initially produced 13,372 HCFA 1500 Claim Forms on November 15, 2021. *Id.* ¶ 5.

15.     On March 28, 2022, GS Labs provided an updated set of 27,895 HCFA 1500 Claim Forms for all claims submitted to Blue KC based on COVID-19 testing services provided since GS Labs' inception through February 2022. *Id.* ¶ 6.

16.     The HCFA Insurance Claim Form 1500s include, among other things, data reflecting the patient's name, date of service, and diagnostic code. *Id.* ¶ 7.

17.     The diagnostic codes may indicate, among other things, whether a patient had contact with, and suspected exposure to, a communicable disease, such as from close personal contact with an infected individual or being in an area where the disease is epidemic. *Id.* ¶ 8.

### *Claims Data Spreadsheets*

18.     On October 27, 2021, GS Labs produced a summary of its claims data titled GS LABS 00000002 AR Details – BCBS KC CONFIDENTIAL as part of its Rule 26 Disclosures. *Id.* ¶ 10. This claims data spreadsheet contains a summary of 13,360 of the claims submitted to Blue KC. *Id.* The claims data includes insurance policy number, patient name, patient date of birth, claim number, date of service, CPT code for the COVID-19 tests provided, and charges for these services provided. *Id.*

19.     On December 29, 2021, GS Labs produced an updated spreadsheet titled GS LABS 00000002-A AR Detail - BCBS KC CONFIDENTIAL. *Id.* ¶ 11.This spreadsheet contains a summary of the claims data for the 13,632 claims GS Labs submitted to Blue KC for payment related to COVID-19 testing received by Blue KC members between November 28, 2020, and

November 8, 2021. *Id*. The GS LABS 00000002-A spreadsheet includes the same data as set forth above, but also includes data reflecting the place of service and the primary diagnosis code. *Id*.

20.    The claims data spreadsheets produced are based on a standard report prepared in GS Labs' ordinary course of business entitled "AR Detail." *Id*. ¶ 12. At Blue KC's request, this standard report was modified to include data reflecting the diagnosis code and place of service. *Id*.

21.    On January 31, 2022, GS Labs produced a supplemental clams data summary spreadsheet titled GS LABS 00000002-B AR Detail BCBS KS, reflecting newly filed claims and filing corrections. *Id*. ¶ 13. This spreadsheet is a summary of the claims data for the 20,473 claims GS Labs submitted to Blue KC for payment related to COVID-19 testing received by Blue KC members between November 28, 2020, and January 10, 2022. *Id*.

22.    GS LABS 00000002-B was based on GS Labs' standard "AR Detail" report and inadvertently omitted Plaintiff's requested modifications to that report. *Id*. ¶ 14. A supplemental report, including Plaintiff's requested data modifications, was produced on March 29, 2022. *Id*.

### *EOB and Remittance Documentation*

23.    GS Labs produced EOBs and remittance documents reflecting Blue KC's payment or denial of payment for the claims at issue on the following dates: (1) October 27, 2021, (2) November 15, 2021, (3) January 11, 2022, and (4) February 11, 2022. *Id*. ¶ 16.

### *Medical Records*

24.    GS Labs has produced 17,990 medical records, including medical intake and consent forms and COVID-19 testing results. *Id*. ¶ 18. As discussed, and as further described in GS Labs' discovery response, in order to comply with Blue KC's requests, GS Labs has had to manually request each record and print them on an individual record-by-record basis. *Id*.

25.    In its discovery response to Request for Production No. 4 (RFPD #4), GS Labs

explained these limitations to Blue KC. *Id.* ¶ 19; MPSJ Exhibit A3 (RFPD #4). GS Labs objected to RFPD #4 as overly burdensome and not proportional to the needs of the case, citing this "time-consuming process" and GS Labs' position that requiring such documentation is neither allowable nor proper under the FFCRA and CARES Act. *Id.*

26.     Notwithstanding, GS Labs has continued to explore economical options for providing this information to Blue KC, which includes approximately 20,000 patient records. *Id.* ¶ 20.

27.     GS Labs recently received an estimate from a reliable vendor of $20,000 to identify and compile the medical records Blue KC requests and prepare them in a form that can be securely produced. *Id.* ¶ 21.

28.     GS Labs has agreed to produce the medical records that Blue KC demands related to Blue KC's beneficiaries, including patient consent forms and COVID-19 test results. *Id.* Based on GS Labs' vendor's estimate, GS Labs anticipates it will be able to complete this production by April 20, 2022, prior to the close of discovery. *Id.* ¶ 22.

### GS Labs Document Productions Are Ongoing, and Discovery Does Not Close Until May 15, 2022

29.     Fact discovery in this case is ongoing and is scheduled to close on May 15, 2022. Doc. 116.

30.     GS Labs is actively engaged in discovery. Moore Decl. ¶ 25. It has produced, and is continuing to produce, responsive documents and information capable of supporting its counterclaims. *Id.* ¶ 25.

31.     GS Labs has already produced, or has agreed to produce, the documents Blue KC identifies in its MPSJ. *Id.* ¶¶ 5–6, ¶¶ 10–14, ¶ 16, ¶ 25; *see also* MPSJ 10–11 (noting GS Labs' agreement to produce these documents).

32.     These documents are voluminous and contain highly personal and sensitive information. Moore Decl. ¶ 25; *see also* ¶¶ 5–6, ¶¶ 10–14, ¶ 16.

33.     GS Labs' productions have required extensive time and financial investment. *Id.* ¶ 25.

## SUMMARY

Blue KC's Motion for Partial Summary Judgment ("MPSJ") (Doc. 192) attempts to improperly short circuit this Court's discovery process and prematurely force GS Labs to produce its remaining discovery in advance of the May 15, 2022 discovery cut-off date. For the reasons set forth below, Blue KC's MPSJ is improper, fails to carry Blue KC's initial burden, is facially deficient under Federal Rule of Civil Procedure 56 and Local Rule 56.1, and should be denied in its entirety.

Blue KC may not use its MPSJ as a substitute for discovery or to prematurely force GS Labs to produce evidence supporting its counterclaims. Summary judgment is appropriate only where, *after an adequate time for discovery*, the moving party can demonstrate that the nonmoving party lacks sufficient evidence to establish the existence of an element essential to is claim and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Blue KC fails to meet this burden.

Blue KC points to nothing in the record to credibly support its contention that GS Labs lacks sufficient evidence to support its counterclaims. Nor could it. GS Labs has produced, and is continuing to produce, documents and evidence from which a reasonable jury could conclude GS Labs is entitled to reimbursement from Blue KC under the FFCRA and CARES Act related to diagnostic COVID-19 testing services provided to Blue KC members.

Further, discovery in this case is actively ongoing and does not close until May 15, 2022. Doc. 116. Blue KC provides no persuasive reason this Court should depart from the discovery cut-off date identified in the First Amended Scheduling Order—especially given Blue KC's acknowledgment that GS Labs has agreed to produce the documents it identifies in its MPSJ.

For these reasons, the Court should deny the MPSJ in its entirety. Alternatively, pursuant to Rule 56(d), GS Labs respectfully requests the Court defer its consideration of the MPSJ until after the close of discovery when GS Labs will have had time to complete its document production and address the issues outlined in the MPSJ. *See* Moore Decl. ¶¶ 24–27.

## FACTUAL AND PROCEDURAL BACKGROUND

GS Labs seeks payments improperly withheld by Blue KC for diagnostic COVID-19 testing services GS Labs provided to Blue KC members. Blue KC's withholding of these payments violates the FFCRA and CARES Act. *See generally* Countercl. [Doc. 4].

Congress enacted the FFCRA on March 18, 2020, in response to the unprecedented COVID-19 pandemic and public health emergency. SOAF ¶ 2. In an effort to encourage COVID-19 testing to help slow the virus, Section 6001 of the FFCRA requires group health plans and health issuers, like Blue KC, to provide benefits for certain items and services related to COVID-19 testing without imposing cost-sharing, prior authorization, or other medical management requirements. FFCRA, Pub. L. No. 116-127, § 6001(a), 134 Stat. 178 (2020) (providing health insurance issuer "shall provide coverage . . . [for] [i]n vitro diagnostic products . . . for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19 . . . and the administration of such in vitro diagnostic products").

On March 27, 2020, the CARES Act was enacted, which amended Section 6001 to include coverage for a broader range of diagnostic items and services. *See* CARES Act, Pub. L. No. 115-136, § 3201, 134 Stat. 281 (2020). It also required reimbursement of diagnostic testing at the "cash price for such service as listed by the provider on a public internet website" unless the parties agree to a different negotiated rate. *Id.* § 3202(a); *see also* SOAF ¶ 3.

In connection with the COVID-19 diagnostic and related testing provided to Blue KC

members, GS Labs timely submitted claims for payments to Blue KC and billed the cash price for the relevant service publicly posted on GS Labs' website, as permitted by the FFCRA and CARES Act. Countercl. ¶ 81. Blue KC denied payment in full or in part on a substantial majority of GS Labs' claims, inaccurately described GS Labs' rates as "facially excessive" and demanding additional, unnecessary, and voluminous documentation to support GS Labs' claims. *Id.* ¶¶ 82– 89, 92; *see also* MTD 1.

Blue KC's refusal to pay GS Labs' claims violates the FFCRA and CARES Act. Federal agency guidance interpreting the FFCRA and CARES Act (hereinafter the "FAQs") confirms that plans and issuers may not "use medical screening criteria to deny (or impose cost sharing on) a claim for COVID-19 testing" for asymptomatic patients and "cannot require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." SOAF ¶¶ 8–9. Blue KC's suggestion to the contrary is based on an earlier FAQ that does not stand for the proposition Blue KC cites. *See* MPSJ 7.[5]

---

[5]Departmental guidance does not, as Blue KC contends, provide that "tests administered on patients without symptoms of COVID-19 or exposure to another person with COVID-19 are not diagnostic and therefore, need not be reimbursed." MPSJ at 7. To support this contention, Blue KC relies on FAQs, Part 43 Q5 (June 23, 2020), which explains that insurers are not required to cover testing for "surveillance," "general workplace health and safety," and "any other purposes not primarily intended for individualized diagnosis or treatment of COVID-19." *FAQS About [FFCRA] and [CARES Act] Implementation Part 43*, U.S. DEP'T OF HEALTH & HUMAN SERVS. 6 (Q5) (June 23, 2020), https://www.cms.gov/cciio/resources/fact-sheets-and-faqs. That FAQ does not, however, define a diagnostic test, and GS Labs does not dispute that Blue KC's FFCRA and CARES Act reimbursement obligations are limited to diagnostic testing. In a later set of FAQs, the Departments clarified that in covering diagnostic tests, plans and issuers "***cannot*** require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." FAQs, Part 44 Q1 (emphasis added) (noting FAQs, Part 44, Q1 "***clarifies*** the Departments' guidance in FAQs Part 43, Q5, with respect to the testing of asymptomatic individuals with no known or suspected exposure to COVID-19" (emphasis added)). Contrary to Blue KC's assertion, FAQs, Part 44 Q1 makes clear that COVID-19 testing may be "diagnostic" even if a patient does not present symptoms or have a recent known or suspected exposure. GS Labs submits that the documentation produced to date and GS Labs'

28

On July 20, 2021, Blue KC filed this lawsuit against GS Labs in an effort to escape its obligation to pay for COVID-19 testing for Kansas and Missouri residents at the federally required rates. *See* Doc. 1. GS Labs answered on August 5, 2021, and asserted various counterclaims related to Blue KC's violations of the FFCRA and CARES Act. Doc. 4. This MPSJ followed.

## ARGUMENT AND AUTHORITIES

A moving party is entitled to summary judgment only upon a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the parties have had adequate time for discovery, a movant will be entitled to summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (quoting *Celotex*, 477 U.S. at 323–24).

The moving party bears the initial burden of showing there are no genuine issues of material fact. *Id.* It can satisfy this burden "in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." *Id.* If a moving party does not satisfy its initial burden, the nonmoving party has *no obligation to produce any additional or supporting evidence*, even if the nonmoving party has the ultimate burden of persuasion at trial. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Bedford*, 880 F.3d at 996.

Only if the party seeking summary judgment satisfies its initial burden does the burden

ongoing productions provide evidence from which a reasonable jury could conclude GS Labs' claims are diagnostic in nature and therefore reimbursable.

shift to the nonmoving party to demonstrate facts showing the presence of a genuine issue for trial. *Adickes*, 398 U.S. at 160; *Bedford*, 880 F.3d at 997. When considering motions for summary judgment, facts "must be viewed in the light most favorable to the nonmoving party." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A nonmoving party survives a summary judgment motion if the evidence, viewed in the light most favorable to the nonmoving party, is "such that a reasonable jury could return a verdict for the nonmoving party." *Stuart C. Irby Co. v. Tipton*, 796 F.3d 918, 922 (8th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Hughes v. Am. Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir. 1976) (noting "the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try" (citation omitted)).

## I.     Blue KC Has Failed to Meet Its Burden of Production Because It Fails to Show That GS Labs Lacks Sufficient Evidence to Support Its Counterclaims.

Blue KC is not entitled to summary judgment on its MPSJ because it has not shown an absence of evidence to support GS Labs' counterclaims. Further, there has not been adequate time for discovery, which is ongoing, and Blue KC provides no persuasive reason to depart from the discovery cut-off date in the First Amended Scheduling Order.

### A.     *Blue KC Does Not Point to an Absence of Evidence on an Essential Element of GS Labs' Counterclaims.*

Blue KC does not point to an absence of evidence on an essential element of GS Labs' counterclaims. Nor could it. GS Labs has produced documents and evidence from which a reasonable jury could find GS Labs is entitled to reimbursement from Blue KC under the FFCRA and CARES Act. *See* SOAF ¶¶ 13–24.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and must identify the portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Bedford*, 880 F.3d at 996 (noting

movant "must identify the portion of the record" demonstrating the absence of a genuine dispute of material fact); Fed. R. Civ. P. 56(c)(1)(A) (requiring party to cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . . admissions, interrogatory answers, or other materials").

The moving party may not satisfy its burden merely by asserting that the nonmovant lacks evidence or has "not produced any evidence" to support an essential element of its claim. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1105 (9th Cir. 2000) (requiring more than "simply . . . saying that the nonmoving party has no [] evidence"); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). ("Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."); *see also* 10A Fed. Prac. & Proc. Civ. § 2727.1, at 491–92 ("[T]he party moving for summary judgment cannot sustain its burden ... merely by asserting that the nonmovant lacks evidence to support its claim."). Rather, the burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.[6]

In *Celotex*, the movant satisfied this initial burden by directing the court to the plaintiff's interrogatory answer confirming that the plaintiff had no witnesses who could testify that her husband had been exposed to asbestos during the statutory period it was manufactured by Celotex. 477 U.S. at 320, 328. Blue KC incorrectly suggests the same result is warranted here because "to

---

[6]Justice White emphasized this same point in his concurring opinion. *Id.* at 328 (White, J., concurring) ("It is not enough to move for summary judgment . . . with a conclusory assertion that he plaintiff has no evidence to prove his case."). Justice Brennan agreed. *Id.* at 332 (Brennan, J., dissenting) ("Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment." (citation omitted)).

date" GS Labs allegedly "has been unwilling or unable" to produce documents demonstrating it is "entitled to reimbursement under FFCRA," despite Blue KC's document request for medical records and other supporting documentation and GS Labs' Rule 26(a) Disclosures identifying Blue KC patient records and claims data as documents GS Labs may use to support its claims or defenses. MPSJ 10–12; *see also id.* at 6 (alleging Blue KC's reimbursement obligation is limited to COVID-19 tests that were "actually performed" and "diagnostic"). But *Celotex* is materially distinguishable from this case because GS Labs has produced evidence from which a jury could reasonably conclude GS Labs is entitled to reimbursement under the FFCRA and CARES Act, and discovery is ongoing.

> 1.    *GS Labs has produced evidence from which a reasonably jury could find GS Labs is entitled to reimbursement from Blue KC.*

Blue KC's allegation that GS Labs has failed to produce evidence demonstrating it is entitled to reimbursement under the FFCRA is demonstrably false. GS Labs has produced substantial supporting documentation. *See* SOAF ¶¶ 13–24. Nevertheless, Blue KC contends that GS Labs' documents "to date" are insufficient to substantiate its counterclaims because those documents allegedly fail to establish that every COVID-19 testing claim submitted to Blue KC was "actually performed" and "diagnostic" in nature. MPSJ 1, 6, 12. Not so.

GS Labs has produced 17,990 medical records, including claim forms and intake and consent forms, and it is continuing to produce these documents on a rolling basis as set forth in its discovery response. SOAF ¶ 24. GS Labs has also produced 27,895 HCFA Claim Form 1500s, which comprises all of the HCFA Claim Form 1500s submitted to Blue KC since GS Labs' inception through the end of February 2022. *Id.* ¶ 15. These forms alone are sufficient evidence from which a reasonable jury could find GS Labs is entitled to reimbursement from Blue KC.

As Blue KC acknowledges, the HCFA Claim Form 1500s include claim information such

as the patient's name, date of service, and diagnostic code. MPSJ SOF ¶ 18; SOAF ¶ 16. The diagnostic codes indicate, among other things, whether the patient had "contact with and (suspected) exposure to communicable disease." SOAF ¶ 12; *see also id.* ¶ 11, ¶ 17. The HCFA Claim Form 1500s are competent evidence from which a reasonable jury could find that GS Labs is entitled to reimbursement from Blue KC under the FFCRA and CARES Act. *Bedford*, 880 F.3d at 997.

Blue KC's suggestion that GS Labs' evidence is unreliable is both misguided and insufficient to entitle it to summary judgment. *See* MPSJ 4. In an effort to undermine GS Labs' evidence, Blue KC highlights ostensible inconsistencies between the HCFA Claim Forms' diagnostic codes and the patient consent and intake forms to suggest GS Labs' evidence is inaccurate or misleading. MPSJ SOF ¶¶ 21–22 (identifying claims where the diagnostic code indicates the patient had contact with and (suspected) exposure to COVID-19, despite an indication on the consent and intake form the patient reported no contact with a COVID-19 patient), ¶ 28.[7]

Blue KC's analysis misses the mark for several reasons. First, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, *plans and issuers generally must assume* that the receipt of the test reflects an 'individualized clinical assessment' *and the test should be covered without cost sharing, prior authorization, or other medical management requirements*." SOAF ¶ 9 (emphasis added). Plans and issuers, like

---

[7]Blue KC also submits that the HCFA Claim Form 1500s are unreliable because GS Labs produced HCFA Claim Form 1500s for patients that are not identified in Exhibit A4. MPSJ SOF ¶¶ 25–26. These claims were not included in the GS Labs claims data because GS Labs did not include these claims in its accounts receivable for Blue KC. *See* GS Labs' Resp. to SOF ¶¶ 25–26. The identified claim forms were produced as requested and required by the Court on February 2, 2022. *See* Doc. 115; *see also* GS Labs' Resp. to SOF ¶¶ 25–26.

Blue KC, may not "use medical screening criteria to deny (or impose cost sharing on) a claim for COVID-19 diagnostic testing" for asymptomatic patients and "cannot require the presence of symptoms or a recent known or suspected exposure, or otherwise impose medical screening criteria on coverage of tests." *Id*. Blue KC's focus on whether patients were exposed to another individual with COVID-19 is therefore misplaced.

Second, Blue KC's analysis ignores industry guidance for coding and reporting COVID-19 testing encounters like those at issue here. Industry guidance encouraged testing centers to use "Z20" codes for COVID-19 testing encounters, given COVID-19's characterization as a global pandemic. SOAF ¶ 1, ¶¶ 11–12. This guidance stated that "codes in category Z20, Contact with and (suspected) exposure to communicable diseases, are for patients who are suspected to have been exposed to a disease by close personal contact with an infected individual ***or are in an area where a disease is epidemic***." *Id.* ¶ 12 (emphasis added); *see also Id.* ¶ 11. COVID-19's designation as a global pandemic signifies an even greater risk of spread and exposure than the risks associated with an epidemic.[8] *See id.* ¶ 1.

This guidance also specifically instructed testing centers, like GS Labs, to code COVID-19 testing encounters prior to January 1, 2021, as "Z20.828," and encounters after January 2, 2021, as "Z20.822." *Id.* ¶ 12. Thus, contrary to Blue KC's suggestion, the fact a patient may not have reported contact with a COVID-19 patient on his or her consent and intake form does not render either record unreliable. GS Labs' data is reliable and sufficient to support GS Labs' claims—

---

[8]"Merriam-Weber defines "epidemic" to mean "affecting or tending to affect a disproportionately large number of individuals within a population, community, or region at the same time." Epidemic, Merriam-Webster.com Dictionary (2022). It defines "pandemic" as "occurring over a wide geographic area (such as multiple countries or continents) and typically affecting a significant proportion of the population." Pandemic, Merriam-Webster.com Dictionary (2022).

particularly at the summary judgment stage, as it falls squarely within the materials identified in Rule 56(c) and is capable of being presented in an admissible form at trial. Fed. R. Civ. P. 56; Moore Decl. ¶¶ 9, 15, 17, 23.

Third, even if inconsistencies exist between the HCFA Claim Form 1500s and other medical records GS Labs has produced, these purported inconsistencies do not provide a valid basis for granting summary judgment. At most, they create a genuine issue of material fact, which renders summary judgment inappropriate as a matter of law.[9]

GS Labs has produced competent evidence from which a jury could reasonably conclude GS Labs is entitled to reimbursement from Blue KC under the FFCRA and CARES Act, and Blue KC offers no viable argument to the contrary.[10]

> 2. *Blue KC cannot credibly contend it has satisfied its burden to show there is an absence of evidence to support GS Labs' counterclaims.*

Unlike in *Celotex*, Blue KC does not point to any materials in the record to credibly support its contention "there is an absence of evidence to support" GS Labs' counterclaims. *Compare Celotex*, 477 U.S. at 320, 325, *with* MPSJ 10–12; *see also* Fed. R. Civ. P. 56(c)(1)(A) (stating party may support its motion by "citing to particular parts of the materials in the record, including

---

[9]As Blue KC acknowledges, GS Labs has produced other supporting information, including summary claims data and patient intake and consent forms and other medical records. Blue KC's arguments regarding the reliability of these documents are unpersuasive for substantially the same reasons as Blue KC's HCFA Claim Form arguments. *Supra* p. 33–35. Likewise, Blue KC's suggestion that GS Labs must produce evidence in a form that is admissible at trial in order to avoid summary judgment is incorrect. *Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56[] permits a property summary judgment motion to be opposed by any of the kind of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . .").

[10]GS Labs' business records and other evidence are all admissible or capable of presentment in an admissible form at trial. *See* Moore Decl. ¶¶ 9, 15, 17, 23; *see also* Fed. R. Evid. 803(6); Fed. R. Evid. 1006.

depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials").

Blue KC's repeated emphasis on GS Labs' production *to date* is telling. MPSJ 1, 10, 12. Discovery does not close until May 15, 2022, and Blue KC provides no reasonable basis to depart from this deadline, especially given GS Labs' agreement to produce the documents and evidence identified in the MPSJ. *See* SOAF ¶¶ 24–28, ¶¶ 30–31; *see also* MPSJ 11 (noting GL Labs' "agreement to produce records"). These facts materially distinguish this case from *Celotex*.

Blue KC acknowledges that in response to its document request seeking "all medical records . . . or other records or data collected or generated as a result of any Blue KC member's receipt of services from GSL," GS Labs agreed, subject to the limitations set forth in its response, to produce responsive documents on a "rolling" basis. MPSJ SOF ¶¶ 7–8; MPSJ Exhibit A3 (RFPD #4). Blue KC also highlights GS Labs' Rule 26(a) Disclosures, indicating GS Labs' intention to produce any Blue KC member patient records and claims data GS Labs may use to support its claim or defenses. MPSJ ¶ 6. Blue KC does not suggest these documents do not exist or that they are incapable of supporting GS Labs' counterclaims. It simply insists it is taking GS Labs too long to produce them. MPSJ 10–11.

Blue KC's arguments largely ignores GS Labs' document productions to date, which include the 27,895 HCFA Claim Form 1500s previously discussed, summary claims data spreadsheets,[11] and select patient intake and consent forms and other medical records. SOAF

---

[11]The summary claims data spreadsheet is based on a standard report. SOAF ¶ 12. At Blue KC's request, this report was modified to include the diagnosis code and testing site. *Id*. However, when GS Labs produced a supplemental report reflecting newly filed and correct claims, it was produced in the standard format without Blue KC's requested modifications. *Id*. ¶¶ 13–14; *see also* MPSJ SOF ¶ 17. This inadvertent oversight was corrected, and a supplemental report containing Blue KC's requested modifications was provided to Blue KC on March 29, 2022. SOAF ¶ 14.

¶¶ 13–15, ¶¶ 18–19, ¶¶ 21–24. GS Labs has produced and is continuing to produce these documents on a rolling basis, consistent with the discovery cut-off date in the Court's First Amended Scheduling Order. *See id.* ¶¶ 28–31; *see also* Doc. 116 ("Close of discovery May 15, 2022"); MPSJ SOF ¶ 11.

Blue KC nevertheless maintains GS Labs' productions are too slow. It takes particular issue with GS Labs' incomplete consent and intake form production. MPSJ ¶ 19. But, as explained in GS Labs' response to Blue KC's Request for Production, individual patient medical records must be manually requested and printed on an individual basis. MPSJ Exhibit A3 (RFPD #4); SOAF ¶¶ 24–25. Given this "time-consuming process" and the fact the FFCRA and CARES Act render these documents largely irrelevant, GS Labs objected to Blue KC's request as both overly burdensome and not proportional to the needs of the case. *Id.* Notwithstanding, GS Labs has continued to explore economical options for providing this information to Blue KC. SOAF ¶ 26.

GS Labs recently received an estimate from a reliable vendor of $20,000 to identify and compile the medical records Blue KC requests and prepare those records in a form that can be securely produced. *Id.* ¶ 27. Notwithstanding the fact that Blue KC's demand for such information is improper under the FFCRA and CARES Act,[12] and relates to highly sensitive and personal information, GS Labs has agreed to incur these disproportionate costs and produce these medical records before the close of discovery. *Id.* ¶¶ 25–28.

Blue KC's complaint that GS Labs is taking too long to produce certain documents in its possession is materially different than suggesting GS Labs "cannot present evidence to

---

[12]Notably, other Blue Cross Blue Shield entities appear to acknowledge that requesting medical records is not proper under the FFCRA and/or CARES Act, given their express limitations on the same. *See* June 8, 2021 email between Highmark, Inc. and Blue KC (inquiring into "how you [Blue KC] were able to request medical records and medical necessity concerns based on the limitations of [the FFCRA and CARES] Acts"), attached as Exhibit 2 (filed under seal).

substantiate" its counterclaims. To the extent Blue KC's true aim is to expedite the discovery process, Blue KC's MPSJ is not the proper vehicle to accomplish that goal. *See infra* § I.B; *see also Nissan Fire*, 210 F.3d at 1105 ("A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence.").

Blue KC has not carried its initial burden under Rule 56 to demonstrate the absence of a genuine dispute of material fact or that it is entitled to judgment as a matter of law. GS Labs is therefore under no obligation to come forward with additional evidence to defeat Blue KC's MPSJ, and it should be denied in its entirety.

> **B.      Blue KC's MPSJ Is Premature Because There Has Not Been Adequate Time For Discovery and Blue KC Provides No Persuasive Reason to Depart from the Discovery Cut-Off Date in the First Amended Scheduling Order.**

Blue KC's MPSJ should be denied for another reason: it is premature. As previously discussed, a party moving for summary judgment cannot satisfy its Rule 56 burden "simply by saying that the nonmoving party has no [] evidence." *Nissan Fire*, 210 F.3d at 1105; *see also Clark*, 929 F.2d at 607 ("Even after Celotex it is never enough simply to state that the non-moving party cannot meet its burden at trial."). Nor can it "use a summary judgment motion as a substitute for discovery." *Nissan Fire*, 210 F.3d at 1105.

It is only "after adequate time for discovery" that a moving party may be permitted to carry its initial burden of production by showing an absence of evidence sufficient to support the nonmoving party's claims. *Celotex*, 477 U.S. at 322; *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1105–06 ("The nonmoving party, of course, must have had sufficient time and opportunity for discovery before a moving party will be permitted to carry its initial burden of production by showing that the nonmoving party has insufficient evidence."); *see also Bedford*, 880 F.3d at 996. A moving party must have made "reasonable efforts, using the

normal tools of discovery, to discover whether the nonmoving party has enough evidence to carry its burden of persuasion at trail." *Nissan Fire*, 210 F.3d at 1105. Only after such "suitable discovery" may a moving party credibly maintain that the nonmoving party lacks evidence essential to its claims. *See id*. at 1106.

Here, there has not been adequate time for discovery. As Blue KC concedes, discovery is not scheduled to close until May 15, 2022, and GS Labs is continuing to produce responsive documents. *See* MPSJ SOF ¶¶ 8, 11; *see also* SOAF ¶¶ 30–31. To the extent Blue KC contends GS Labs' document production is deficient or untimely, this issue is not the proper subject of a MPSJ. It should be remedied via the discovery process and this Court's local rules.

A party may not "use a summary judgment motion as a substitute for discovery and it "may not require [a] nonmoving party to produce evidence supporting its claim" by filing a premature summary judgment motion, "saying that the nonmoving party has no such evidence." *Nissan Fire*, 210 F.3d at 1105. Under Local Rule 37.1, attorneys must attempt to resolve discovery disputes prior to requesting court intervention. Blue KC has not attempted to remedy the issues outlined in its MPSJ, *see* Moore Decl. ¶ 4, and this Court should decline Blue KC's invitation to short circuit the discovery process vis-à-vis a premature and meritless MPSJ.

## II. Alternatively, the Court Should Deny Blue KC's MPSJ Pursuant to Rule 56(d).

Alternatively, if the Court determines Blue KC has satisfied its initial burden under Rule 56, which GS Labs specifically denies, GS Labs respectfully requests time to complete discovery pursuant to Rule 56(d), up to and including May 15, 2022, to address the issues identified in the MPSJ. For the reasons set forth in the attached declaration, GS Labs therefore respectfully requests this Court deny Blue KC's motion as premature, or defer considering the motion until after the close of discovery on May 15, 2022. Fed. R. Civ. P. 56(d); *see also* Moore Decl. ¶¶ 24–27.

**CONCLUSION**

For the foregoing reasons, GS Labs respectfully requests the Court deny Blue KC's

Motion for Partial Summary Judgment and enter an order for such other and further relief as it

deems just and equitable.

Respectfully submitted,

HUSCH BLACKWELL LLP

/s/ *Christina B. Moore*
Jeffrey B. Jensen, #46745
Matthew Diehr, #61999
Christina B. Moore, #53917
HUSCH BLACKWELL LLP
190 Carondelet Plaza, Suite 600
St. Louis, Missouri  63105
Tel +1.314.480.1500
jeff.jensen@huschblackwell.com
matthew.diehr@huschblackwell.com
christina.moore@huschblackwell.com

David A. Maas (admitted pro hac vice)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Tel +1.206.757.8184
davidmaas@dwt.com

Adam S. Sieff (admitted pro hac vice)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Avenue, Suite 2400
Los Angeles, California 90017
Tel +1.213.633.8618
adamsieff@dwt.com
Attorneys for GS Labs, LLC


*Attorneys for GS Labs, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.


*/s/ Christina B. Moore*
Christina B. Moore